UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SPRINT COMMUNICATIONS COMPANY, L.P., | ) ) ) | CIV. 10-4110-KES |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | ORDER DENYING DEFENDANT NATIVE AMERICAN TELECOM'S MOTION FOR A PRELIMINARY INJUNCTION |
| NATIVE AMERICAN TELECOM, LLC, and CROW CREEK SIOUX TRIBAL COURT, | ) ) ) ) | |
| Defendants. | ) | |

Defendant, Native American Telecom (NAT), moves for a preliminary injunction to enjoin plaintiff, Sprint Communications Company, from withholding interstate switched access charges that NAT has already billed or will bill to Sprint in the future. Sprint resists the motion. The motion is denied.

**BACKGROUND**

Viewed in the light most favorable to Sprint, the nonmoving party, the pertinent facts to this order are as follows:

Sprint provides nationwide long-distance telephone services and is known under the telecommunications regulatory framework as an interexchange carrier (IXC). Sprint delivers long-distance calls to local exchange carriers (LECs) for termination to end-users. Under the current regulatory framework established by the Federal Communication Commission (FCC), Sprint pays the LEC a terminating access charge based on the LEC's filed tariff.

In 1997, the Crow Creek Sioux Tribe established the Crow Creek Sioux Tribal Utility Authority (Tribal Utility Authority). In October of 2008, the Tribal Utility Authority authorized NAT, a tribally owned limited liability company organized under the laws of South Dakota, to provide telecommunications service on the Crow Creek Reservation subject to the tribe's laws. Pursuant to the 2008 approval order, NAT filed two access tariffs for telephone traffic on the reservation, one with the FCC for interstate traffic and one with the Tribal Utility Authority for intrastate traffic within the reservation. In September of 2009, NAT launched its system on the Crow Creek Reservation.

NAT is an LEC that also operates a free conference calling system with a conference call bridge located on the reservation. The party using NAT's services does not pay NAT for the conference call but rather is assessed normal charges by the party's telecommunications provider. NAT then bills the telecommunications provider an access fee as defined in its tariffs. NAT's conference calling system is at issue here.

After paying two of NAT's bills for charges connected to conference calls, Sprint ceased paying NAT's terminating access tariffs because Sprint believed that NAT was involved in a traffic-pumping scheme, otherwise known as access stimulation or regulatory arbitrage, to generate traffic from conference calls.

In March of 2010, NAT filed a complaint against Sprint with the Tribal Utility Authority seeking enforcement of its access tariffs. On March 29, 2010,

the Tribal Utility Authority entered an ex parte order finding that Sprint's refusal to pay NAT's tariffs violated the "filed rate doctrine." In response, Sprint filed a complaint with the South Dakota Public Utilities Commission (SDPUC) to enjoin NAT's collection efforts with respect to interstate traffic. On July 12, 2010, NAT filed a complaint in the CCSTC to collect the unpaid access service tariffs. Sprint sought relief in this court to enjoin the CCSTC from deciding the collection action. The court granted Sprint's motion for a preliminary injunction enjoining the CCSTC.

NAT then filed a second interstate tariff with the FCC. Several IXCs, including Sprint, petitioned the FCC to reject or, in the alternative, suspend NAT's tariff pending an administrative investigation. The FCC declined to rule that the second tariff was so patently unlawful that it should be rejected, and the tariff became effective on November 30, 2010. Docket 67-6 at 1.

NAT moved for a preliminary injunction on its November 2010 tariff to require Sprint to pay NAT's bills during the pendency of this action. Sprint responded that NAT has not alleged a cause of action against Sprint and, thus, cannot seek a preliminary injunction. NAT moved to amend its counterclaim to assert claims of a breach of contract and collection action pursuant to its federal tariff, a breach of implied contract resulting from a violation of its federal tariff, and quantum meruit and unjust enrichment. NAT also seeks declaratory relief.

Docket 86-1. The court granted NAT's motion to amend its counterclaim during the March 3, 2011, hearing.

Sprint has stated that it will seek leave from the FCC to amend its complaint to add provisions challenging the unlawfulness of NAT's November 2010 tariff. After resolving various discovery disputes and reviewing two additional exhibits consisting of Thomas Reiman's deposition[1] and NAT's CABs Summary,[2] the preliminary injunction motion is ripe for review.

## DISCUSSION

Federal Rule of Civil Procedure 65(a) authorizes a court to issue a preliminary injunction. "A preliminary injunction is an extraordinary remedy,

---

[1] Before the court held a hearing on NAT's preliminary injunction motion, NAT and Sprint engaged in limited discovery pertaining to the preliminary injunction motion and hearing. Sprint sought to depose Thomas Reiman, one of NAT's co-founders. NAT objected to the deposition and moved for a protective order. The parties finished briefing the matter after the March 3, 2011, hearing. The court then ordered the parties to depose Reiman and submit the transcript to the court. Docket 106 at 11.

[2] NAT refused to answer Sprint's interrogatory number 7, which asked NAT to "[i]dentify all interexchange carriers whom NAT has invoiced under any of its tariffs, including the name of the interexchange carrier, the amounts invoiced, and the payments received, if any." Docket 92 at 2. Sprint moved to compel NAT's response to interrogatory number 7. NAT, citing Rule 26(c)(1)(G)'s protections for confidential financial information, refused to answer and the court reviewed the documents in camera. NAT produced one document entitled "NAT-Crow Creek Inception thru Current CABs A/R and Payment Summary" (CABs Summary). Docket 106 at 11. After reviewing the document, the court ordered NAT to produce the document to Sprint but issued a protective order. Docket 117. Specifics of the CABs Summary are generically discussed in this order to ensure that NAT's confidential financial information remains as confidential as possible.

and the burden of establishing the propriety of an injunction is on the movant." *Watkins Inc. v. Lewis*, 346 F.3d 841, 845 (8th Cir. 2003) (citing *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987); *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995)).

The moving party must make a familiar four-part showing before the court issues a preliminary injunction: (1) the threat of irreparable harm by the movant; (2) the balance between this harm and the injury that granting the injunction will inflict on the other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). A district court has wide latitude to issue a preliminary injunction, and the appellate court only reviews a preliminary injunction order for abuse of discretion. *Chicago Stadium Corp. v. Scallen*, 530 F.2d 204, 206 (8th Cir. 1976).

**I.      Probability of Success on the Merits**

The two most critical *Dataphase* factors are the probability that the movant will succeed on the merits and whether the movant will suffer irreparable harm if the preliminary injunction is not granted. *Scallen*, 530 F.2d at 206. Probability of the success on the merits is a critical factor in determining whether a court should issue a preliminary injunction. *Lankford v. Sherman*, 451 F.3d 496, 507 (8th Cir. 2006).

Sprint has represented that it will amend its complaint with the FCC to continue challenging the validity of NAT's November 2010 tariff. Docket 72 at 2 ("Sprint will seek leave to amend its [FCC] complaint to add provisions to its complaint challenging the unlawfulness of Tariff No. 2 . . . ."). The FCC has expertise in the federal communications realm and when a tariff's terms are disputed, the FCC should first interpret that tariff. *See, e.g.*, *Access Telecomm. v. Sw. Bell Tel. Co.*, 137 F.3d 605, 609 (8th Cir. 1998) (" '[W]here words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application,' as is the case here, the issue should first go to the appropriate administrative agency." (alteration in original) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 66 (1956))). NAT and Sprint dispute the terms of NAT's November 2010 tariff and, given the highly technical nature of telecommunications tariffs, the FCC should first determine the validity of NAT's tariff in a final ruling.

Moreover, on February 9, 2011, the FCC released a Notice of Proposed Rulemaking and Further Notice of Proposed Rulemaking (NPRM). Docket 82-2, Fed. Commc'n Comm'n, *Notice of Proposed Rulemaking & Further Notice of Proposed Rulemaking*, Feb. 9, 2011, *available at* http://www.fcc.gov/Daily_Releases/Daily_Business/2011/db0209/FCC-11-13A1.pdf. In the NPRM, the FCC stated that it recognizes the need to address traffic pumping, change the current intercarrier compensation system to reduce current incentives to engage

in regulatory arbitrage for profit, and reevaluate how companies should file tariffs on voice over internet protocol (VoIP) technology. NPRM, Docket 82-2 at 7, 38, 448-49, 494-508, 524-542. VoIP technology is one of the types of technology that NAT currently employs.

If the court ruled on the merits now, any ruling could conflict with the FCC action between Sprint and NAT and/or be contrary to the FCC's ultimate rules on tariffs for VoIP technology and free conferencing calling services. This court has stayed other telecommunications cases concerning tariffs for conference calling systems upon referral to the FCC and not decided the cases' merits. *See, e.g.*, *Splitrock Props., Inc. v. Quest Commc'ns Corp.*, No. 08-4172-KES, 2010 WL 2867126, at *13 (D.S.D. July 20, 2010) (staying a telecommunications case involving a conferencing call system and referring several issues to the FCC); *Sancom Inc. v. Sprint Commc'ns Co.*, No. 07-4107-KES, 2010 WL 936718 (D.S.D. Mar. 15, 2010) (same); *Sancom, Inc. v. Quest Commc'ns Corp.*, No. 08-4172-KES, 2010 WL 960005 (D.S.D. Mar. 12, 2010) (same); *Northern Valley Commc'ns, LLC v. Sprint Commc'ns Co.*, No. 08-1003-KES, 2010 WL 936723 (D.S.D. Mar. 15, 2010) (same); *Sancom, Inc. v. AT&T Corp.*, 696 F. Supp. 2d 1030 (D.S.D. Mar. 11, 2010) (same). There is no reason for the court to deviate from this past practice and determine the merits in this action while the above actions are awaiting determination from the FCC. Moreover, as stated below, because NAT is unable to show irreparable harm, any discussion on the merits is unnecessary.

## II. Irreparable Harm

Of the two most critical *Dataphase* factors, courts more heavily weigh the threat of irreparable harm factor: "[T]he movant's failure to sustain its burden of proving irreparable harm ends the inquiry 'and the denial of the injunctive request is warranted.'" *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991) (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987)). The key word in the irreparable harm factor is irreparable: "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (internal quotation omitted). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins*, 346 F.3d at 844 (citing *Adam-Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 299 (8th Cir. 1996); *Gelco*, 811 F.2d at 420); *see also Sampson*, 415 U.S. at 88 ("This court has stated that '[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.'" (alteration in original) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959))).

NAT need only show the possibility of harm and not actual harm. *See, e.g.*, *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations . . . and, of course, it can be utilized

even without a showing of past wrongs." (citing *Swift & Co. v. United States*, 276 U.S. 311, 326 (1928))). But NAT must "demonstrate that irreparable injury is **likely** in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 375 (2008) (emphasis in original) (citing *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983); *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 441 (1974); *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)).

Courts typically grant preliminary injunctions when the movant proves irreparable harm and the remedy is to maintain the status quo until the case's merits are resolved. *See, e.g.*, *Owens v. Severin*, 293 Fed. Appx. 425, 425 (8th Cir. 2008) (reasoning that the "purpose of [a] preliminary injunction is to preserve the status quo until the court rules on [the] merits." (citing *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994))); *Nat'l Basketball Ass'n v. Minn. Prof'l Basketball, Ltd.*, 56 F.3d 866, 871-72 (8th Cir. 1995) ("A preliminary injunction confers important rights and finally adjudicates the issue of preserving the status quo until the district court reaches the case's merits.").

Sprint argues that even if NAT could show damages, the court cannot grant a preliminary injunction because the injunction would be outside the court's equitable remedies. An injunction is an equitable remedy, *General Motors Corp. v. Harry Brown's LLC*, 563 F.3d 312, 316 (8th Cir. 2009), but NAT seeks a legal remedy of monetary damages.

9

The Supreme Court has held that a court cannot use its equitable powers to grant a preliminary injunction when the injunction only seeks a legal remedy. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999). In interpreting *Grupo*, the Eighth Circuit has reasoned that a district court cannot use its equitable power of an injunction when the underlying case is legal in nature. *Kennedy Bldg. Assocs. v. CBS Corp.*, 476 F.3d 530, 535 (8th Cir. 2007) (reasoning further that a state statute could create an equitable remedy for a legal cause of action). "The law is clear . . . that 'a dollar loss invokes the Court's legal powers, as opposed to its equitable powers.' " *Gen. Motors Corp. v. Harry Brown's, LLC*, 590 F. Supp. 2d 1134, 1138 (D. Minn. 2008), *aff'd Harry Brown's, LLC*, 563 F.3d 312 (8th Cir. 2009) (quoting *Halikas v. Univ. of Minn.*, 856 F. Supp. 1331, 1334 (D. Minn. 1994)); *see also Franklin v. Gwinnett Cnty. Public Sch.*, 503 U.S. 60, 75-76 (1992) ("[I]t is axiomatic that a court should determine the adequacy of a remedy in law before resorting to equitable relief.").

Here, the status quo is that Sprint has disputed NAT's charges since February of 2010. Docket 72 at 36. In its preliminary injunction motion, NAT seeks a monetary damage award from Sprint, which is a legal remedy. Thus, it appears that NAT's request falls outside the court's equitable powers and the court is unable to order NAT's requested remedy.

10

NAT heavily relies on *NewLife Homecare Inc. v. Express Scripts, Inc.*, No. 3:07CV761, 2007 WL 1314861 (M.D. Pa. May 4, 2007), in arguing that the court can grant a preliminary injunction for monetary damages. Notwithstanding that *Newlife* is only persuasive authority and does not address *Grupo*, the facts are also distinguishable. NewLife had a contract with an insurance company to provide prescriptions. *Id.* at *1. Express Scripts Inc. (ESI) had a contract with the insurance company to pay NewLife's bills. *Id.* NewLife submitted claims on behalf of various members of the insurance company to ESI; ESI approved the claims, but never paid NewLife. *Id.* ESI owed NewLife approximately $1.6 million. *Id.* Because ESI withheld payment, NewLife was in arrears to its pharmaceutical suppliers, could not obtain credit, and was unable to secure products to meet its clients' urgent health needs. *Id.* at *2.

The *NewLife* court reasoned "that the law requires convincing proof that a business will in fact cease to exist or be forced into bankruptcy for such an eventuality to be considered irreparable harm." *Id.* at *7. The court found that NewLife met this strict evidentiary burden because it submitted not only an affidavit from the company's treasurer and accounts manager stating that NewLife's suppliers refused to process new orders and some suppliers would begin collection attempts, but also a cash flow projection stating the specific date of when NewLife would be cash flow negative. *Id.* at *5. Finding that NewLife had "presented concrete evidence that it will in fact be forced out of business and/or

11

into bankruptcy due to the defendant's failure to release the payments," and that some threat existed that patients would be unable to obtain life-saving medications, the court granted the preliminary injunction. *Id.* at *6.

The facts of this case are distinguishable from those in *NewLife*. While ESI never disputed the terms of its contract with NewLife and the insurance company, Sprint argues that NAT's tariff is invalid, vague, and unenforceable. The *NewLife* court used its equitable power to enforce an undisputed, existing contract. This court, if it grants the preliminary injunction, would enforce NAT's tariff, the validity of which is directly disputed by Sprint. Because there is no factual similarity to *NewLife* and the case does not address *Grupo*, NAT's reliance on *NewLife* is unpersuasive.

The other cases relied on by NAT are also factually distinguishable. In *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970), the appellate court affirmed, in part, a preliminary injunction to enjoin a manufacturer from contacting a dealer's customers and to prevent termination of the dealership by the manufacturer. *Id.* at 1207-08. Sprint and NAT do not have a relationship similar to a dealership relationship that the court could enforce. In *Dorean v. Salem Inn, Inc.*, 422 U.S. 922 (1975), the Supreme Court affirmed a preliminary injunction when a city ordinance prohibited topless dancing because the ordinance violated business owners' First and Fourteenth Amendment rights and, absent the injunction, the business owners would have suffered "a

12

substantial loss of business and perhaps even bankruptcy." *Id.* at 932. NAT does not allege a deprivation of a constitutional right and, instead, only seeks a legal remedy of monetary damages.

In *Northwestern Controls v. Outboard Marine Corp.*, 317 F. Supp. 698 (D. Del. 1970), the district court denied a preliminary injunction and reasoned that "where the loss, as in the case, may be ascertained in money damages, no irreparable injury is shown and refusal to grant a preliminary injunction is proper." *Id.* at 703 (citing *Graham v. Triangle Publ'ns, Inc.*, 344 F.2d 775 (3d Cir. 1965)). *Northwestern Controls* supports the conclusion in this case because NAT's injury is only monetary. Lastly, in *Columbia Broadcasting System, Inc. v. ASCAP*, 320 F. Supp. 389 (S.D.N.Y. 1970), the court issued a preliminary injunction to put the parties back to the status quo ante under the parties' previous contract. *Id.* at 393-94. While Sprint paid two of NAT's bills in December of 2009 and January of 2010, Sprint has stated that it made the payments in error and denies that it has a contract with NAT. NAT's arguments and citations to case law are unpersuasive and the court's equitable powers do not include the grant of a preliminary injunction to remedy a legal wrong.

Even if the court could issue the remedy that NAT seeks using its equitable powers, NAT has not sustained its burden to prove that it will suffer irreparable harm if the court does not issue the preliminary injunction. NAT's CABs Summary shows that as of April 10, 2011, the date NAT compiled the

13

CABs Summary, NAT has billed ten telecommunications companies approximately $6.8 million and assessed approximately $283,000 in finance charges. NAT has received about $1.3 million in payments and, as of April 10, 2011, is owed approximately $5.8 million. NAT has billed Sprint about $782,000 and assessed about $23,000 in finance charges. Sprint has paid about $29,000 in two separate payments and currently owes NAT approximately $775,000. Of the $5.8 million that NAT is owed by ten telecommunications companies, Sprint is responsible for $775,000, or approximately 13 percent, of all payments owed to NAT.

One IXC is currently indebted to NAT for approximately $2 million and except for one payment in December of 2010, has not paid NAT's invoices since July of 2010. A second IXC is indebted to NAT for approximately $1 million and has not paid NAT since August of 2010. A third IXC is indebted to NAT for approximately $1.7 million and has not paid NAT since February of 2010.

NAT offers no reason as to why Sprint's failure to pay will cause NAT to file for bankruptcy when three other IXCs have not paid NAT in at least six months and, combined, owe NAT approximately $4.7 million. NAT has neither identified a specific amount that will keep it afloat during the pendency of this action nor offered concrete proof that an injunction against Sprint would save NAT from the alleged bankruptcy.

Moreover, Sprint ceased paying NAT's bills in February of 2010, but NAT did not bring its preliminary injunction motion until January of 2011. A significant delay in time between the filing of a preliminary injunction motion and the alleged harm weighs against a finding that irreparable harm is imminent. *See, e.g., Crow Creek Sioux Tribal Farms, Inc. v. U.S. I.R.S.*, 684 F. Supp. 2d 1152, 1158 (D.S.D. 2010) ("Also relevant, though not dispositive, to determining whether there would be irreparable harm is a party's delay in seeking injunctive relief from the Court."); *Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1202, 1221 (D. Utah 2004) ("Plaintiffs' delay in seeking an injunction undermines their argument that they will suffer irreparable harm if an injunction does not issue."); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2948.1 (1995) ("A long delay by plaintiff after learning of the threatened harm may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."). NAT waited more than six months after Sprint filed this action against NAT in August of 2010 before moving for a preliminary injunction against Sprint. NAT's delay further undermines its claim that it faces imminent bankruptcy.

NAT has not offered sufficient concrete evidence that it faces imminent bankruptcy if the court does not grant its preliminary injunction motion. Because there is no threat of irreparable harm, the court need not analyze the

possibility of success on the merits[3] or any of the other *Dataphase* factors. *See Beacon Theatres*, 359 U.S. at 506-07; *Watkins*, 346 F.3d at 844; *Adam-Mellang*, 96 F.3d at 299; *Gelco*, 811 F.2d at 420. NAT has not met its burden to show that a preliminary injunction is appropriate. Accordingly, it is

ORDERED that defendant Native American Telecom, LLC's motion for a preliminary injunction (Docket 67) is denied.

IT IS FURTHER ORDERED that Sprint's motion to strike (Docket 110) is denied as moot.

Dated May 31, 2011.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

---

[3] NAT has filed two notices of supplementary authority in support of its preliminary injunction motion, *see* Dockets 104, 105, and Sprint responded to the notices and moved to strike the supplemental authority and replace NAT's authority with Sprint's authority. *See* Docket 109, 110, 111, 112. NAT has responded to Sprint's motion to strike. Docket 114. Because the supplemental authority primarily concerns the success on the merits factor, the court will not address the supplemental authority at this time and Sprint's motion to strike is denied as moot.