UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SPRINT COMMUNICATIONS COMPANY, L.P., | ) ) ) | CIV. 10-4110-KES |
| Plaintiff, | ) ) | |
| vs. | ) ) | MEMORANDUM OPINION AND ORDER |
| NATIVE AMERICAN TELECOM, LLC, and CROW CREEK SIOUX TRIBAL COURT, | ) ) ) ) | |
| Defendants. | ) ) | |

Defendant, Native American Telecom, LLC (NAT), moves to stay this case pending action by the Federal Communications Commission (FCC) on issues relevant to this case. Docket 121. On November 28, 2011, the FCC issued a final rule concerning the services and technology at issue in this case. *Connect America Fund; A National Broadband Plan for Our Future; Establishing Just and Reasonable Rates for Local Exchange Carriers*, 76 Fed. Reg. 73830, 2011 WL 5909863 (Nov. 29, 2011) (to be codified at 47 C.F.R. pts. 0, 1, 20, 36, 51, 54, 61, 64, and 69) (final rule). After the court ordered further briefing on what impact, if any, the final rule has on this case, NAT represented to the court that its motion can be denied and that the court can issue a ruling on the case. Docket 128, 131.

Plaintiff, Sprint Communications Company, L.P., also moves to stay and for a referral of certain issues to the FCC. Docket 124. Sprint does not believe

that the final rule has any impact on this case and, thus, urges the court to determine the merits of the motions. Docket 129. Sprint also moves to strike or in the alternative disregard certain affidavits and evidence submitted by NAT. Docket 136.

NAT's motion to stay is denied as moot, Sprint's motion to stay is granted, and the court will refer three issues to the FCC for resolution. Sprint's motion to strike is denied without prejudice.

## BACKGROUND

### I.   History of the Present Case[1]

Sprint provides nationwide long-distance telephone services and is known under the telecommunications regulatory framework as an interexchange carrier (IXC). Sprint delivers long-distance calls to a local exchange carrier (LEC) for termination to end-users. Under the FCC's current regulatory framework, Sprint pays the LEC a terminating access charge based on the LEC's interstate access tariff, which is filed with the FCC.

NAT is an LEC. NAT's interstate tariff number one, filed with the FCC, became effective on September 15, 2009. NAT's second interstate tariff became effective on November 30, 2010, and canceled and replaced NAT's tariff number

---

[1] The facts in this case have been well developed through multiple docket entries and two preliminary injunction hearings where testimony was presented. See Dockets 62, 101, and 118 for a more detailed recitation of the facts.

2

one. NAT revised its tariff number two, and the revisions became effective on June 26, 2011.

NAT also operates a free conference calling system (used for conference calling, chat-lines, and similar services) in connection with Free Conferencing Corporation, which is owned by WideVoice. NAT has a conference call bridge located on the Crow Creek Sioux Reservation in South Dakota. A party using NAT's services does not pay NAT for the conference call but rather is assessed normal charges by the party's telecommunications provider. NAT then bills the telecommunications provider an access fee as defined in its interstate tariff. NAT's access charges billed to Sprint for conference calls are at issue here. NAT provides the free conference calling services via Voice over Internet Protocol (VoIP) technology. *See* Docket 14-1 at 4 ("Through the use of advanced antenna and radio technology with OFDA/OFDMA (Orthogonal Frequency Division Multiplexing), NAT delivers wireless IP (Internet Protocol) voice and data communications.").

After paying two of NAT's bills for charges connected to conference calls, Sprint ceased paying NAT's terminating access tariffs because Sprint believed that NAT was involved in a traffic-pumping scheme, otherwise known as access stimulation, to generate traffic from free conference calls and chat services.

Sprint filed suit against NAT alleging a breach of the Federal Communications Act (FCA) and a state-law unjust enrichment claim. Docket 1.

3

Sprint also sought declaratory and injunctive relief against the Crow Creek Sioux Tribal Court and its-then Chief Judge, Theresa Maule. The court granted a motion by Sprint to enjoin the Crow Creek Sioux Tribal Court from hearing this matter. Docket 62. NAT then asserted counterclaims against Sprint alleging a breach of contract and a collection action pursuant to its tariffs, a breach of implied contract resulting from a violation of its tariffs, and a quantum meruit/unjust enrichment claim. NAT also seeks declaratory relief. Docket 99.

On January 12, 2011, NAT moved for a preliminary injunction to enjoin Sprint from withholding any interstate switched access charges that NAT has billed to Sprint since March 1, 2010, and to enjoin Sprint from withholding access charges in the future. Docket 67. The court denied NAT's preliminary injunction motion. Docket 118.

## II.    Related Cases

This case is one of a number of cases pending in this court and in other courts involving a dispute between an LEC and an IXC regarding access charges associated with traffic delivered to free calling providers. In each of these cases, an LEC claims that an IXC has wrongfully refused to pay terminating access charges for services performed pursuant to the LEC's interstate tariffs and requests compensation under breach of contract, breach of implied contract, and/or unjust enrichment theories. In each case, the IXC

claims that the services provided were not covered by the applicable tariff because the LEC did not terminate the calls and the free calling providers were not end users within the meaning of the tariffs. Many of the IXCs also claim that the applicable LEC engaged in unlawful traffic pumping.

The following cases are pending in the District of South Dakota, some of which have been stayed pending referral of specific issues to the FCC :

| | |
|---|---|
| *Northern Valley v. Qwest*, Civ. 11-4052-KES | |
| *Northern Valley v. Sprint*, Civ. 11-4053-KES | |
| *Northern Valley Communications L.L.C. v. Qwest Communications Co.*, Civ. 09-1004-CBK | Stayed |
| *Splitrock Properties, Inc. v. Sprint Communications Co.*, Civ. 09-4075-KES | Stayed |
| *Northern Valley Communications, LLC v. Sprint Communications Co.*, Civ. 08-1003-KES | Stayed |
| *Splitrock Properties, Inc. v. Qwest Communications Corp.*, No. 08-4172-KES | Stayed |
| *Sancom, Inc. v. AT & T Corp.*, Civ. 08-4211-KES | Stayed |
| *Northern Valley Communications, LLC v. MCI Communications Services, Inc. d/b/a Verizon Business Services*, Civ. 07-1016-KES[2] | Stayed |
| *Sancom, Inc. v. Sprint Communications Co.*, Civ. 07-4107-KES | Stayed |
| *Sancom, Inc. v. Qwest Communications Co.*, Civ. 07-4147-KES. | Stayed |

---

[2] *Northern Valley v. MCI*, Civ. 07-1016 is consolidated with *Sancom, Inc. v. MCI Communications Services, Inc., d/b/a Verizon Business Services*, Civ. 07-4106.

Moreover, the court is aware of similar cases pending in other jurisdictions, many of which have been stayed pending referral of specific issues to the FCC. *See, e.g., Qwest Commc'ns Co. v. Tekstar Commc'ns, Inc.*, No. 10-490, 2010 WL 2772442 (D. Minn. July 12, 2010); *Tekstar Commc'ns, Inc. v. Sprint Commc'ns Co.*, No. 08-1130, 2009 WL 2155930 (D. Minn. July 14, 2009); *All. Am. Tel. Co. v. AT&T, Inc.*, No. 07-861, 2010 WL 7526933 (S.D.N.Y. Jan. 19, 2010); *see also Bluegrass Tel. Co. v. Qwest Commc'ns Co.*, No. 4:09-CV-70-M, 2010 WL 1257727 (W.D. Ky. Mar. 26, 2010) (staying case pending resolution of referrals in District of South Dakota, District of Minnesota, and Southern District of New York cases). *But see N. Cnty. Commc'ns Corp. v. Verizon Global Networks, Inc.*, 685 F. Supp. 2d 1112, 1117 (S.D. Cal. 2010) (denying motion to refer Verizon's counterclaims pursuant to primary jurisdiction doctrine).

## III.    Relevant FCC History

The FCC not only has multiple similar actions pending before it but also has taken various administrative actions concerning the services and technology at issue in this case. The *Farmers* line of cases is particularly pertinent to this action.

In *Farmers*, Farmers & Mutual Telephone Company, an LEC, and Qwest Communications Corporation, an IXC, disputed whether Qwest had to pay Farmers' billed access charges for types of services similar to those at issue here. *Qwest Commc'ns Corp. v. Farmers & Merchants Mut. Tel. Co.*, 22 FCC Rcd.

6

17973 (2007), 2007 WL 2872754 (*Farmers I*). Initially, the FCC, in addressing whether a free conferencing calling company is an end user for purposes of Farmers' tariff and, if not, whether Farmers can recover access charges from Qwest, ruled in favor of Farmers. *Id.* at 17986-88. The FCC later granted partial reconsideration based on Qwest's assertions that Farmers engaged in fraud and misrepresentations. *Qwest Commc'ns Corp. v. Farmers & Merchants Mut. Tel. Co.*, 23 FCC Rcd. 1615 (2008), 2008 WL 246393; *see also Sancom, Inc. v. AT&T Corp.*, 696 F. Supp. 2d 1030, 1034-35 (D.S.D. 2010) (discussing the *Farmers* line of cases in detail).

        In *Qwest Communications Corporation v. Farmers & Merchants Mutual. Telephone Company*, 24 FCC Rcd. 14801, 14812-13 (2009), 2009 WL 4073944 (*Farmers II*), the FCC found that the conference calling companies did not subscribe to the services offered under Farmers' tariff. Because the conference calling companies were neither "customers" nor "end users" within the meaning of Farmers' tariff, Farmers was not entitled to charge Qwest switched access charges. *Id.* Thus, the FCC found that Farmers' practice of charging Qwest access charges for the traffic from the conference calling companies was unjust and unreasonable in violation of 47 U.S.C. § 201(b). *Id.* at 14812-13. The FCC, however, declined to rule that Farmers was "precluded from receiving any compensation at all for the services it has provided to Qwest." *Id.* at 14812 n.96 (citation omitted). The FCC declined Farmers' petition for reconsideration and rejected challenges to its authority to issue *Farmers II. Qwest Commc'ns*

*Corp. v. Farmers & Merchants Mut. Tel. Co.*, 25 FCC Rcd. 3422 (2010), 2010 WL 972315 (*Farmers III*).

The Court of Appeals for the District of Columbia upheld the FCC's reasoning in *Farmers II* and *Farmers III*. *Farmers & Merchants Mut. Tel. Co. v. Fed. Commc'n Comm'n*, ___ F.3d ___, No. 10-1093, 2011 WL 6848437 (D.C. Cir. Dec. 30, 2011). In summarizing the FCC's decision in *Farmers II*, the court reasoned that "[t]he Commission found that in numerous respects, the conference calling contracts did not establish a subscriber relationship under Farmers' tariff." *Id.* at *3. For example, Farmers did not bill the conference calling companies and the companies never paid access charges to Farmers, Farmers did not expect to be paid, and the parties' relationship was not structured consistent with Farmers' tariff. *Id.* at *3. The court also rejected Farmers' argument that the FCC ignored the plain terms of its tariff that required Qwest to pay the tariffed rate regardless of whether the conference calling companies were end users. *Id.* at *4 (reasoning that "the tariff itself includes a diagram of switched access service that illustrate an end user as one of the sub-elements of that service.").

The court upheld the FCC's determination that Farmers did not provide Qwest with "switched access" pursuant to its tariff, and, thus, Farmers was unjustly and unreasonably charging Qwest pursuant to § 201(b) and § 203(c). *Id.* at *5 (citation omitted). Accordingly, the court upheld the FCC's determination that the filed rate doctrine did not apply:

8

> Although it did not decide how traffic to the conference calling companies should be classified, the Commission based its conclusion, that in the absence of an end user such traffic did not constitute switched access service under the tariff, on the controlling plain text of Farmers' tariff. The service was outside of the tariff and, as such, the filed rate doctrine could not protect Farmers from liability to Qwest.

*Id.* at *6 (internal citation omitted). The court continued to leave open the question of whether and to what extent Farmers could recover compensation from Qwest.

In February of 2011, the FCC released a "Notice of Proposed Rulemaking and Further Notice of Proposed Rulemaking." *Connect America Fund; A National Broadband Plan for Our Future; Establishing Just and Reasonable Rates for Local Exchange Carriers*, 26 FCC Rcd. 4554, 2011 WL 466775 (proposed Feb. 9, 2011). On November 29, 2011, the FCC released its final rule, which addresses "access stimulation" and "traffic pumping." The final rule sets out a two-part test for determining whether an LEC is engaged in access simulation and, if so, provides a compensation scheme. 76 Fed. Reg. at 73837. The FCC also created a transitional framework for VoIP intercarrier compensation. *Id.* at 73833. But the final rule does not state that it is retroactive, and the court will not assume that it is retroactive. *See, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law. . . . By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless

that power is conveyed by Congress in express terms." (citations omitted)).

Thus, the final rule is inapplicable to the time period before the final rule

became effective.

## DISCUSSION

"Primary jurisdiction 'is a doctrine specifically applicable to claims

properly cognizable in court that contain some issue within the special

competence of an administrative agency. It requires the court to enable a

referral to the agency, staying further proceedings so as to give the parties

reasonable opportunity to seek an administrative ruling.' " *United States v. Rice*,

605 F.3d 473, 475 (8th Cir. 2010) (quoting *Reiter v. Cooper*, 507 U.S. 258, 268

(1993)). "The doctrine 'is concerned with promoting proper relationships

between the courts and administrative agencies charged with particular

regulatory duties.' " *Id.* (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59,

63 (1956)). "Primary jurisdiction 'promotes uniformity, consistency, and the

optimal use of the agency's expertise and experience.' " *Id.* (quoting *United*

*States v. Henderson*, 416 F.3d 686, 691 (8th Cir. 2005)).

There is no fixed formula for deciding whether to apply the doctrine of

primary jurisdiction. *Access Telecomms. v. Sw. Bell Tel. Co.*, 137 F.3d 605, 608

(8th Cir. 1998) (citing *W. Pac.*, 352 U.S. at 64). Instead, the court considers

"whether the reasons for the doctrine are present and whether applying the

doctrine will aid the purposes for which the doctrine was created." *Id.* (citing

10

*United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 224 (8th Cir. 1984)).
The Eighth Circuit has identified two main reasons and purposes for the
doctrine. *Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 938 (8th Cir. 2005)
(internal quotation omitted). First, and most common, "the use of agency
expertise in cases raising issues of fact not within the conventional experience
of judges or cases requiring the exercise of administrative discretion[.]" *Id.*
(internal quotation omitted). Second, the "promotion of consistency and
uniformity within the areas of regulation[.]" *Id.* (citation omitted); *see also Rice*,
605 F.3d at 475 ("Primary jurisdiction 'promotes uniformity, consistency, and
the optimal use of the agency's expertise and experience.' " (quoting *Henderson*,
416 F.3d at 691)). "The doctrine of primary jurisdiction . . . should seldom be
invoked unless a factual question requires both expert considerations and
uniformity of resolution." *McDonnell Douglas*, 751 F.2d at 224 (quotations
omitted). When the primary jurisdiction doctrine applies, the "district court has
discretion either to [stay the case and] retain jurisdiction or, if the parties
would not be unfairly disadvantaged, to dismiss the case without prejudice."
*Access Telecomms.*, 137 F.3d at 609 (internal quotation and citation omitted,
alteration in original).

Sprint urges the court to refer four issues to the FCC: (1) "Whether NAT's
FCC Tariff No. 1 was lawful[;]" (2) "Whether NAT's FCC Tariff No. 2, as revised
effective June 26, 2011, is lawful[;]" (3) "Whether NAT is entitled to collect

interstate switched access charges it has billed to Sprint pursuant to FCC Tariff Nos. 1 and 2 for calls to numbers assigned to free conference calling services, chat rooms providers and the like[;]" and (4) "Whether NAT is unlawfully attempting to charge for switched access through the operation of an unreasonable scheme." Docket 125 at 12. Sprint further contends that it expects the court, consistent with its other referral orders, will refer an additional issue: "If the services provided by NAT do not qualify as switched access services to Free Conferencing Corporation or other free calling providers, determination of how the traffic should be classified, whether that traffic can be tariffed and whether NAT is entitled to any compensation for the services NAT provided, and if so what a reasonable rate would be for NAT's services." Docket 125 at 12.

In prior orders, this court has generally referred three issues to the FCC: (1) whether the LEC is entitled to collect interstate switched access charges it has billed to the IXC for calls to numbers assigned to free calling providers; (2) in the event the services provided by the LEC to the IXC do not qualify as switched access service under the LEC's applicable interstate access tariff, determination of the proper classification of these services, whether such services are subject to federal tariffing requirements, and whether the LEC is entitled to obtain compensation for these services; and (3) in the event that the services provided by the LEC to the IXC do not qualify as switched access

12

service under the LEC's applicable interstate access tariff, but the LEC is
otherwise entitled to compensation for these services, determination of a
reasonable rate for these services. *See, e.g., Sancom*, 696 F. Supp. 2d at 1036.[3]
The court finds that the reasons for applying the primary jurisdiction doctrine
are present and that applying the doctrine will aid the purposes for which the
doctrine was created with respect to the three issues outlined by the court.

## I.    Application of the Tariffs

All of Sprint's proposed issues concentrate on whether NAT's tariffs are
lawful and whether NAT can collect switched access fees involving calls to free
conference calling companies utilizing VoIP technology. As stated above, the
final rule, which sets out a two-part test for determining whether an LEC is
engaged in access stimulation and provides a transitional framework for
intercarrier compensation for a carrier using VoIP technology, does not appear
to be retroactive. Thus, if the court declines to refer this case to the FCC, the
court would need to interpret NAT's tariffs' terms and then determine if the

---

[3] The court has issued a number of almost-identical orders staying
similar cases pending referral to the FCC. *See, e.g., Splitrock Props., Inc. v.
Sprint Commc'ns Co.*, No. Civ. 09-4075-KES, 2010 WL 1329634 (D.S.D.
Mar. 30, 2010); *Splitrock Props., Inc. v. Qwest Commc'ns Corp.*, No. Civ. 08-
4172-KES, 2010 WL 2867126 (D.S.D. July 20, 2010); *Sancom, Inc. v. AT&T
Corp.*, 696 F. Supp. 2d 1030 (D.S.D. 2010); *Sancom Inc. v. Sprint Commc'ns Co.*,
No. Civ. 07-4107-KES, 2010 WL 936718 (D.S.D. Mar. 15, 2010); *Sancom, Inc.
v. Qwest Commc'ns Corp.*, No. Civ. 07-4147, 2010 WL 960005 (D.S.D. Mar. 12,
2010). For simplicity, the court will refer to its previous orders with a single
citation to *Sancom, Inc. v. AT&T Corp.*, 696 F. Supp. 2d 1030 (D.S.D. 2010).

court should enforce the tariffs when VoIP technology is used for the time period before the final rule became effective.

An action to enforce a tariff is properly brought before a district court. *Access Telecomms.*, 137 F.3d at 609; *see also United States v. Great N. Ry. Co.*, 337 F.2d 243, 246 (8th Cir. 1964) ("Ordinarily, the construction of a tariff is a matter of law for the Court, being no different than the construction of any other written document." (citation omitted)). But " 'where words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application,' . . . the issue should first go to the appropriate administrative agency." *Access Telecomms.*, 137 F.3d at 609 (quoting *W. Pac.*, 352 U.S. at 66). "The reason is plainly set forth: such a 'determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of [the regulated area] is indispensable, and such acquaintance is commonly to be found only in a body of experts.' " *W. Pac.*, 352 U.S. at 66 (quoting *Great N. Ry. Co. v. Merchants' Elevator Co.*, 259 U.S. 285, 291 (1922)).

If the interpretation of the tariff is straightforward, then courts do not apply the primary jurisdiction doctrine. *See, e.g.*, *GCB Commc'ns, Inc. v. U.S. S. Commc'ns, Inc.*, 650 F.3d 1257, 1264 (9th Cir. 2011) (reasoning that referral was not appropriate because "the basic compensation concept, with all of its complexity, is not before us. What is before us is the relatively easier task of

14

construing the language of the FCC orders."); and *Nat'l Commc'ns Ass'n v. AT&T Co.*, 46 F.3d 220, 223 (2d Cir. 1995) (reasoning that application of the primary jurisdiction was unnecessary because the case did "not present any issues involving intricate interpretations or applications of tariffs that might need the FCC's technical or policy expertise.").

Contrastingly, if the case requires interpretation of technical terms or specialized knowledge, then referral is appropriate under the primary jurisdiction doctrine. *See, e.g.*, *Access Telecomms.*, 137 F.3d at 609 (reasoning that referral was appropriate because the issue required the FCC to determine the reasonableness of a telecommunications practice); *see also Clark v. Time Warner Cable*, 523 F.3d 1110, 1115 (9th Cir. 2008) (reasoning that referral was proper because Congress specifically delegated responsibility to the FCC to define the type of services that were at issue in that case); *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1089 (9th Cir. 2006) (reasoning that "the interpretation of an agency order issued pursuant to the agency's congressionally granted regulatory authority falls within the agency's primary jurisdiction where the order reflects policy concerns or issues requiring uniform resolution." (citing *Serv. Storage & Transfer Co. v. Virginia*, 359 U.S. 171, 177 (1959); *Rilling v. Burlington N. R.R. Co.*, 909 F.2d 399, 401 (9th Cir. 1990)); and *In re StarNet, Inc.*, 355 F.3d 634, 639 (7th Cir. 2004) ("Instead of trying to divine how the FCC would resolve the ambiguity . . . we think it best

15

to send this matter to the Commission under the doctrine of primary

jurisdiction.").

The application of NAT's switched access tariffs to the time period before

the final rule became effective requires the interpretation of words used in a

technical sense and consideration of extrinsic evidence relating to topics within

the FCC's expertise. One of the most glaring areas in need of the FCC's

expertise is NAT's definition of "end user" in its tariffs. In *Qwest*

*Communications Co. v. Northern Valley Communications, LLC*, 26 FCC Rcd. 8332

(2011), 2011 WL 2258081 (*Northern Valley I*), the tariff of Northern Valley, a

CLEC, defined an "end user" as "any Customer of an Interstate or Foreign

Telecommunications Service that is not a carrier." *Id.* at 8335. The tariff further

provided that "an End User need not purchase any service provided by

[Northern Valley.]" *Id.* The FCC found this portion of Northern Valley's tariff

unlawful:

> The Commission has determined that a CLEC may not impose
> switched access charges pursuant to [a] tariff unless it is providing
> interstate switched exchange access services to its own end users,
> and that an entity to whom the CLEC offers free service is not an
> end user. Thus, if Northern Valley wishes to charge IXCs for
> terminating calls to entities that pay no fees, it must do so through
> a negotiated contract.

*Id.* at 8338. The FCC ordered Northern Valley to file a new tariff within ten

days. *Id.* at 8341. The FCC found Northern Valley's revised tariff unlawful.

*Northern Valley Commc'ns LLC Revisions to FCC Tariff No. 3*, 26 FCC Rcd. 9280

(2011), 2011 WL 2577786. The FCC denied Northern Valley's petition for

reconsideration. *Qwest Commc'ns Co. v. Northern Valley*, 26 FCC Rcd. 14520

(2011), 2011 WL 4600858.

Before the FCC released its order in *Northern Valley I*, NAT's tariff

number two contained some similar language defining an end user, including

that "[a]n End User need not purchase any service provided by the Company."

Docket 67-3 at 9. NAT later revised its tariff number two and provided a new

definition of end user:

> "End User" means any customer of an interstate or foreign
> telecommunications service that is not a carrier, except that a
> carrier (other than a telephone company) shall be deemed to be an
> "end user" when such carrier uses a telecommunications service
> for administrative purposes and a person or entity that offers
> telecommunications services exclusively as a reseller shall be
> deemed to be an "end user" if all resale transmissions offered by
> such reseller originates or terminates on the premises of such
> reseller.

Docket 127-1 at 9. Moreover, NAT's revised tariff number two purports to

charge free conference calling companies a fee:

> In connection with the FCC's Universal Service Orders, the
> Company will pay a percentage of its interstate retail revenues to
> support the Universal Service Fund (USF). The Company will pass-
> through the USF assessment to its End Users by assessing a
> charge applicable against all retail interstate and international
> charges, including usage and non-usage charges. This surcharge is
> in addition to standard usage charges and any applicable service
> charges and surcharges associated with the Company's service.
> The Company's Universal Service Fee factor will match the relevant
> quarterly Universal Service Contribution Factor approved by the
> FCC up to the nearest tenth of a percent.

Docket 127-1 at 49. As in *Northern Valley I,* the FCC will need to carefully parse the terms used in NAT's tariffs to determine whether the tariff applies to calls to free conference calling companies. The interpretation of Buyer and End User is a task within the FCC's unique expertise. *See, e.g.*, *AT&T Corp. v. Y'Max Commc'ns Corp.*, 226 FCC Rcd. 5742, 5747-48 (2011), 2011 WL 1361436 (interpreting "end user" when the LEC billed the IXC access charges for calls made through a MagicJack device that allows a person to make a phone call over the internet); *Sancom*, 696 F. Supp. 2d at 1038 ("The FCC is uniquely qualified to compare the terms of an agreement between an LEC and a conference calling company with the terms of a traditional agreement for the provision of tariffed access services because of the FCC's experience in the field.").

NAT's tariffs contain other technical terms and apparent ambiguities that should first be determined by the FCC. For example, NAT's tariff number two contains four different definitions of switched access services, *see* Docket 67-3 at 8, 10, 38 (providing various definitions for "switched access service"), which need to be synthesized and require technical expertise. NAT's revised tariff number two deleted "volume end user" from its definitions but still references "volume end user" in the tariff. *See* Docket 127-1 at §§ 3.1.7.4. and 7.2.2.

Additionally, NAT's tariffs alter the statutory statute of limitations for raising disputes.[4]

Moreover, NAT provides the free conference calling services via VoIP technology. It is unclear how, if at all, an LEC is to be compensated when it utilizes VoIP technology because courts have held that VoIP services are exempt from access charges pursuant to 47 U.S.C. §§ 251(b)(5), 251(g). *See, e.g.*, *PAETEC Commc'ns, Inc. v. CommPartners, LLC*, No. 08-0397, 2010 WL 1767193, at *5 (D.D.C. Feb. 18, 2010) ("There cannot be a pre-Act obligation relating to inter-carrier compensation for VoIP, because VoIP was not developed until the 1996 Act was passed. . . . Because the access charge regime is inapplicable to VoIP-originated tariff, and because a filed tariff cannot be inconsistent with the statutory framework pursuant to which it is promulgated, the filed-rate doctrine must yield in this case."); *cf. Sw. Bell Tel., L.P. v. Mo. Pub. Serv. Comm'n*, 461 F. Supp. 2d 1055, 1080 (E.D. Mo. 2006) ("Because IP-PSTN is a new service developed after the Act, there is no pre-Act compensation regime which could have governed it, and therefore § 251(g) is inapplicable."). In determining whether an LEC can recover switched access charges from an IXC when the LEC uses a non-traditional method of service, the FCC has

---

[4] The FCA establishes a two-year statute of limitations for actions. 47 U.S.C. § 415(a). NAT's revised tariff number two, however, imposes a 90-day statute of limitations. *See* Docket 127-1 at § 3.1.7.1(a) ("All bills are presumed accurate, and shall be binding on the Buyer unless written notice [of] a good faith dispute is received by the Company within 90 days[.]").

carefully reviewed the LEC's tariffs and the technology at issue to reach a resolution. *See, e.g., AT&T Corp.*, 26 FCC Rcd. at 5752-55 (carefully parsing the LEC's interstate tariff to determine how the LEC should be compensated, if at all, when it used a MagicJack device to transmit calls). Determining whether NAT's tariffed services using VoIP technology are the functional equivalent of services provided by incumbent LECs and how NAT should be compensated, if at all, for using VoIP technology, requires detailed knowledge of the types of technology at issue and how that technology fits into the FCA, a task within the FCC's expertise.

Determining how, if at all, NAT should be compensated will likely require a determination of what rate applies to access charges incurred with VoIP technology, which is solely within the FCC's expertise. *See MCI Telecomms. Corp. v. F.C.C.*, 627 F.2d 322, 334-36 (D.C. Cir. 1980) (discussing how the FCC, not the court, has the ability to determine rates for interstate telecommunications issues). NAT argues that, due to the final rule, the court can decide this case on its merits. Docket 131 at 14. But, as stated above, the final rule is likely not retroactive and, therefore, NAT's tariffs will need to be interpreted to determine whether NAT can charge Sprint access service charges. And the FCC, not the court, is more qualified to consider the meaning of different types of connections provided to different customers. *Sancom*, 696 F. Supp. 2d at 1038 (citing *Access Telecomms.*, 137 F.3d at 609).

20

Overall, the reasons for the primary jurisdiction doctrine are present in this case so that applying the doctrine will aid the purposes for which it was created. The court has considered the added expense and delay that may result from the primary jurisdiction referral, but it finds that the need for expert consideration, uniformity, and consistency within this complicated, technical, and dynamic field compels referral of specific issues to the FCC. Thus, as in the other multiple cases that this court has referred, *see, e.g.*, *Sancom*, 696 F. Supp. 2d at 1043, the court will refer the interpretation of NAT's tariffs to the FCC.

Sprint's first two proposed issues for referral, whether NAT's tariffs are lawful, are too broad. By combining all four of Sprint's proposed issues and referring back to the court's previously-referred issues,[5] the court believes the following issue summarizes Sprint's concerns, will assist the court in determining the merits of this action after the FCC completes its analysis, and maintains consistency between this action and the numerous other similar actions pending before the court: Whether, under the facts of the present dispute between NAT and Sprint, NAT is entitled to collect interstate switched access charges it has billed to Sprint using VoIP technology pursuant to NAT's

---

[5] *See, e.g.*, *Sancom*, 696 F. Supp. 2d at 1043 (referring the issue of "[w]hether, under the facts of the present dispute between Sancom and AT&T, Sancom is entitled to collect interstate switched access charges it has billed to AT & T pursuant to Sancom's interstate access tariff for calls to numbers assigned to free calling providers.").

interstate access tariff number one, interstate access tariff number two, or revised interstate tariff number two for calls to numbers assigned to free calling providers.

## II.    Classification of Services

Sprint does not specifically request that the court refer the issue of how NAT's services are to be classified if they are not switched access services, but anticipates that the court will refer a similar issue to the FCC in the event that the FCC determines that NAT's services are not switched access services. *See* Docket 125 at 12. The court has referred similar issues to the FCC, *see, e.g*, *Sancom*, 696 F. Supp. 2d at 1043 (referring a similar issue to the FCC), and has referred issues pursuant to the primary jurisdiction doctrine absent a request by a party.[6]

As noted by various courts, "[t]his area of telecommunication regulation is in dynamic flux . . . [so] these issues . . . are ripe for determination and clarification by the regulatory agency." *All. Am. Tel.*, 2010 WL 7526933, at *1; *see also Sancom*, 696 F. Supp. 2d at 1043 (same); *Bluegrass Tel.*, 2010 WL

---

[6] "The primary jurisdiction doctrine should be applied when the reasons for the doctrine are present even if the parties have not raised the issue." *Splitrock Props.*, 2010 WL 2867126, at *4 (D.S.D. July 20, 2010). This is because "the doctrine exists for the proper distribution of power between judicial and administrative bodies and not for the convenience of the parties." *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988).

1257727, at *2 (same); *see also Allnet Commc'n Serv., Inc. v. Nat'l Exchange Carrier Ass'n*, 965 F.2d 1118, 1121 (D.C. Cir. 1992) (reasoning that the FCC is in the better position to resolve conflicting policies in the telecommunications arena). The area is even more in flux after the FCC announced its final rule but did not provide analysis on how, if at all, a CLEC should be compensated for the services at issue here for the time period before the final rule became effective. Because the FCC's input on the tariff application, classification of services, the use of VoIP technology, and reasonable rate issues may inform the court's analysis of this case going forward, the court will refer the following issue to the FCC: If the services provided by NAT do not qualify as switched access services to Free Conferencing Corporation or other free calling providers, determination of how the traffic should be classified, whether that traffic can be tariffed and whether NAT is entitled to any compensation for the services NAT provided, and if so, what a reasonable rate would be for NAT's services.

Moreover, because the FCC, not the court, determines the rate for telecommunication services, the FCC should determine what rate applies to services provided by NAT if the services are not switched access services. Thus, as in other cases, the court will refer an issue about rate making to the FCC: In the event that the services provided by NAT to Sprint do not qualify as switched access services under NAT's applicable interstate access tariff, but NAT is otherwise entitled to compensation for these services, determination of a

reasonable rate for these services. *See, e.g.*, *Sancom*, 696 F. Supp. 2d at 1043 (referring a similar issue to the FCC).

## III.  Motion to Strike

Sprint moves to strike certain evidence submitted by NAT, including Carey Roesel's affidavit (Docket 131-1), Scott Swier's affidavit (Docket 131-2), and Exhibits 1 and 2 (Dockets 131-3, 131-4), or in the alternative disregard this information in resolving the pending motions. Because the court resolved the motion to stay and refer solely on the legal issues presented, the affidavits and accompanying exhibits are irrelevant to the resolution of the pending motions. Thus, Sprint's motion to strike is denied without prejudice. If the affidavits become relevant after the FCC has made its final determination on referral, Sprint may again move to strike the affidavits and accompanying exhibits.

**CONCLUSION**

While NAT originally moved to stay this action pending action by the FCC, NAT urges the court to deny its motion to stay because NAT believes that the final rule is clear and the court can determine the merits of the case. NAT's motion to stay is denied as moot. Sprint moves to stay and refer specific issues to the FCC. Sprint's motion to stay and refer is granted. Sprint also moves to strike or in the alternative disregard certain affidavits and accompanying evidence submitted by NAT. Because that evidence is unnecessary for the court

to determine the motion to stay, Sprint's motion to strike is denied without prejudice. Accordingly, it is

ORDERED that defendant's motion to stay (Docket 121) is denied as moot.

IT IS FURTHER ORDERED that plaintiff's motion to stay and refer (Docket 124) is granted.

IT IS FURTHER ORDERED that plaintiff's motion to strike (Docket 136) is denied without prejudice.

IT IS FURTHER ORDERED that this matter is referred to the FCC for resolution, to the extent the FCC's jurisdiction permits, of the following issues:

(1)     Whether, under the facts of the present dispute between NAT and Sprint, NAT is entitled to collect interstate switched access charges it has billed to Sprint using VoIP technology pursuant to NAT's interstate access tariff number one, interstate access tariff number two, or revised interstate tariff number two for calls to numbers assigned to free calling providers.

(2)     If the services provided by NAT do not qualify as switched access services to Free Conferencing Corporation or other free calling providers, determination of how the traffic should be classified, whether that traffic can be tariffed and whether NAT is entitled to any compensation for the services NAT provided, and if so, what a reasonable rate would be for NAT's services.

(3)     In the event that the services provided by NAT to Sprint do not qualify as switched access services under NAT's applicable interstate access tariff, but NAT is otherwise entitled to compensation for these services, determination of a reasonable rate for these services.

25

IT IS FURTHER ORDERED that Sprint will contact the Market Disputes Resolution Division of the FCC to obtain guidance regarding the appropriate method for bringing this matter before the FCC. Sprint will initiate proceedings as recommended by the Market Disputes Resolution Division within 30 days of the date of this order. Sprint is directed to furnish the FCC with a copy of this order as part of its submission.

IT IS FURTHER ORDERED that the parties will submit a joint report to the court every three months describing the status of the proceeding before the FCC, the first of which will be filed no later than three months from the date of this order.

Dated February 22, 2012.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE