UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SPRINT COMMUNICATIONS COMPANY L.P., <br><br> Plaintiff, <br><br> vs. <br><br> NATIVE AMERICAN TELECOM, LLC., B. J. JONES, in his capacity as Special Judge of Tribal Court; and CROW CREEK SIOUX TRIBAL COURT, <br><br> Defendants. | 4:10-CV-04110-KES <br><br> ORDER ON: <br><br> SPRINT'S MOTION TO COMPEL DOCKET NO. 183; SPRINT'S MOTION FOR LIMITED DISCOVERY DOCKET NO. 199; & NATIVE AMERICAN TELECOM, LLC'S MOTION FOR RULE 26(F) CONFERENCE DOCKET NO. 201 |

## INTRODUCTION

This matter is before the court on the complaint of plaintiff Sprint Communications Company L.P. ("Sprint"). See Docket No. 1. Sprint invokes this court's federal question, diversity, and supplemental jurisdiction. Id.; see 28 U.S.C. §§ 1331, 1332, and 1367. Sprint has filed a motion to compel [Docket No. 183] and a motion for leave to take limited discovery [Docket No. 199]. Defendant Native American Telecom, LLC ("NAT") has filed a motion directing Sprint to complete the parties' planning conference under Fed. R. Civ. P. 26(f) and for a scheduling order [Docket No. 201]. All three of these motions were referred to this magistrate judge for determination pursuant to 28 U.S.C. § 636(b)(1)(A) and the October 16, 2014, standing order issued by the Honorable Karen E. Schreier. See Docket No. 204.

## FACTS

**A.    Initial Pleadings**

This four-year old case has been much-litigated.  The facts, including the procedural history of this case, are as follows.

Sprint is a nationwide long-distance carrier known in telecommunications lingo as an "interexchange carrier (IXC).  NAT is a "local exchange carrier" (LEC).  LECs usually own the "real estate" in telecommunications:  the facilities that connect to users' telephones within the LEC.  One of the things LECs do is provide switched access services to IXCs, which allow IXCs to transmit long-distance phone calls to customers in the LEC's area, even though the IXC does not own or lease the facilities that connect to the customers' telephones.  When a call begins in the LEC and travels out of the LEC's area, the LEC charges an origination access fee to the IXC; when a call begins elsewhere and ends in the LEC's area, the LEC charges the IXC a termination access fee.

The Federal Communications Commission (FCC) establishes rules for the rates that LECs can charge IXCs for these services.  These rates are based on tariffs filed with the FCC for interstate services and with the South Dakota Public Utilities Commission (SDPUC) for intrastate services.  These fees for switched access services can be thought of as "rent":  a fee paid by the IXC (here, Sprint) to the LEC (here, NAT) for the temporary use of the LEC's property—the facilities used to connect to customers' telephones—for purposes of connecting the IXC's customer to a customer within the LEC.

Where a telephone call originates and terminates within the LEC's area, no fees to an IXC are generated because the LEC handles the call from start to finish.  It is only where the call originates from outside the LEC and terminates within the LEC (or vice versa) that the LEC is allowed to charge a switched access fee to the IXC.  Enter the concept of "traffic pumping."

Traffic pumping occurs when an LEC artificially increases its long-distance telephone call volume by partnering with a service that purports to offer free (or nearly free) calling services.  Usually, the free calling service is located outside the LEC, but it obtains a telephone number within the LEC.  Then, when calls are placed to the calling service, they are routed through the LEC, often terminating in a place other than the LEC.  Thus, sometimes the call neither originates in the LEC nor terminates there, but it "pumps" the LEC's long distance traffic, allowing the LEC to charge IXCs switched access fees.  Traffic pumping schemes often involve an agreement between the LEC and the free calling service to share the switched access fees generated paid by the IXC.

NAT filed a tariff before the FCC on September 14, 2009.  However, it never completed the process of filing a tariff before the SDPUC.  Instead, NAT proceeded under a tariff it filed with the Crow Creek Sioux Tribal Authority.

Sprint accuses NAT of traffic pumping.  NAT operates a free conference calling system with partner Free Conferencing Corporation, which is owned by WideVoice.  NAT owns a conference call bridge in its LEC, on a South Dakota Indian Reservation.  When a party uses NAT's conferencing system, it does not

3

pay NAT for the call but instead is charged by the party's IXC.  NAT then bills the IXC a switched access fee pursuant to its tariff.  Sprint has been the recipient of bills from NAT for these charges.  Sprint alleges beginning in December 2009, NAT began invoicing Sprint for switched access fees that were the result of traffic pumping.  Sprint initiated an action before the SDPUC to stop the traffic pumping, but NAT refused to acknowledge SDPUC's jurisdiction over it.  NAT then sued Sprint in Crow Creek Tribal Court, seeking punitive damages against Sprint.  Sprint ultimately brought this action in this court.

NAT filed a motion to stay these federal court proceedings in order to allow the tribal court to determine, in the first instance, whether it had jurisdiction over NAT's lawsuit against Sprint there.  See Docket No. 14.  Sprint then moved for a preliminary injunction, seeking to enjoin the tribal action from going forward.  See Docket No. 20.  The court granted Sprint's motion and enjoined the tribal action and denied NAT's motion to stay, holding that actions on federal tariffs were required to be determined in federal court.  See Docket No. 62.

NAT then filed its own motion for a preliminary injunction, asking the court to order Sprint to pay all switched access charges from March 1, 2010, forward.  See Docket No. 67.  Before that motion had been decided, NAT also filed a motion to amend its answer to Sprint's complaint so that it could assert counterclaims against Sprint for nonpayment of the switched access charges. See Docket No. 86.

4

The parties held a telephonic planning conference pursuant to FED. R. CIV. P. 26(f) on January 26, 2011.  See Docket No. 88.  At that conference, the parties agreed to expedited discovery relevant to NAT's pending preliminary injunction motion.  Id.  The report of the meeting indicated that the parties would reconvene their Rule 26(f) meeting to address plans for additional discovery if the court's ruling on NAT's motion made further discovery necessary.  Id. at p. 3.

NAT then filed a motion for a protective order, seeking to prevent Sprint from deposing Thomas Reiman as NAT indicated that it did not intend to call Reiman as a witness at its preliminary injunction hearing.  See Docket No. 89.  Sprint, in turn, filed a motion to compel NAT to respond to a written interrogatory.  See Docket No. 92.

A hearing was held on NAT's preliminary injunction hearing on March 3, 2011.  See Docket No. 97.  The court took the matter under advisement at the conclusion of the hearing.  NAT's motion to amend its answer was orally granted at the hearing.  Id.

The court later granted in part Sprint's motion to compel.  See Docket No. 117.  The court denied NAT's motion to avoid Reiman's deposition.  See Docket No. 106.  Still later, the court denied NAT's motion for preliminary injunction after receiving and taking into consideration a transcript of Reiman's deposition.  See Docket No. 118.  In responding to NAT's motion, Sprint indicated that it was going to amend a complaint it currently had pending before the FCC to include a request that the FCC determine the validity of

NAT's tribally-filed tariff.  Id.  The court found it appropriate that the FCC determine, in the first instance, the validity of NAT's tariff because of the highly technical nature of telecommunications tariffs and the FCC's expertise in this area.  Id.  In addition, the FCC had recently issued a notice of proposed rulemaking to address the issue of traffic pumping and the court did not want to issue a ruling that might conflict with that later-promulgated rule.  Id.

NAT then moved to stay the proceeding pending a decision by the FCC. See Docket No. 121.  Sprint filed its own motion also asking for a stay; in addition, Sprint asked the court to refer five issues to the FCC, to include the validity of NAT's tariffs.  See Docket No. 124.  In the interim, the FCC issued its final rule and both parties agreed that the rule had no impact on this case. See Docket No. 141.  On February 22, 2012, the court granted Sprint's motion to stay and to refer the five issues to the FCC.  Id.

**B.     The FCC's CAF Order**

On October 27, 2011, the FCC issued a Report and Order and Further Notice of Rulemaking in the matter entitled In re Connect America Fund, FCC 11-161 ("CAF Order").  See Docket No. 191-1 at pp. 6-28.[1]  In this document, the FCC addresses the issue of traffic pumping, which it called "access stimulation."  Id.  The report first noted the crucial importance of wide-spread availability of fixed and mobile broadband to this country's economic growth, global competitiveness, civil life, and education.  Id. at ¶¶ 1-5.  The report

---

[1] The document filed is an excerpt of the FCC opinion only.  The actual opinion is 938 pages on Westlaw when one attempts to print the opinion out in dual-column format.

noted that currently, many Americans do not have access to modern broadband networks, especially in rural and isolated areas.  Id.  The purpose of the opinion was to ensure the extension of broadband access to those populations where "private sector economics still do not add up, and therefore the immediate prospect for" such citizens to receive mobile broadband service via "stand-alone private sector action is limited."  Id. at ¶ 5.  The Commission therefore proposed a "gradual reduction of intercarrier charges and [eventual] movement to a bill-and-keep methodology" in order to "promote the nation's transition to IP networks."  Id.

The Commission then described the process of traffic pumping, or "access stimulation," which is consistent with the above description provided herein.  Id. at ¶ 656.  The Commission noted that the arrangement was unfair in that it resulted "in a jump in revenues and thus inflated profits" for the LECs who employ the practice, thus making the "LEC's interstate switched access rates unjust and unreasonable" under the Telecommunications Act, 47 U.S.C. § 201(b), which requires reasonable rates to be charged to common carriers.  Id. at ¶ 657.  This established a need to reform the practice of access stimulation, which the Commission estimated had cost IXCs over $2.3 billion in the five years preceding the opinion.  Id. at ¶¶ 662, 664.  The practice had spawned a multitude of disputes in a variety of forums and was harmful to competition.  Id. at ¶¶ 664-65.

The Commission addressed this unfairness by first adopting a definition of "access stimulation" that included two conditions.  Id. at ¶ 657.  If an LEC

7

meets both of those conditions, the LEC is generally required to reduce its switched access tariff rates to "the rates of the price cap LEC in the state with the lowest rates." Id. ¶¶ 657, 688-89.  In this way, the Commission held that the extent to which "IXC customers that do not use the stimulating services would be forced to subsidize the customers that do use the services" would be reduced. Id. at ¶ 657.

The definition of "access stimulation" was (1) a revenue sharing condition [between the LEC and the free calling service] and (2) the LEC has experienced an increase in traffic volume by either (a) having a 3-1 ratio of interstate terminating-to-originating traffic ratio in a calendar month; or (b) has had more than a 100 percent growth in interstate originating and/or terminating switched access MOU in a month compared to the same month in the preceding year. Id. at ¶ 658.

A "revenue sharing" agreement exists when a rate-of-return LEC or a competitive LEC has an agreement with another party under which the LEC makes payments *to* the other party based on the billing or collection of switched access fees to an IXC or wireless carrier. Id. at ¶ 669.  The agreement can be express, implied, written, or oral. Id.  The form of the payment from the LEC to the other party can be in the form of a monetary payment, discount, credit, service, feature, function, or any other item of value. Id.  The other party can be an affiliate of the LEC. Id. at ¶¶ 669, 674.

The Commission envisioned that IXCs would be able to police the activities of LECs by monitoring the IXC's own traffic records to keep track of

8

when or if a LEC exceeded either of the traffic measures described in the
second condition above.  Id. at ¶ 659.  At that time, the IXC would then be
allowed to file a complaint with the Commission making an initial showing that
the second condition was met, which creates a rebuttable presumption of
revenue-sharing.  Id. at ¶¶ 659, 699. The burden would then shift to the LEC
to show that it had not met either prong of the definition of access stimulation
and was not, therefore, in violation of FCC rules.  Id.  The Commission held
that this process would "help the Commission identify circumstances where a
LEC may be in violation of [its] rules."  Id. at ¶ 659.

The Commission stated that if an LEC meets the definition of access
stimulation, the LEC need not file an amended tariff if its tariff rates are
already below the benchmark rate.  Id. at ¶¶ 679, 691.

## C.      Resumption of This Litigation

On July 23, 2014, the court lifted the stay it previously issued, withdrew
the issues that had been referred to the FCC, granted Sprint until August 10 to
amend its complaint, and granted NAT until September 10 to amend its
counterclaim.  See Docket No. 168.  The court set a deadline of October 1,
2014, for filing motions to dismiss.  Id.  The telephonic hearing which formed
the basis for the court's rulings indicated that the claims and issues framed by
the parties in their complaint and counter claims mayno longer be cogent after
certain interim rulings by the FCC.  See Docket No. 169.

Also, the parties had pursued proceedings before the SDPUC, including
discovery, that may have negated certain issues with regard to NAT's original

9

tariffs.  Id.  Accordingly, the court proposed to allow both parties to amend their pleadings and, if the parties wanted to file a motion to dismiss based on statute of limitations issues as to the original tariffs, the court indicated it would rule on that motion.  Id.  Thereafter, the court stated that it could refer additional issues to the FCC.  Id. at pp. 12-13.

In the wake of this ruling, Sprint declined to amend its complaint.  NAT did, however, amend its counterclaim.  See Docket No. 172.  In that amended counterclaim, NAT alleges that the issue of traffic pumping was thoroughly investigated by the FCC and the FCC issued the CAF Order, declining to hold that the practice was illegal per se.  Id.  Instead, NAT alleges that the FCC promulgated a definition which, if met, requires a LEC to "benchmark its tariffed access rates to the rates of the price cap LEC with the lowest interstate switched access rates in the state."  Id.  In addition, NAT argues that Sprint exhaustively litigated its traffic pumping claim in proceedings before the SDPUC, which held that NAT's practices were not illegal.  Id.  NAT alleges that a long-time Sprint employee testified at the SDPUC proceedings that NAT was at all times in compliance with all applicable laws and regulations.  Id.  NAT argues that the doctrine of collateral estoppel prevents Sprint from continuing to urge its traffic pumping claim and that the claim is now moot.  Id.  NAT asserts claims of breach of contract and breach of an implied contract against Sprint for unpaid switched access fees, and also a claim for unjust enrichment.  Id.  NAT seeks a declaration from the court as to the rights and duties of the parties and a ruling on its collateral estoppel argument.  Id.  Finally, NAT

asserts a claim for abuse of process against Sprint, alleging that this and other actions brought by Sprint were not based on legitimate concerns about traffic pumping, but were instead an improper attempt to cut costs and delay required payments to LECs.  Id.

On October 1, Sprint filed a motion for summary judgment on NAT's counterclaims one and two, alleging that NAT had failed to follow regulatory procedures to amend its tariffs in accord with the FCC's CAF Order.  See Docket No. 176, 178.

On the same day, Sprint filed a motion pursuant to FED. R. CIV. P. 12(b)(6) to dismiss that portion of NAT's contract and implied contract claims seeking damages for invoices filed for August 11, 2012 and due by September 10, 2012.  See Docket No. 181.  Sprint also moves the court to dismiss in its entirety NAT's collateral estoppel claim because the issues for which estoppel is urged are either irrelevant to the issues in this case or were not decided adversely to Sprint by the SDPUC.  Id.  Finally, Sprint moves to dismiss the abuse of process claims on the grounds that NAT has not pleaded a plausible claim.  Id.

**D.    Currently Pending Discovery Motions**

That brings us to the three pending motions referred.  On October 10, Sprint moved to compel NAT to respond to Sprint's Request for Admission No. 1, to which NAT objected.  See Docket No. 183.  At first NAT objected to the request and neither admitted nor denied it.  See Docket No. 191.  One of NAT's objections was that the request was a compound, complex question that

embraced multiple assertions of fact and erroneous legal assumptions.  Id.
After a failed effort by the parties to attempt to resolve the discovery dispute,
including a refusal by Sprint to break the request down into multiple requests
to admit, each containing a single assertion of fact, NAT filed a supplemental
response that denied the request.  Id.  See also Docket No. 191-1 at pp. 75-79.
NAT also objects to the relevancy of the request.  See Docket No. 191.

The gist of Sprint's request to admit is that it wants NAT to admit that
the conference bridge it hosts terminates in Internet Protocol ("IP"), thereby
rendering the calls Voice over Internet Protocol (VoIP) traffic under the FCC's
rules.

Sprint's Request to Admit No. 1 reads as follows:

Attached as Exhibit A are diagrams provided by NAT to Sprint on
November 7, 2013.  Each diagram shows a blue arrow, from a
Router or a switch to "NAT Voice Application Services."  Per the
legend, a blue arrow represents a "Voice over IP connection."
Admit that, as reflected in the diagrams, all calls into Free
Conferencing bridge(s) have been "delivered to the bridge(s) in
Internet Protocol."

See Docket No. 191-1 at p. 75.

NAT's original response to this request, and its supplemental response,
goes on for four pages, largely articulating one objection after another.  See id.
at pp. 75-79.  At the end, NAT states, "Subject to these objections, and
assuming the phrase "bridge(s) in Internet Protocol" refers to "IP format" within
the meaning of the applicable regulations cited above, NAT denies that its
telecommunications traffic terminates in IP format."  Id. at p. 79.  Whether

telecommunications traffic terminates in IP format is apparently key to certain FCC regulations.  See e.g. 47 C.F.R. § 51.913.

Sprint asserts that NAT's response is improper.  It asks the court to either deem the request to be admitted or, in the alternative, to allow the parties to engage in limited discovery as to the issue of whether NAT's telecommunications traffic relative to its bridge(s) terminates in IP format.  See Docket No. 183 and 199.  Specifically, Sprint requests that it be allowed to take a deposition of NAT pursuant to Fed. R. Civ. P. 30(b)(6) in order to inquire about (1) Call Flow Documents produced by NAT in the proceedings before the SDPUC (which were appended to the request to admit as exhibits) and (2) the way calls were delivered by NAT into the bridge(s) of Free Conferencing Corporation.  See Docket No. 199.

NAT generally resists Sprint's request for limited discovery.  See Docket No. 202.  Instead, NAT argues that the court should require the parties to hold a planning conference pursuant to Fed. R. Civ. P. 26(f) and, thereafter, issue a general scheduling order, allowing full discovery.  Id.  See also Docket No. 174. NAT argues that Sprint is improperly trying to relitigate issues it has already litigated before the SDPUC and lost.  Id.  NAT argues that the CAF Order found revenue-sharing and traffic pumping to be legal, thus "mooting" Sprint's claims.  Id.  Furthermore, NAT argues that the court should not refer this matter again to the FCC because all technical matters involved in the case have been resolved and the expertise of the FCC is no longer needed.  Id.

13

Sprint responds that the only issue within the SDPUC's jurisdiction, and therefore, the only issue decided by the SDPUC was the issue of intrastate access charges.  Only the FCC has jurisdiction over interstate access charges.  The charges at issue in Sprint's complaint are, Sprint maintains, interstate charges over which the SDPUC had no jurisdiction to decide.  See Docket No. 207.

## DISCUSSION

### A.    Meet and Confer Requirement

Rule 37(a)(1) requires the parties to meet and confer to attempt to resolve discovery disputes prior to filing a motion to compel.  See FED. R. CIV. P. 37(a)(1).  In addition, this court's local rules impose a similar requirement.  See DSD LR 37.1.  The record reflects that the parties' counsel met either in person or telephonically and discussed this discovery dispute, and that they also exchanged emails regarding it, to no avail.  See e.g. Docket No. 185, 185-3. The court finds that this requirement is satisfied.

### B.    Sprint and NAT's Motions

The court begins with the first motion, Sprint's motion to compel at Docket No. 183, and the law applicable to requests for admission.  Those requests are governed by Rule 36, which states in pertinent part as follows:

> (1) **Scope**.  A party may serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to:

14

> (A) facts, the application of law to fact, or opinions about
>   either; and
> (B) the genuineness of any described documents.
>
> * * *
>
> (4) **Answer**.  If a matter is not admitted, the answer must
> specifically deny it or state in detail why the answering party
> cannot truthfully admit or deny it.  A denial must fairly respond to
> the substance of the matter; and when good faith requires that a
> party qualify an answer or deny only a part of a matter, the answer
> must specify the part admitted and qualify or deny the rest.  The
> answering party may assert lack of knowledge or information as a
> reason for failing to admit or deny only if the party states that it
> has made reasonable inquiry and that the information it knows or
> can readily obtain is insufficient to enable it to admit or deny.
> (5) **Objections**.  The grounds for objecting to a request must be
> stated.  A party must not object solely on the ground that the
> request presents a genuine issue for trial.
> (6) **Motion Regarding the Sufficiency of an Answer or
> Objection**.  The requesting party may move to determine the
> sufficiency of an answer or objection.  Unless the court finds an
> objection justified, it must order that an answer be served.  On
> finding that an answer does not comply with this rule, the court
> may order either that the matter is deemed admitted or that an
> amended answer be served.  The court may defer its final decision
> until a pretrial conference or a specified time before trial.  Rule
> 37(a)(5) applies to an award of expenses.

See FED. R. CIV. P. 36(a).


Rule 37 addresses sanctions associated with requests to admit:

> If a party fails to admit what is requested under Rule 36 and if the
> requesting party later proves a document to be genuine or the
> matter true, the requesting party may move that the party who
> failed to admit pay the reasonable expenses, including attorney's
> fees, incurred in making that proof.  The court must so order
> unless:
>> (A) the request was held objectionable under Rule 36(a);
>> (B) the admission sought was of no substantial importance;
>> (C) the party failing to admit had a reasonable ground to
>>   believe that it might prevail on the matter; or
>> (D) there was other good reason for the failure to admit.

See FED. R. CIV. P. 37(c)(2).

15

Requests to admit require a party to make reasonable inquiry to obtain any information which the party has or can readily obtain in order to admit or deny the request.  See FED. R. CIV. P. 36(a)(4).  The purpose of requests to admit pursuant to Rule 36 are to save parties from having to expend time and money proving facts which are readily ascertainable by the other party and not reasonably capable of dispute.  Johnson Internat'l Co. v. Jackson Nat'l Life Ins. Co., 812 F. Supp. 966, 987-88 (D. Neb. 1993), aff'd in part and remanded on other grounds, 19 F.3d 431 (8th Cir. 1994).  If a party unreasonably fails to admit a matter after being requested to do so, possible sanctions include the costs (including attorney's fees) of the party that served the request to admit in marshaling the evidence necessary to prove the matter.  Id.  See also FED. R. CIV. P. 37(c)(2).  Sanctions can be assessed against not only the party, but his, her, or its attorney as well.  Johnson Internat'l Co., 19 F.3d at 438-49.

Here, NAT was right to object to the request propounded by Sprint.  The request is so compound and complex, it is not clear in the end what is being admitted if one responds "admit."  For example, several diagrams were submitted with the request.  See Docket No. 185-4.  Each document should have been the subject of a separate request to admit that the document is genuine and originated with NAT.  Further requests could have asked NAT to admit what an individual feature on a single exhibit meant (e.g. the blue arrows).  Further requests could have asked NAT to admit a conclusion as to what each exhibit showed (e.g. that the calls depicted ended in IP format).  Jumbled together as all these various elements were, Sprint's request to admit

16

did not comply with Rule 36's requirement that a request to admit be directed to a fact, the application of law to fact, an opinion about either, or the genuineness of any described document.  See FED. R. CIV. P. 36(a)(1).  The court will not grant Sprint's motion to compel.  The court notes that, at the meet and confer, the problem of the compound nature of the request was explained to Sprint's counsel by NAT's counsel and Sprint had an opportunity—which it chose not to act on—to serve NAT with revised requests to admit.

As an alternative to granting Sprint's motion to compel, Sprint asks for permission to conduct a Rule 30(b)(6) deposition of NAT to inquire surgically about two issues:  (1) Call Flow Documents produced by NAT in the proceedings before the SDPUC (which were appended to the request to admit as exhibits) and (2) the way calls were delivered by NAT into the bridge(s) of Free Conferencing Corporation.

NAT resists Sprint's surgical approach to discovery and asks for a full-blown Rule 26(f) meeting and for the district court to issue a Rule 16 scheduling order thereafter addressing all deadlines and discovery issues in this case.  In support of its position, NAT states that a second referral to the FCC is not warranted.  NAT further argues that many of the issues have now been mooted by both the CAF Order and the proceedings before the SDPUC.

The court declines to determine whether NAT is correct as that would require this court to resolve the merits of the issues that are now pending before the district court in Sprint's two dispositive motions.  Those dispositive motions were not referred to this magistrate judge, so they are not for this

17

court to express opinions on.  For example, NAT argues that the SDPUC proceedings operate to collaterally estop Sprint from pursuing its claims against NAT.  That argument is at the heart of NAT's counterclaim number five, and is the target of Sprint's motion to dismiss.  This court expresses no opinion about whether and to what extent the SDPUC proceedings have an effect on the issues or claims in this lawsuit.

Similarly, NAT argues that the FFC's CAF Order held that the practice of traffic pumping was "legal" and that IXCs like Sprint are not justified in withholding payment of switched access fees.  The court read the same opinion and cannot come to the same conclusion as NAT about the Commission's holdings.  Nevertheless, the application, if any, of the CAF Order to the issues in this case are for the district court to decide in the pending dispositive motions.  Likewise, the applicability, if any, of 47 C.F.R. § 51.913 (addressing the delivery of calls in IP format), to the issues and claims in this lawsuit is again, a matter for the district court to determine.

Finally, the court should not grant NAT's request for a full-blown scheduling conference and Rule 16 scheduling order if this case is not going to be litigated in this forum, but rather will be referred again to the FCC.  Instead, it would be more appropriate for the parties to conduct their pre-trial or pre-hearing proceedings before the FCC in accordance with the FCC's rules for such matters.  The district court expressed its intention at the July 23, 2014, status conference to issue a referral to the FCC again once the parties were afforded the opportunity to amend their pleadings and place the statute of

limitations issue before the court.  This court is not going to second-guess that decision by the district court.

Sprint has appended the exhibits from the request for admission to its dispositive motion.  <u>Compare</u> Docket No. 180-6 <u>with</u> Docket No. 185-4.  It claims that NAT produced the documents in the SDPUC proceedings and that the documents show that NAT delivered the calls depicted in the diagrams to its bridge(s) in IP format.  NAT disputes the authenticity of these documents and claims the documents are ambiguous.  <u>See</u> Docket No. 192.  It is appropriate to allow discovery to take place to clear up the issue as to the significance of these documents because they most probably have a bearing on the district court's resolution of Sprint's two pending dispositive motions.  The most economical way to do this is to allow Sprint to take a deposition of NAT pursuant to Rule 30(b)(6) and the court will so order.

When a corporation or limited liability company is a party to be deposed, the party seeking the deposition may choose either to designate a specific individual to be deposed or, alternatively, the party may describe the subject matter of the questions to be asked and allow the corporate party to designate a representative to testify on behalf of the corporation.  <u>See</u> Fed. R. Civ. P. 30(a) and (b)(6); <u>Cadent Ltd. v. 3M Unitek Corp.</u>, 232 F.R.D. 625, 627-28 (C.D. Cal. 2005); <u>United States v. Afram Lines Ltd.</u>, 159 F.R.D. 408, 413 (S.D.N.Y. 1994); <u>Sugarhill Records Ltd. v. Motown Record Corp.</u>, 105 F.R.D. 166, 169 (S.D.N.Y. 1985).

If the party seeking discovery chooses to designate the subject matter of the deposition rather than name a particular deponent, as Sprint does here, then the corporate party must designate a specific person to testify as to those matters listed in the Rule 30(b)(6) notice. See FED. R. CIV. P. 30(b)(6). The corporation is free to designate whomever it wishes; but the designation imposes on the corporation a duty to prepare that person to testify as to the matters listed in the Rule 30(b)(6) deposition notice. See Charles A. Wright, Arthur R. Miller & Richard L. Marcus, 8A Fed. Practice & Procedure, § 2103 at pp. 455-57 (3d ed. 2010) (hereinafter "Wright & Miller"). See also Prokosch v. Catalina Lighting, Inc., 193 F.R.D. 633, 638 (D. Minn. 2000); Alliance for Global Justice v. District of Columbia, 437 F. Supp. 2d 32, 37 (D.D.C. 2006). Further, a corporation may not rely on the documents it produced in discovery because "[p]roducing documents and responding to written discovery is not a substitute for providing a thoroughly educated Rule 30(b)(6) deponent." Great American Ins. Co. of New York v. Vegas Constr. Co., 251 F.R.D. 534, 541 (D. Nev. 2008). Refusal or failure by the corporation to prepare its designee to testify to the matters listed in the Rule 30(b)(6) deposition notice invites court-ordered sanctions. See 8A Wright & Miller § 2103 at pp. 464-66. NAT is cautioned to take note of the above law when designating their corporate representative for Sprint's Rule 30(b)(6) motion.

## CONCLUSION

Based on the foregoing law, facts, and analysis, it is hereby

ORDERED that Sprint's motion to compel [Docket No. 183] is denied in its entirety.  No sanctions will issue to either side.  It is further

ORDERED that Sprint's motion for leave to take the Rule 30(b)(6) deposition of NAT [Docket No. 199] is granted; Sprint is ordered to conform its deposition notice strictly to the two subjects it described in its motion; Sprint is further forbidden from inquiring into any areas other than those two subjects listed in its deposition notice.  Both parties are ordered to complete this deposition within 30 days from the date of this order.  It is further

ORDERED that NAT's motion for a Rule 26(f) conference and Rule 16 scheduling order [Docket No. 201] is denied in its entirety.

DATED this 14th day of January, 2015.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge

21