UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SPRINT COMMUNICATIONS COMPANY L.P., | 4:10-CV-04110-KES |
| Plaintiff, | |
| vs. | ORDER GRANTING IN PART AND DENYING IN PART SPRINT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART NAT'S MOTION FOR SUMMARY JUDGMENT |
| CROW CREEK SIOUX TRIBAL COURT, NATIVE AMERICAN TELECOM, LLC., and B. J. JONES, in his official capacity as special judge of Tribal Court; | |
| Defendants. | |

Pending are cross-motions for summary judgment. Plaintiff, Sprint Communications Company, L.P., seeks summary judgment on Counts I and IV of defendant Native American Telecom, LLC's (NAT) amended counterclaim. NAT seeks summary judgment on all of Sprint's claims, as well as summary judgment on Counts I and IV of its amended counterclaim. For the following reasons, the court grants in part and denies in part Sprint's motion and grants in part and denies in part NAT's motion.

## BACKGROUND

The pertinent, undisputed facts are as follows:[1]

---

[1] Because both parties have moved for summary judgment, additional facts will be discussed as they pertain to the specific issues raised in the parties' motions.

Sprint provides nationwide long-distance telephone services and is known under the telecommunications regulatory framework as an interexchange carrier (IXC). Sprint delivers long-distance calls to a local exchange carrier (LEC) for termination to end-users. Under the FCC's current regulatory framework, Sprint pays the LEC a terminating access charge based on the LEC's interstate access tariff, which is filed with the FCC.

In October 2008, the Crow Creek Sioux Tribal authority authorized NAT to provide telecommunications service on the Crow Creek Reservation subject to the tribe's laws. Pursuant to the 2008 approval order, NAT began to operate as an LEC. NAT filed its first interstate tariff with the FCC, which became effective on September 15, 2009. NAT's second interstate tariff became effective on November 30, 2010, and canceled and replaced NAT's tariff number one. NAT revised its tariff number two, which revision became effective on June 26, 2011. NAT's third interstate tariff was filed with the FCC in August 2011, and became effective on August 23, 2011.

NAT also operates a free conference calling system (used for conference calling, chat-lines, and similar services) in connection with Free Conferencing Corporation (Free Conferencing). A party using NAT's services does not pay NAT for the conference call, but rather is assessed charges by the party's telecommunications provider. NAT then bills the telecommunications provider an access fee as defined in its interstate tariff. NAT's access charges, which were billed to Sprint for conference calls, are at issue here.

2

After paying two of NAT's bills for charges connected to conference calls, Sprint ceased paying NAT's terminating access tariffs because Sprint believed that NAT was involved in a traffic-pumping scheme, otherwise known as access stimulation, to generate traffic from free conference calls and chat services. On August 16, 2010, Sprint filed suit against NAT alleging a breach of the Federal Communications Act (FCA) and a state-law unjust enrichment claim. Docket 1.

On March 8, 2011, NAT amended its answer and asserted counterclaims against Sprint alleging a breach of contract and a collection action pursuant to its tariffs, a breach of implied contract resulting from a violation of its tariffs, and a quantum meruit/unjust enrichment claim. NAT also sought declaratory relief. Docket 99.

On November 29, 2011, the FCC released its *Connect America Fund* final rule, which addresses access stimulation and traffic pumping. *See Connect America Fund; A National Broadband Plan for Our Future; Establishing Just and Reasonable Rates for Local Exchange Carriers; High-Cost Universal Service Support*, 76 Fed. Reg. 73830 (Nov. 29, 2011). The FCC also created a transitional framework for VoIP intercarrier compensation. *Id.* at ¶ 19. On December 27, 2011, this court issued an order directing the parties to discuss what effect, if any, the FCC's *Connect America Fund* final rule had on the issues presented in this case. Docket 128. Then, on February 22, 2012, this court issued an order discussing the final rule and determined that it did not apply retroactively. Docket 141 at 9-11 ("Thus, the final rule is inapplicable to the time period before the final rule became effective."). As part of the same order,

3

this court granted Sprint's then-pending motion to stay this proceeding and referred three issues to the FCC for resolution. *Id.* at 25. This court also directed the parties to issue periodic updates describing the status of the FCC proceeding. This court received these updates over the next two years, which showed that the status of the FCC referral remained unchanged since November 2012. *Compare* Docket 154 *with* Docket 163. Because of the limited progress on the FCC referral, a telephonic status conference was held on July 23, 2014. *See* Docket 164.

The parties stated that they had been engaged in litigation before the South Dakota Public Utilities Commission (SDPUC). Docket 169 at 5. In that litigation, NAT was granted a certificate of authority by the SDPUC to provide certain telecommunications services in South Dakota. Based on the results of the SDPUC litigation and the lack of action by the FCC during the period of the stay, the parties discussed whether some of the disputes in this case remained viable. *Id.* at 8-10. The court proposed entering an order that would lift the stay, withdraw the issues that had been referred to the FCC, and establish deadlines for the parties to amend the complaint, counterclaims, and to file any motions to dismiss. *Id.* at 12. The court also stated that it would rule on any motions to dismiss based on a statute of limitations defense and that a new referral of issues to the FCC could then be discussed. *Id.* With the parties in agreement, a formal order was issued that same day. *See* Docket 168.

Sprint did not amend its complaint. NAT amended its counterclaim on September 9, 2014, and added a number of allegations that arose during the

4

period of the stay and FCC referral. Docket 172. A number of procedural motions have since been filed by the parties. Relevant to the present discussion are the parties' cross-motions for summary judgment. Docket 211, Docket 223.

## LEGAL STANDARD

Summary judgment on all or part of a claim is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Craig*, 144 F.3d 593, 595 (8th Cir. 1998). The moving party can meet its burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party has met this burden, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). "Further, 'the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, the dispute must be outcome determinative under prevailing law.' " *Id.* (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992)). The facts, and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion" for summary judgment. *Matsushita Elec.*

5

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## DISCUSSION

### I.  Sprint's Motion for Partial Summary Judgment

Sprint seeks summary judgment on Counts I and IV of NAT's amended counterclaim. Count I of NAT's amended counterclaim seeks to enforce each of NAT's interstate tariffs and to recover the amounts NAT billed to Sprint pursuant to those tariffs. Docket 172 at 17. Count IV seeks declaratory relief regarding Sprint's obligations pursuant to NAT's tariffs. *Id.* at 18-19. Alternatively, Sprint argues that NAT's cross-motion for summary judgment on Counts I and IV of its amended counterclaim should be denied.

### A.  Whether Sprint Can Move for Summary Judgment?

NAT asserts that Sprint cannot move for partial summary judgment because Sprint has not amended its complaint to include the grounds upon which Sprint's motion is founded.[2] Sprint is seeking partial summary judgment as a defendant on Counts I and IV of NAT's amended counterclaim. In its answer to NAT's counterclaim, Sprint denied that NAT's tariffs were enforceable and pleaded several affirmative defenses on point.  Sprint's answer was sufficient to raise the grounds it now pursues, and Sprint was not required to

---

[2] NAT initially asserted that Sprint had conceded the calls at issue were properly billed as access charges because of a statement of undisputed material fact that Sprint submitted in its previous summary judgment motion. NAT has clarified that it did not intend to argue Sprint admitted NAT's charges were valid. Docket 245.

first amend its complaint before seeking partial summary judgment on Counts I and IV of NAT's amended counterclaim.

    **B.**    **Whether NAT Was Authorized to Provide Telecommunications Services on the Crow Creek Reservation Prior to June 12, 2014?**

It is undisputed that the Crow Creek Sioux Tribal Utility Authority granted NAT a certificate of authority to provide telecommunications services on the Crow Creek Reservation in October 2008. Docket 212 at ¶ 2; Docket 220 at ¶ 2. That certificate purported to allow NAT to operate as a CLEC on the Reservation. Docket 14-4 at 1 n.1. It is also undisputed that NAT filed an application with the SDPUC in October 2011 to provide intrastate access services in South Dakota that originate or terminate off the Reservation. Docket 212 at ¶ 11; Docket 240 at ¶ 11. Further, it is undisputed that the SDPUC did not grant NAT a certificate of authority until June 12, 2014. Docket 220 at ¶ 23; Docket 240 at ¶ 23. Sprint contends that the SDPUC–and not the Tribal Utility Authority–was the only regulatory body that could grant NAT the authority to act as a CLEC whether on the Reservation or not. Until it received that authority from the SDPUC, Sprint argues that NAT could not enforce any of its interstate tariffs.

Describing the original Communications Act of 1934, the Supreme Court observed,

> [W]hile the Act would seem to divide the world of domestic telephone service neatly into two hemispheres-one comprised of interstate service, over which the FCC would have plenary authority, and the other made up of intrastate service, over which the States would retain exclusive jurisdiction-in practice, the

> realities of technology and economics belie such a clean parceling
> of responsibility.

*La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 360 (1986). Although "the world of domestic telephone service" described by the Court was "fundamentally restructured" by the Telecommunications Act of 1996, *AT&T Corp. v. Iowa Util. Bd.*, 525 U.S. 366, 371 (1999), the Court's observation of separate domains remains relevant today. And while the issue before the Court involved only two spheres occupied by the federal and state governments, the question before this court is whether Indian tribes occupy a third.

The Supreme Court has recognized "the Federal Government's longstanding policy of encouraging tribal self-government." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14 (1987). "This policy reflects the fact that Indian tribes retain 'attributes of sovereignty over both their members and their territory.' " *Id.* (quoting *United States v. Mazurie*, 419 U.S. 544, 557 (1975)). For years, the FCC has also acknowledged that Native American tribes have a role in ensuring that "all Americans, in all regions of the United States, have the opportunity to access telecommunications and information services." *In the Matter of Statement of Policy on Establishing A Government-to-Government Relationship with Indian Tribes*, 16 FCC Rcd. 4078 at *1 (F.C.C. 2000). In an *Indian Telecom Initiatives* booklet, the FCC stated that it "is committed to facilitating increased access to telecommunications in Indian Country." Docket 46-4 at 1. The Commission listed the benefits of increased telecommunications services on tribal lands, including access to education and employment opportunities,

8

public safety services, and government programs. *See* Docket 46-4. The agency has also pledged its support for securing those services on tribal lands: "In a series of steps undertaken since 1998, the FCC, in consultation with tribal leaders and other government agency officials, has sought to address concerns about barriers to telecommunications service deployment and subscribership in Indian Country. Concerns addressed include geographic isolation, lack of information, and economic obstacles." Docket 46-5 at 9.

The FCC has further acknowledged that Indian tribes are sovereign and that it would "endeavor to work with Indian Tribes on a government-to-government basis consistent with the principles of Tribal self-government to ensure . . . that Indian Tribes have adequate access to communications services." *Statement of Policy*, 16 FCC Rcd. 4078 at *2. "The FCC recognizes the rights of tribal governments to set their own communications priorities and goals for the welfare of their membership." Docket 46-5 at 3. Thus, the FCC has not only expressed a need to include Indian tribes in the world of domestic telecommunications, but has also recognized that the sovereignty possessed by Indian tribes makes them an active participant.

The FCC has found that Tribes possess the authority to regulate telecommunications services on tribal land. *See In the Matter of Western Wireless Corporation*, 16 FCC Rcd. 18145 (F.C.C. 2001). In *Western Wireless*, a carrier sought to deploy a wireless service to members of the Oglala Sioux Tribe on the Pine Ridge Reservation in South Dakota. *Id.* at ¶ 6. The question before the FCC involved a determination of which body–the Tribe, the State, or the

9

FCC–had regulatory authority over Western Wireless's services. The FCC noted that the "case presents the issue of the extent of tribal authority over a non-tribally owned carrier that intends to serve both tribal members and others on the reservation." *Id.* at ¶ 13. Under those facts, the FCC ultimately found that both the state and the Tribe had regulatory authority over certain aspects of Western Wireless's services. *Id.* at ¶ 23. Tribes are not, as Sprint contends, wholly excluded from regulating the provision of telecommunications on tribal land.

Similarly, the SDPUC acknowledged the difficult question of which body had regulatory authority over NAT and the services it provided. Docket 211-5 at 9 (SDPUC Opinion) (noting "[s]ome of the lack of clarity is likely due to the questions regarding jurisdiction of the Commission over NAT" and that NAT requested "whatever authority that this Commission determined it needed."). In fact, the SDPUC did not believe it had sole regulatory authority. *Id.* at 16 ("The Commission finds it has the necessary jurisdiction to grant a certificate of authority to NAT . . . . However, the Commission finds that it does not have primary regulatory authority over the provision of service by NAT to members on the reservation as NAT is a telecommunications company operating on the Crow Creek Reservation as a limited liability company formed under the Crow Creek Sioux Tribe."). The Commission, however, did not make additional conclusions about the extent of the Tribe's authority over services provided on the Reservation. *Id.* But the Commission did respond to Sprint's argument that NAT was operating illegally in the state because it did not have a certificate of

10

authority, and concluded that "NAT's operation without a [state] certificate of authority does not bar it from receiving a [state] certificate of authority." *Id.* at 13.

The Crow Creek Sioux Tribal Utility Authority expressly granted NAT, a majority tribally-owned entity, permission to provide local telecommunications services on the Crow Creek Reservation. That permission included the authority to act as a CLEC on the Reservation. In light of the observations made by the FCC, the FCC's *Western Wireless* decision, the federal government's long-standing recognition of encouraging tribal self-government, and the SDPUC's response to Sprint's argument that NAT was operating illegally, the court finds that the Tribe possessed its own authority to confer such permission upon NAT. The fact that NAT also sought and obtained permission to provide similar services outside the Reservation from the SDPUC in no way divested the Tribe of the regulatory authority it enjoyed on the Reservation. *Cf. Western Wireless*, 16 FCC Rcd. 18145 at ¶ 23. Consequently, the court finds that NAT had sufficient authority to provide local telecommunications services on the Reservation prior to receiving the state's permission to provide those services off the Reservation.

**C.    Whether NAT's Interstate Tariffs Number 1 and Number 2 are Unenforceable?**

Prior to this court's February 22, 2012, order, the FCC had issued several opinions involving litigation between IXCs and LECs that were similar to the parties' disputes here. *See In the Matter of Qwest Commc'ns Corp. v.*

*Farmers & Merchs. Mut. Tele. Co.*, 22 FCC Rcd. 17973 (F.C.C. 2007) (*Farmers I*);

*In the Matter of Qwest Commc'ns Corp. v. Farmers & Merchs. Mut. Tele. Co.*, 24

FCC Rcd. 14801 (F.C.C. 2009) (*Farmers II*); *In the Matter of Qwest Commc'ns*

*Corp. v. Farmers & Merchs. Mut. Tele. Co.*, 25 FCC Rcd. 3422 (F.C.C. 2010)

(*Farmers III*); *AT&T Corp. v. YMax Commc'ns Corp.*, 26 FCC Rcd. 5742 (F.C.C.

2011); *In the Matter of All American Telephone Co., et al. v. AT&T Corp.*, 26 FCC

Rcd. 723 (F.C.C. 2011) (*All American I*); *In the Matter of Qwest Commc'ns Co.,*

*LLC. v. Northern Valley Commc'ns, LLC*, 26 FCC Rcd. 8332 (F.C.C. 2011)

(*Northern Valley I*)[3]; *In the Matter of Sprint Commc'ns Co., L.P. v. Northern Valley*

*Commc'ns Co., LLC.*, 26 FCC Rcd. 10780 (F.C.C. 2011) (*Northern Valley II*).

Additionally, the *Farmers* line of cases had been appealed to and affirmed by

the D.C. Circuit Court of Appeals. *Farmers & Merchs. Mut. Tele. Co. v. FCC*, 668

F.3d 714 (D.C. Cir. 2011). Since the time of the February 2012 order, several

other opinions from the Commission have been issued discussing similar

disputes. *See In the Matter of AT&T Corp. v. All American Tele. Co.*, 28 FCC Rcd.

3477 (F.C.C. 2013) (*All American II*)[4]; *In the Matter of Qwest Commc'ns Co., LLC*

*v. Sancom, Inc.*, 28 FCC Rcd. 1982 (F.C.C. 2013).[5] The D.C. Circuit Court of

---

[3] The FCC denied Northern Valley's petition for reconsideration on
October 5, 2011. *In the Matter of Qwest Commc'ns Co., LLC v. Northern Valley*
*Commc'ns, LLC*, 26 FCC Rcd. 14520 (F.C.C. 2011).
   [4] The FCC released a reconsideration order of *All American I* on the same
day that it released its *All American II* decision. *In the Matter of All American*
*Tele. Co. v. AT&T Corp.*, 28 FCC Rcd. 3469 (F.C.C. 2013). There, the FCC
denied All American's petition for reconsideration.
   [5] Sancom subsequently filed a petition for reconsideration. *See In the*
*Matter of Qwest Commc'ns Co., LLC v. Sancom, Inc.*, 28 FCC Rcd. 8310 (F.C.C.
2013). Thereafter, the parties submitted a joint motion to dismiss, informing

Appeals has also affirmed the *Northern Valley* line of cases. *Northern Valley Commc'ns, LLC v. FCC*, 717 F.3d 1017 (D.C. Cir. 2013).

With the exception of *All American I* and *Northern Valley II* (which involved the same tariff at issue in *Northern Valley I*), the court's February 22, 2012, order discussed and analyzed each of the then-contemporary FCC decisions. *See* Docket 141. Sprint suggests the subsequent decisions from the FCC and D.C. Circuit enable this court to determine for itself whether NAT properly billed Sprint for access services pursuant to its tariffs.

### 1.   Summary of Relevant Case History

Through the FCC's decisions and subsequent appeals, the Commission has acknowledged several theories IXCs may advance in order to challenge either an LEC's purported provision of switched access services under the terms of the LEC's tariff or the enforceability of the LEC's tariff itself. In the *Farmers* and *Sancom* cases,[6] the FCC looked at whether the conferencing company was, in fact, an "end user" or "customer" of the LEC's services as described in the LEC's tariff. *Farmers II*, 24 FCC Rcd. 14801 at ¶ 10 (noting that "The tariff requires that to be a customer, the person or entity must subscribe to the services offered under the tariff."); *Sancom*, 28 FCC Rcd. 1982 at ¶ 16 (explaining that "in order for Sancom to provide Switched Access

---

the Commission that they had resolved their dispute. *Id.* at ¶ 2. The Commission granted the motion.

    [6] The FCC noted that *Sancom* "is materially similar to and controlled by" the *Farmers* line of cases. *Sancom*, 28 FCC Rcd. 1982 at ¶ 11. "Indeed, the Tariff's descriptions of 'end user' and 'customer' are identical to the definitions at issue in *Qwest v. Farmers.*" *Id.*

Service under the Tariff, calls must originate or terminate with an 'end user' (i.e., a 'customer' that 'subscribes to the services offered' under the Tariff.")). To answer that question, the Commission engaged in a multi-factor analysis that looked to the actual business relationship between the conferencing company and the LEC. *Farmers II*, 24 FCC Rcd. 14801 at ¶¶ 12-20, 25 (explaining it looked to "the totality of the circumstances and facts of this case"); *Sancom*, 28 FCC Rcd. 1982 at ¶¶ 17-23 (same). If the conferencing companies were not "customers" or "end users" that subscribed to the LEC's services under the tariffs, then the LEC was not entitled to bill the IXC for switched access services under the terms of the tariffs. *Farmers II*, 24 FCC Rcd. 14801 at ¶ 10; *Sancom*, FCC Rcd. 1982 at ¶ 17.

By contrast, in the *Northern Valley* cases, the question was whether the LEC's tariff itself was lawful. *Northern Valley I*, 26 FCC Rcd. 8332 at ¶ 2 (explaining that "*The tariff* therefore violates Commission Rule 61.26 . . . and accordingly also violates section 201(b) of the Act.") (emphasis added); *Northern Valley II*, 26 FCC Rcd. 10780 at ¶ 6 (similarly finding "that *the Tariff* violates Rule 61.26, and, accordingly, violates section 201(b) of the act.") (emphasis added). In that inquiry, the FCC looked at whether the tariff attempted to allow the LEC to impose access charges on the IXCs for calls to entities to whom the LEC offered free service. *Northern Valley I*, 26 FCC Rcd. 8332 at ¶ 7.[7] The

---

[7] The Commission also noted several other unlawful provisions in the tariff, such as the requirement that disputed bills first be paid in full and a provision that altered the statute of limitations. *Northern Valley II*, 26 FCC Rcd. 10780 at ¶¶ 11-14.

Commission explained that LECs may tariff access charges only if the LEC is terminating a call to its "own end users." *Id.* at ¶ 8. Under the Commission's rules, the phrase "end user" means a "customer of an interstate or foreign telecommunications service." *Id.* at ¶ 9. And the Communications Act defined "telecommunications service" as "the offering of telecommunications for a fee." *Id.* (citation omitted). Thus, to be an "end user" the entity must be a customer of a service that is offered for a fee. *Id.* Consequently, if the LEC's tariff permits the LEC to bill for "calls to or from entities to whom [the LEC] offers its services free of charge," then the tariff is unenforceable. *Id.* As a further contrast to the *Farmers* and *Sancom* cases, the FCC found that the parties' actual practices did not matter if the tariff itself was unlawful. *Id.* at ¶ 13 (explaining that " 'Tariffs are to be interpreted according to the reasonable construction of their language; neither the intent of the framers nor the practice of the carrier controls . . . .' ") (citation omitted). In terms of a remedy, the FCC in *Northern Valley* ordered the LEC to file a revised tariff in order to cure its defects. *Id.* at ¶ 15.

Finally, the *All American* line of cases involves a blend of these holdings. The Commission noted that some of the traffic billed by the CLECs was not assessed pursuant to enforceable tariffs. *All American II*, 28 FCC Rcd. 3477 at ¶¶ 35-37. Following *Farmers*, the FCC found that the CLECs were not terminating calls to "end users" as defined in their tariffs. *Id.* at ¶¶ 38-40. And the Commission also found that, based on the egregious facts of the case, the

CLECs' conduct amounted to an unjust and unreasonable practice under the Communications Act. *Id.* at ¶¶ 24, 33.

### a.   NAT's Tariff Number 1

NAT's interstate tariff number 1 was filed with the FCC and became effective on September 15, 2009. It was then revised and amended on October 21, 2009, to be effective on October 22, 2009. Docket 220 at ¶ 19; Docket 240 at ¶ 19. NAT's original tariff number 1 explained that "Switched Access Service, which is available to Customers for their use in routing or receiving traffic and/or in furnishing their services to End Users, provides a two-point communications path between a Customer and an End User." Docket 221-1 at 6. The tariff then defined a "Customer" as the entity "who orders service and is responsible for the payment of charges and compliance with the Company's regulations." Docket 221-1 at 3. Thus, to be a customer entailed responsibility for the payment of NAT's services. NAT's definition of an "End User" was any entity

> [W]hich subscribes to or otherwise uses local exchange services, interexchange services, Commercial Mobile Radio Service or other wireless service, VoIP services, or other services provided by a local exchange carrier, common carrier, Wireless Provider, VoIP Provider, or other provider of services that transit the Company's facilities.

Docket 211-1 at 4. NAT's tariff also stated that "The End User may be, but need not be the customer of an Interexchange Carrier and may or may not be a customer of the Company." Docket 221-1 at 4.

16

NAT's revised tariff number 1 included a longer definition of "Customer." As amended, a "Customer" was any entity "which uses service under the terms and conditions of this tariff and is responsible for payment of charges." Docket 221-2 at 3. Thus, it did not remove the requirement that a customer bear responsibility for payment. Additionally, the tariff provided that "[t]he term 'Customer' also refers to an Interexchange Carrier utilizing the Company's Switched or Dedicated Access services described in this tariff *to reach End Users.*" *Id.* (emphasis added). The revision, however, did not alter its previous definition of "end user."

First, NAT's original and revised tariff number 1 is unenforceable pursuant to the FCC's *Northern Valley* line of cases. In *Northern Valley*, the Commission explained that "a CLEC may tariff access charges only if those charges are for transporting calls to or from an individual or entity to whom the CLEC offers service *for a fee.*" *Northern Valley I*, 26 FCC Rcd. 8332 at ¶ 7. As with Northern Valley's tariff, the portion of NAT's tariff that states "The End User may be, but need not be the customer of an Interexchange Carrier and may or may not be a customer of the Company" attempts to allow NAT to bill tariffed charges to Sprint for terminating calls that are delivered to non-paying entities. This is so because, under NAT's tariff, a "customer" bears responsibility for paying NAT for its services, and an "end user" is one who "subscribes to or otherwise uses" NAT's services. Yet, NAT's tariff states that the end user was not required to be a customer and thus was not required to be responsible for paying for the services rendered. Consequently, NAT could

17

not have billed Sprint for tariffed services pursuant to its original and revised tariff number 1.

Second, the record also demonstrates that Free Conferencing did not subscribe to or use (and therefore was not an "end user" of) NAT's services.[8] In the *Farmers* and *Sancom* cases, the FCC noted a number of non-exhaustive factors that supported its conclusion: (1) Whether the conference calling companies would pay for the LEC's services; (2) Whether the LEC treated the conferencing company like other customers; (3) Whether the LEC and conference companies operated under an exclusivity agreement; (4) Whether the LEC handled the conferencing company's traffic differently; (5) Whether the LEC's agreements with the conference companies contained terms that did not resemble traditional agreements for tariffed services; and (6) Whether the LEC timely reported revenues from its services or submitted Universal Service contributions. *See Farmers II*, 24 FCC Rcd. 14801 at ¶¶ 12-20; *Sancom*, 28 FCC Rcd. 1982 at ¶¶ 13, 18-23.

As to the first factor, NAT acknowledges that it did not bill Free Conferencing until September 2011, long after its original and revised tariff number 1 was superseded. Similarly, several income statements and ledgers produced during the SDPUC proceeding show that Free Conferencing did not pay NAT until September 12, 2011. Docket 221-8 at 41 (Profit and Loss

---

[8] While not addressed by NAT, the fact that NAT's tariff defined an "end user" as one who "subscribes to" or, alternatively, "otherwise uses" NAT's services does not alter this analysis. *See YMax*, 26 FCC Rcd. 5742 ¶¶ 24-28 n.87.

Statement); Docket 240 at ¶ 25. Additionally, according to a 2009 service agreement between Free Conferencing and NAT, Free Conferencing was required to generate a monthly minimum number of minutes of conferencing traffic. Docket 221-7 at 5 ("[Free Conferencing shall provide a minimum of 15,000 minutes per month of conferencing traffic[.]"). And NAT was obliged to pay Free Conferencing a so-called "marketing fee" for each minute of traffic terminated on Free Conferencing's equipment. *Id.* In *Farmers II*, the FCC found it "significant" that the LEC was required "to pay the conference calling companies a per-minute fee for the traffic generated through their mutual relationship." *Farmers II*, 24 FCC Rcd. 14801 at ¶ 12. Moreover, the NAT-Free Conferencing arrangement is largely identical to that in *Sancom*. *See Sancom*, 28 FCC Rcd. 1982 at ¶ 4 (noting a monthly minimum amount of traffic the conferencing company would generate and the per-minute fee the LEC would pay). Thus, the lack of payment flowing from Free Conferencing to NAT for NAT's services illustrates that Free Conferencing was not an end user of NAT's tariffed services. *See Farmers II*, 24 FCC Rcd. 14801 at ¶ 12; *see also Sancom*, 28 FCC Rcd. at ¶ 19.

Regarding the second factor, the service agreement also demonstrates that Free Conferencing was not treated like any other customer of NAT. For example, NAT agreed to provide Free Conferencing with "all telecommunications services utilized by [Free Conferencing] in connection with this Agreement *without charge*." Docket 221-7 at 7 (emphasis added). Those services included co-location space, rack space, dedicated Internet access,

analog telephone circuits, electrical power, fire protection, generator and battery backup, switch technician labor, and switch programming service, among others. *See id.* The fact that NAT provided these services without charge also shows that NAT did not view Free Conferencing as a typical customer. *See Farmers II*, 24 FCC Rcd. 14801 at ¶ 12 (noting the "host of services to support the conference calling companies' business venture" provided by Farmers without charge).[9]

As to the third factor, NAT and Free Conferencing operated under an exclusivity agreement. Specifically, NAT agreed that it would "not grant access to its facilities without the express written permission of [Free Conferencing], to any company or individual that would compete in a similar business with [Free Conferencing]." Docket 221-7 at 5. "Such an exclusivity clause is antithetical to the notion of tariffed service." *Farmers II*, 24 FCC Rcd. 14801 at ¶ 14; *Sancom*, 28 FCC Rcd. 1982 at ¶ 23 (finding "Sancom's relationships with the Free Calling Companies were exclusive and demonstrate an intention for Sancom not to provide service as a common carrier.").

Regarding the fifth factor, the parties' agreement contained terms that did not resemble traditional arrangements of tariffed services. In addition to the requirement that Free Conferencing generate a minimum amount of monthly

_____

[9] Many of the specific services NAT provided to Free Conferencing were identical to those in *Farmers II. See Farmers II*, 24 FCC Rcd. ¶ 12 n.48 (detailing how Farmers provided "collocation space, rack space, digital subscriber line services and other dedicated Internet access, electrical power, fire protection, generator and/or battery backup, switch technician labor, switch programming, and dedicated DS3 trunks to its switches.")

traffic, the agreement also contains a confidentiality clause. Docket 21-7 at 3. This illustrates a lack of impartiality on the part of NAT towards other customers. *Sancom*, 28 FCC Rcd. 1982 at ¶ 23 ("What's more, Sancom's agreements with the Free Calling Companies contained confidentiality clauses that prohibited the parties from revealing the agreements' terms."). The agreement also contains a choice of law clause providing that the laws of the State of California will govern claims arising out of the agreement. Docket 221-7 at 7. Such a requirement is also not found in NAT's tariff. *Sancom*, 28 FCC Rcd. 1982 at ¶ 25 (noting the South Dakota choice of law provision in the parties' service agreement was distinct from the LEC's tariff).

NAT asserts that it and Free Conferencing were aware that the service agreement and the companies' billing practices would need to be altered in order to comply with the FCC's *Farmers II* decision. *See, e.g.,* Docket 240 at ¶ 24 (citing Docket 240-2). According to the service agreement, however, it could "only be amended, modified or supplemented by a separate written document duly executed by authorized representatives of both" Free Conferencing and NAT. Docket 221-7 at 7. But NAT and Free Conferencing did not reduce the new agreement to writing until 2012. Docket 240 at ¶ 29 (citing Docket 240-2 at 17-18 (SDPUC Transcript)). By that time, NAT's original and revised tariff number 1 had long since been superseded. And NAT still did not bill Free Conferencing for services prior to September 2011, which is also beyond the period when NAT's original and revised tariff number 1 was in effect. Additionally, the document that purports to replace the 2009 service

agreement is not a new agreement but rather a redlined version of the original. Docket 240-8. A number of clauses are incomplete, and it is not clear if the document was ever completed or carried any legal effect. [10] Moreover, the only provision of the original service agreement that the parties allegedly agreed to disregard (though not in writing as the service agreement requires) before the 2012 agreement was signed was the exclusivity clause. *See e.g.*, Docket 240 at 37 (citing Docket 240-2 at 18 (SDPUC Transcript)). That would not, however, vitiate the lack of payment from Free Conferencing to NAT, the minimum traffic requirement Free Conferencing was required to generate, the numerous services NAT provided Free Conferencing without charge, or the other terms of the agreement such as the confidentiality clause that are not contained within NAT's interstate tariffs.

The balance of the relevant factors shows that Free Conferencing did not pay for NAT's services and that Free Conferencing was not an end user of NAT's services pursuant to NAT's original or revised tariff number 1. Rather, the arrangement orchestrated by NAT and Free Conferencing resembled a relationship of business partners instead of carrier-customer. Consequently, NAT was not entitled to bill Sprint for switched access services involving calls delivered to Free Conferencing under its original or revised tariff number 1. *Sancom*, 28 FCC Rcd. 1982 at ¶ 25. For these reasons, Sprint is entitled to

---

[10] During the SDPUC proceeding, a witness for NAT testified that he was "not sure that this document reflects all of the changes accurately" when asked about the amended service agreement. Docket 240-2 at 17-18.

summary judgment regarding Counts I and IV of NAT's amended counterclaim as they pertain to NAT's original and revised interstate tariff number 1.

### b.    NAT's Tariff Number 2

### (1)    The Filed Rate Doctrine

NAT argues that the filed rate doctrine prevents Sprint from challenging whether it did, in fact, provide tariffed access services pursuant to its interstate tariff number 2.[11] "The filed rate doctrine, also known as the filed tariff doctrine, is derived from the tariff-filing requirements of the [Communications Act] and 'forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority.' " *Marcus v. AT & T Corp.*, 138 F.3d 46, 58 (2d Cir. 1998) (quoting *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577 (1981)). Section 203(a) of the Communications Act requires telecommunications carriers to file a tariff with the FCC "showing all charges" and "showing the classifications, practices, and regulations affecting such charges." 47 U.S.C. § 203(a). Telecommunications carriers cannot "charge, demand, collect, or receive a greater or less or different compensation" for services subject to tariffs. 47 U.S.C. § 203(c).

" 'Under [the filed rate] doctrine, once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer.' " *Iowa Network Servs., Inc. v. Qwest*

---

[11] NAT does not argue the Filed Rate Doctrine bars Sprint's claims regarding NAT's tariff number 1.

*Corp.*, 466 F.3d 1091, 1097 (8th Cir. 2006) (quoting *Evanns v. AT & T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000)) (alteration in original). The filed rate doctrine prohibits courts from granting relief that would have the effect of changing the rate charged for services rendered pursuant to a valid tariff. *See Firstcom, Inc. v. Qwest Corp.*, 555 F.3d 669, 681 (8th Cir. 2009).

Sprint is not challenging the rates set forth in NAT's tariffs but instead contends that NAT improperly billed Sprint for services that did not fall under the provisions of the tariff itself. *Qwest Commcn's Co. v. Aventure Commcn's*, No. 4L07-cv-00078-JEG, 2015 WL 711154 at *55 (S.D. Iowa Feb. 17, 2015) (rejecting LEC's similar argument and noting that the IXC "does not ask the Court to determine the reasonable or fair value for services rendered."). Similarly, Sprint contests whether NAT's tariffs comport with FCC's decisions that prevent LECs from tariffing for services provided to non-paying customers. As the Commission observed, "The tariffed rates are deemed lawful only to the extent that the tariff actually applies[.]" *Farmers II*, 24 FCC Rcd. 14801 at ¶ 26 n.98. If NAT did not actually provide services in accordance with its tariff, NAT cannot bill Sprint for tariffed services. *Id.* at ¶ 21; *see also Farmers & Merchs. Mut. Tel. Co.*, 668 F.3d at 722 ("Because the Commission could properly conclude that the conference calling companies were not end users under the tariff, tariffed services are not at issue."). Likewise, if a tariff purports to permit an LEC to bill for calls delivered to a non-paying customer, the tariff cannot be enforced. *Northern Valley I*, 26 FCC Rcd. 8332 ¶ 9. Thus, the filed rate doctrine does not act as a barrier to Sprint's claims.

24

### (2)   Original Tariff Number 2

NAT's original interstate tariff number 2 was filed with the FCC on November 15, 2010, to be effective on November 30, 2010. It was then revised and amended to be effective June 26, 2011. Docket 220 at ¶ 20; Docket 240 at ¶ 20. NAT's original tariff number 2 generally explained that "Switched Access Services provides for the use of switching and/or transport facilities or services to enable a Buyer to utilize the Company's Network to accept Calls or to deliver Calls." Docket 221-4 at 5. The tariff then defined "Buyer" as "an Interexchange Carrier utilizing the Company's Access Service to complete a Call to or from End Users" and "[t]he Buyer is responsible for the payment of charges for any service it takes from the company[.]" Docket 221-4 at 3. In turn, the tariff's definition of "End User" was "any Customer of an Interstate or Foreign Telecommunications Service that is not a carrier[.]" *Id.* at 4. But the tariff also stated that "An End User need not purchase any service provided by the Company." *Id.*

NAT's original tariff number 2 was even more indistinguishable from the tariff in the *Northern Valley* cases than its original tariff number 1. There, as here, Northern Valley defined an "End User" as "any customer of an Interstate or Foreign Telecommunications Service that is not a carrier." *Northern Valley II*, 26 FCC Rcd. 10780 at ¶ 9. The phrase "telecommunications service" is defined under the Communications Act as "the offering of telecommunications for a fee." *Id.* (quoting 47 U.S.C. § 153(53)). Thus the first part of the tariff's definition of an end user "is a user to whom [Northern Valley] offers its services

25

for a fee." *Northern Valley II*, 26 FCC Rcd. 10780 at ¶ 9. (emphasis in original). But the additional language in Northern Valley's tariff, which NAT's tariff mirrored, stated that "[a]n End User need not purchase any service provided by [Northern Valley]." *Id.* "Unlike the first sentence, this last sentence seems to define 'End User' as an individual or entity to whom [the LEC] offers its services *free of charge*." *Id.* The court in *Northern Valley* concluded that because Northern Valley's tariff was internally inconsistent, it violated the Commission's rules and could not be enforced. *Id.*[12] Because NAT's tariff mirrors the language of Northern Valley's tariff, it too is not enforceable.

Moreover, as the Commission explained, "a CLEC may tariff access charges only if those charges are for transporting calls to or from an individual or entity to whom the CLEC offers service *for a fee*." *Northern Valley I*, 26 FCC Rcd. 8332 at ¶ 7. As with Northern Valley's tariff, the portion of NAT's tariff that states "an End User need not purchase any service provided by [the LEC]" attempts to allow NAT to bill tariffed charges to Sprint for terminating calls that are delivered to non-paying entities. *Id.* NAT's original tariff number 2 is unenforceable for this reason as well. *Id.* at ¶ 9. Consequently, NAT improperly billed Sprint for tariffed services under its original tariff number 2.

---

[12] Notably, NAT's tariff also attempts to define a "Customer of an Interstate or Foreign Telecommunications Service" as "any person or entity who sends or receives an interstate or foreign Telecommunications service transmitted to or from a Buyer across the Company's Network, *without regard to whether and how much payment is tendered to either the Company or the Buyer*[.]" Docket 221-4 at 4 (emphasis added). This definition is materially identical as the same definition contained in Northern Valley's tariff that the Commission also found to be problematic. *Northern Valley II*, 26 FCC Rcd. 10780 ¶ 9 n.38 (providing definition).

26

### (3)   Revised Tariff Number 2

NAT's revised tariff number 2 left intact its definition of "Switched Access Service" and "Buyer." A new definition of a "Customer" was added. Docket 221-3 at 10. A "Customer" was defined as any entity "which subscribes to the services offered under this Tariff, including Interexchange Carriers (IXCs), end users and interconnectors." Docket 221-3 at 10 (emphasis added). The problematic language at the end of NAT's definition of "End User" was excised, so that an " 'End User' means any customer of an interstate or foreign telecommunications service that is not a carrier[.]" *Id.* at 11.

In its revised form, NAT's tariff number 2 became indistinguishable from the tariffs in the *Farmers* and *Sancom* cases. Farmers' tariff,[13] like NAT's revised tariff number 2, stated that an end user is "any customer of an interstate or foreign telecommunications service that is not a carrier." *Farmers II*, 24 FCC Rcd. 14801 at ¶ 10 (emphasis omitted). And Farmers' definition of "customer" likewise was "any entity that 'subscribes to the services offered under this tariff.' " *Id.* (emphasis omitted). Thus, to be an "end user" under Farmers' (and NAT's) tariff required the entity to be a "customer," and to be a "customer" required an entity to "subscribe to the services" under the tariff. *Id.* Consequently, whether Free Conferencing in fact subscribed to NAT's services would again turn on the set of factors employed by the FCC in the *Farmers* and

---

[13] Sancom's tariff contained the same definitions. *Sancom*, 28 FCC Rcd. 1982 at ¶¶ 6, 11 ("Indeed, the Tariff's definitions of 'end user' and 'customer' are identical to the definitions at issue in [*Farmers II*].". For the sake of clarity, the court will refer only to Farmers' tariff for comparative purposes rather than to Sancom's tariff as well.

*Sancom* cases. *See Farmers II*, 24 FCC Rcd. 14801 at ¶¶12-20; *Sancom*, 28 FCC Rcd. 1982 at ¶¶ 13, 18-23.

Notably, however, NAT's revised tariff number 2 became effective in June 2011 and was shortly thereafter replaced by NAT's tariff number 3 in August 2011. But it was not until September 2011 that NAT began to issue bills to Free Conferencing. Thus, as with NAT's original and revised tariff number 1, NAT did not receive any payments from Free Conferencing while NAT's original or revised tariff number 2 was in effect. Again, the lack of payment flowing from Free Conferencing to NAT for NAT's services illustrates that Free Conferencing did not subscribe to and was not an end user of NAT's services at this time. *See Farmers II*, 24 FCC Rcd. 14801 at ¶ 12; *see also Sancom*, 28 FCC Rcd. at ¶ 19. Moreover, as discussed above, the parties' 2009 service agreement had not yet been modified (if at all) by the problematic 2012 service agreement until long after NAT's original and revised tariff number 2 had been replaced. Accordingly, Free Conferencing was still not an "end user" pursuant to NAT's revised tariff number 2. Consequently, NAT was not entitled to bill Sprint for calls delivered to Free Conferencing under its revised tariff number 2.

### (4)    Notice-and-Dispute Provisions

NAT argues that Sprint did not comply with the notice-and-dispute provisions of its tariff and that Sprint cannot be granted summary judgment as a result. Specifically, NAT points out that its original tariff number 2 required Sprint to submit a written notice of a "good faith dispute" before Sprint could challenge any of NAT's invoices. Docket 67-3 at 33. Additionally, under this

tariff, Sprint was required to first pay any disputed charges in full. *Id.* at 34. And if Sprint did not tender payment for any disputed invoices, NAT was allowed to deny Sprint's challenge. *Id.*

First, the dispute provisions in NAT's tariff only apply if Sprint was a "Buyer" as defined in NAT's tariff. *Id.* at 33 (". . . and shall be binding on the Buyer unless written notice of a good faith dispute is received . . . ."). But Sprint was not a "Buyer" because NAT's original tariff number 2 was not enforceable and Free Conferencing was not an end user as defined in NAT's revised tariff number 2. *See id.* at 8 (explaining a Buyer utilizes NAT's "Access Service to complete a call to or from End Users."). Thus, the notice-and-dispute provisions did not apply to Sprint. Second, NAT acknowledges that it did, in fact, receive notice from Sprint as early as 2010 that it was disputing whether NAT properly billed it for access charges. Docket 242 at 15 (citing Docket 172 at ¶ 34). Third, regarding the requirement that Sprint first pay disputed invoices in full before challenging their veracity, the FCC has held similar tariff provisions unenforceable. In *Northern Valley II*, the LEC's tariff at issue contained similar language requiring "all disputed charges to be paid 'in full prior to or at the time of submitting a good faith dispute[.]' " *Northern Valley II*, 26 FCC Rcd. 10780 at ¶ 14. The Commission stated such a requirement was unreasonable because "this provision requires everyone to whom Northern Valley sends an access bill to pay that bill, no matter what the circumstances (including, for example, if no services were provided at all), in order to dispute a

29

charge." *Id.* Thus, the notice-and-dispute provisions of NAT's tariff are no bar to Sprint's ability to contest the propriety of NAT's access charges.

In sum, Sprint is entitled to summary judgment regarding Counts I and IV of NAT's amended counterclaim as they pertain to NAT's original and revised interstate tariff number 2.

### D.    Whether NAT's Tariff Number 3 is Unenforceable?

It is undisputed that NAT's interstate tariff number 3 was filed on August 8, 2011, to become effective August 23, 2011. Docket 220 at ¶ 21; Docket 240 at ¶ 21; *see* Docket 180-1 (NAT's interstate tariff number 3). NAT's tariff number 3 states generally that "Switched Access Service, which is available to customers for their use in furnishing their services to end users, provides a two-point electrical communications path between a customer's premises and an end user's premises." Docket 180-1 at 64. A "customer" is defined as any entity "which subscribes to the services offered under this Tariff, including Interexchange Carriers (ICs), end users and interconnectors." *Id.* at 10. And an "end user" was once again defined as "any customer of an interstate or foreign telecommunications service that is not a carrier[.]" *Id.* at 12. Thus, as in the *Farmers* and *Sancom* lines of cases, whether an entity is an "end user" under NAT's tariff number 3 depends on whether it is also a "customer," and whether the entity is a "customer" depends on whether it "subscribes to" NAT's tariffed services. *See Farmers II*, 24 FCC Rcd. 14801 at ¶ 10; *Sancom*, 28 FCC Rcd. 1982 at ¶¶ 6, 11.

Unlike NAT's previous tariffs, Free Conferencing began paying NAT for its services shortly after NAT's tariff number 3 went into effect. The first bill to Free Conferencing was sent in September 2011, which Free Conferencing paid on September 12, 2011. Additionally, the NAT-Free Conferencing 2009 service agreement was purportedly replaced by a new service agreement in 2012, also while this tariff was in effect. *See* Docket 240-8. According to the dates on the newer document, it was executed by the parties between November 30, 2012, and December 6, 2012. *Id.* at 11.[14] But it is not clear when the agreement was to take effect or terminate, because the provision setting out the term of the agreement had not been completed. *Id.* at 3. Additionally, a number of alterations to the original agreement were made, such as: deletion of the exclusivity clause, alteration of the so-called marketing fee NAT would pay Free Conferencing, and deletion of the requirement that NAT provide numerous services free of charge. Docket 240-8 at 4-5, 7. But whatever compensation NAT was to receive for the services it provided to Free Conferencing (such as Internet access, electrical power, and labor) was not filled in. *Id.* at 7. It is apparent from the amended agreement that NAT and Free Conferencing set out to alter their relationship, but it is unclear whether they in fact did so or actually reached a mutual agreement to do so. Sprint's position is that Sprint is entitled to summary judgment or, alternatively, that sufficient facts about the NAT-Free Conferencing relationship remain in dispute to at least prevent summary judgment in NAT's favor. In light of the numerous uncertainties

---

[14] The date of Gene DeJordy's signature is not clearly discernable.

surrounding the NAT-Free Conferencing relationship during the period when NAT's tariff number 3 was effective, the court agrees with the latter proposition.

Nonetheless, Sprint advances three other arguments in support of its position that NAT's tariff number 3 is unenforceable. These arguments, however, have already been addressed by the court. First, Sprint argues the two-year statute of limitations applicable to carriers such as NAT bars NAT's attempt to recover amounts that came due on or before September 10, 2012. As part of this court's April 1, 2015, order on Sprint's motion to dismiss, however, the court found that NAT's amended counterclaim related back to the dates in its original counterclaim. Thus, the statute of limitations did not bar NAT's attempt to recover on its bills that came due prior to September 10, 2012. *See* Docket 248.[15] Second, Sprint contends that because NAT was operating without a certificate of authority from the SDPUC until June 12, 2014, it cannot enforce any of its tariffs prior to that time. The court has already addressed and rejected this argument as part of this order. Finally, Sprint argues that NAT was required to revise its interstate tariff to specify the parties' compensation obligations regarding VoIP-PSTN traffic.[16] This court's

---

[15] The court's original order is found at Docket 234. The court granted the parties' joint motion to amend a factual matter contained in the background section of the opinion. *See* Docket 247. The substance of the order is unchanged.

[16] Traditionally, telephone calls are placed over what is known as the Public Switched Telephone Network (PSTN). "Voice over Internet Protocol" communications, or "VoIP" calls, are calls placed over the Internet. The phrase "VoIP-PSTN traffic" refers to a specific kind of VoIP traffic that the FCC has defined generally as "traffic exchanged over PSTN facilities that originates and/or terminates in IP format." *In the Matter of Connect America Fund*, Report

April 27, 2015, order on Sprint's earlier motion for summary judgment, however, concluded NAT was not so required to amend its tariff. *See* Docket 249.[17] In conclusion, neither Sprint nor NAT is entitled to summary judgment regarding Counts I and IV of NAT's amended counterclaim as they pertains to NAT's interstate tariff number 3.

## II.    NAT's Motion for Partial Summary Judgment

### A.    Sprint's Claims Against NAT

In Sprint's complaint, Sprint accused NAT of, among other things, unlawfully engaging in access stimulation and improperly billing Sprint for non-tariffed access services. Docket 1. Sprint alleged that NAT violated the Communications Act in several respects,[18] and sought various forms of relief. NAT broadly seeks summary judgment "dismissing all of Sprint's claims against NAT" as well as summary judgment in its favor on Counts I and IV of its amended counterclaim. Docket 211 at 1. NAT reads Sprint's complaint to stand for only two propositions: (1) That NAT is engaged in an unlawful access

---

and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd. 17663, ¶ 940 (Nov. 18, 2011).

[17] The court's original order is found at Docket 243. The court granted the parties' joint motion to amend a factual matter contained in the background section of the opinion. *See* Docket 247. The substance of the order is unchanged.

[18] NAT also recasts Sprint's complaint to stand for the proposition that Sprint has "asserted only two grounds to justify its refusal to pay charges billed by NAT." Docket 213 at 1. While Sprint's complaint alleges that NAT is in violation of the law, its answer to NAT's amended counterclaim is where Sprint articulated a number of denials and affirmative defenses to NAT's attempt to enforce its tariffs. Docket 238. The court nonetheless construes NAT's motion for summary judgment as attempting to negate those claims that Sprint has made against NAT in its complaint, rather than the defenses alleged in Sprint's answer.

stimulation scheme, and (2) That NAT is a "sham" entity that exists only to generate access stimulation revenue.  NAT asserts that these two allegations have been dismantled by the FCC and the SDPUC. NAT also takes the position that because those two issues have been resolved in its favor, it is entitled to summary judgment on Counts I and IV of its amended counterclaim. For the reasons discussed above, however, NAT is not entitled to summary judgment on Counts I and IV of its amended counterclaim. Thus, the only issue to be decided is whether NAT's motion regarding Sprint's claims should be granted.

### 1.    Access Stimulation

NAT argues that, as a matter of law, the FCC's *CAF Order* declared the practice of access stimulation to be lawful. As a consequence, Sprint's argument that NAT is (or was) engaged in an unlawful access stimulation scheme must fail. First, NAT ignores that the *CAF Order* is not retroactive and did not affect the parties' dispute prior to its effective date. *See In the Matter of Connect America Fund*, 27 FCC Rcd. 4040, ¶ 699 n.1182 (F.C.C. 2011) ("Because the rules we adopt are prospective, they will have no binding effect on pending complaints."). Thus, whether NAT's conduct prior to the *CAF Order* was unlawful has not been resolved. Second, the FCC did not consecrate the practice of access stimulation. To the contrary, the Commission noted that one of the purposes of the *CAF Order* was to "curtail wasteful arbitrage practices." *Id.* at ¶ 33. Of those wasteful practices, access stimulation was singled out as "one of the most prevalent arbitrage activities today[.]" *Id.* at ¶ 649. And in a subsequent clarification order, the FCC stated that, "Prior to the [*CAF Order*],

the Commission adopted several orders resolving complaints concerning access stimulation under preexisting rules and compliances with the Communications Act." *In the Matter of Connect America Fund*, 27 FCC Rcd. 3037 at ¶ 26 (F.C.C. 2012). Following this statement is a footnote citing, by way of example, the FCC's earlier orders from the *Farmers* and *Northern Valley* lines of cases. *Id.* at n.69. The Commission then stated that the *CAF Order* "complements these previous decisions, and nothing in the [*CAF Order*] should be construed as overturning or superseding these previous Commission decisions." *Id.* at ¶ 25. Thus, the Commission has remained steadfast in its view that entities engaged in access stimulation may also be engaged in unjust and unreasonable conduct.

NAT attempts to buttress its argument by pointing out that, under the *CAF Order*, a CLEC engaged in access stimulation is generally required to refile its interstate tariff and benchmark its rates "to that of the price cap LEC with the lowest interstate switched access rates in the state." *In the Matter of Connect America Fund*, 27 FCC Rcd. 4040 at ¶ 679. And "if the competitive LEC's rates are already below the benchmark rate" prior to the *CAF Order*'s deadline, "such a LEC does not have to file a revised interstate switched access tariff." *Id.* NAT notes that its tariff number 3 was filed prior to the *CAF Order* and that NAT has already reduced its interstate tariff rates accordingly. Docket 212 at ¶ 4; Docket 220 at ¶ 4. Thus, NAT argues, even if it was engaged in access stimulation in the past, it is already in compliance with the FCC's rules and can no longer be found to be in violation of the law.

NAT's argument has been made before. In the *All American II Reconsideration Order*, the FCC observed:

> Defendants argue that carriers who act unjustly and unreasonably in violation of the Act and Commission rules may do so with impunity as long as they benchmark their access rates to the competing incumbent local exchange carrier. Nothing in the [*CAF Order*] supports this contention. Indeed, the Commission's prior decisions demonstrate the exact opposite to be the case.

*All American II Reconsideration Order*, 29 FCC Rcd. 6393 at ¶ 16. In a footnote following the last sentence, the FCC cited its prior decisions from the *Northern Valley*, *YMax*, *Sancom*, and *Farmers* lines of cases. *Id.* n.66. The Commission went on to explain that one of the purposes of the *CAF Order* was to curtail rather than legitimize access stimulation, and that the *CAF Order* does not "insulate the Defendants from the consequences of a finding that their conduct was unjust, unreasonable, and unlawful, in violation of the Act and the Commission's rules." *Id.* at ¶ 17. Thus, nothing in the *CAF Order* or the FCC's prior and subsequent decisions stands for the proposition that access stimulation should simply be viewed as lawful conduct. NAT's motion for summary judgment on this point is denied.

### 2.   Issue Preclusion

In Sprint's complaint, one of Sprint's factual allegations was that NAT exists solely to generate access stimulation revenue. Docket 1 at ¶ 2 ("NAT purports to operate local exchange carrier operations on the Reservation but in reality exists only to engage in traffic pumping."). According to NAT, this issue was resolved against Sprint at the SDPUC proceeding. Further, NAT asserts

that the doctrine of issue preclusion prevents Sprint from continuing to advance the same argument here.

Because the parties' dispute is before this court pursuant to federal question jurisdiction,[19] the court follows the doctrine of issue preclusion as articulated by the Eighth Circuit. *Heiser v. Woodruff*, 327 U.S. 726, 733 (1946) ("It has been held in non-diversity cases since *Erie v. Tompkins*, that the federal courts will apply their own rule of res judicata."). "Issue preclusion . . . bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment[.]' " *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001)). "This preclusion principle is rooted in concerns of judicial economy." *Simmons v. O'Brien*, 77 F.3d 1093, 1095 (8th Cir. 1996). The doctrine applies to antecedent state adjudications as well as federal adjudications. *Id.* at 1096. The same principles apply "[w]hen an administrative agency is acting in a judicial capacity and resolved disputed issues of fact

---

[19] The court notes that the parties have also invoked diversity jurisdiction. *See, e.g.*, Docket 1 at 5; Docket 172 at 3. If the case was solely before the court on the basis of diversity jurisdiction, the court would apply the principles of issue preclusion as dictated by the South Dakota Supreme Court. *Royal Ins. Co. of Am. v. Kirksville College of Osteopathic Medicine, Inc.*, 304 F.3d 804, 807 (8th Cir. 2002) (noting issue preclusion is a matter of state substantive law to be applied in diversity cases). The parties have not addressed whether the state or federal doctrine should be followed in cases where both diversity and federal question jurisdiction are invoked. NAT's brief relies on the Eighth Circuit. Docket 213 at 11. Sprint did not offer a rebuttal. Notably, however, South Dakota's doctrine of issue preclusion draws on federal law and does not differ greatly from the test articulated by the Eighth Circuit. *See Black Hills Jewelry  Mfg. Co. v. Felco Jewelry Indus., Inc.*, 336 N.W.2d 153, 157 (citing *Hanson v. Hunt Oil Co.*, 505 F.2d 1237 (8th Cir. 1974)).

properly before it which the parties have had an adequate opportunity to litigate[.]" *United States v. Utah Const. & Min. Co.*, 384 U.S. 394, 421 (1966); *see also Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991).

In the Eighth Circuit, whether issue preclusion applies turns on the satisfaction of five elements:

    (1)    The party sought to be precluded in the second suit must have been a party, or in privity with a party, to the original lawsuit;

    (2)    The issue sought to be precluded must be the same as the issue involved in the prior action;

    (3)    The issue sought to be precluded must have been actually litigated in the prior action;

    (4)    The issue sought to be precluded must have been determined by a valid and final judgment; and

    (5)    The determination in the prior action must have been essential to the prior judgment.

*Ginters v. Frazier*, 614 F.3d 822, 826 (8th Cir. 2010) (citations omitted). NAT claims that the SDPUC's finding that NAT is not a "sham" entity that exists solely to engage in access stimulation should be given preclusive effect. Sprint has not responded to NAT's argument.

During the SDPUC proceeding, the state regulatory agency addressed whether it would grant NAT's application to provide intrastate telecommunications services in South Dakota. Docket 211-5 at 2. Sprint, along with several other parties, intervened to contest NAT's application. *Id.* The parties engaged in broad discovery and numerous procedural motions were raised and resolved. *See id.* at 5-8. After several years of litigation, the SDPUC granted NAT's application. In doing so, it considered several factors such as whether NAT had sufficient technical, financial, and managerial capabilities to

38

offer services in the state. *Id.* at 9 (citing SDCL 49-31-3 and -71). The SDPUC also considered whether it was in the public interest to grant NAT's application. *Id.* at 13.

Regarding NAT's financial capabilities, Sprint "asserted that NAT's business plan is reliant on access revenues from access stimulation" and that NAT did not have a viable financial future. *Id.* at 10-11. The SDPUC noted that "To date, NAT's revenues are reliant on its business relationship with Free Conferencing" and that the *CAF Order* would "negatively impact NAT's revenues." *Id.* at 11. Nonetheless, the SDPUC found that NAT was taking steps to "actively plan for a future without these revenues" and that "the entirety of the evidence regarding [NAT's] financial capabilities" weighed in favor of granting NAT's application. *Id.* at 11-12.

As to NAT's managerial capabilities, "Sprint further asserted that NAT was a 'sham' entity that was 'established for the sole purpose of traffic-pumping.' " *Id.* at 12. Sprint also argued that NAT brought little benefit to the Crow Creek Sioux Tribe. *Id.* The SDPUC proceeding noted that the chairman of the tribe refuted Sprint's contention that NAT did not benefit the tribe and highlighted various services such as an Internet library and Internet Technology and Learning Center that NAT was involved in. *Id.* at 13 (also noting that "NAT and the tribe are actively seeking additional development opportunities."). Ultimately, the agency found that NAT was not a sham entity. *Id.* Likewise, addressing Sprint's concerns that granting NAT a certificate of

authority was not in the public interest, the SDPUC reiterated that "the Commission has found that NAT is not a sham entity." *Id.* at 15.

The first element of issue preclusion is satisfied, as Sprint intervened in and was a party to the SDPUC proceeding. The second element is also met because Sprint has alleged in both this proceeding and the SDPUC proceeding that NAT exists solely to engage in access stimulation. Likewise, NAT sought to counter Sprint's allegation in that proceeding as well as in this proceeding. The third element is met because the SDPUC directly addressed the parties' contention and found that NAT provided a number of benefits for the tribe and tribal members, and that NAT is pursuing business ventures that do not involve access stimulation. The fourth element is satisfied because the decision of the SDPUC was never appealed and the time for appeal has passed. Finally, the fifth element is satisfied because whether NAT existed for purposes beyond engaging in access stimulation bore directly on the SDPUC's findings that it had the financial and managerial capacity to deliver telecommunications service in the state, and whether granting NAT a certificate of authority was in the public interest. Therefore, the elements of issue preclusion are satisfied. Consequently, Sprint may not assert that NAT exists solely to engage in access stimulation. On this point, NAT's motion for summary judgment is granted.

## CONCLUSION

NAT cannot enforce its interstate tariffs number 1 and 2 regarding calls that terminated to Free Conferencing. Whether NAT can recover for amounts that it billed to Sprint pursuant to its interstate tariff number 3 for calls

40

delivered to Free Conferencing cannot be resolved on the facts presented. NAT's argument that access stimulation is lawful conduct is unfounded. Nonetheless, the court agrees with NAT's limited argument that Sprint is precluded from litigating the issue of whether NAT exists solely to engage in access stimulation by virtue of the SDPUC proceeding. The court expresses no opinion on the issue of damages or compensation. Accordingly, it is

ORDERED that Sprint's motion for partial summary judgment (Docket 223) is granted in part and denied in part in accordance with this opinion.

IT IS FURTHER ORDERED that NAT's motion for partial summary judgment (Docket 211) is granted in part and denied in part in accordance with this opinion.

Dated August 7, 2015.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

41