UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SPRINT COMMUNICATIONS COMPANY L.P., | 4:10-CV-04110-KES |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| vs. | |
| CROW CREEK SIOUX TRIBAL COURT, NATIVE AMERICAN TELECOM, LLC., and B. J. JONES, in his official capacity as special judge of Tribal Court; | |
| Defendants. | |

Plaintiff, Sprint Communications Company, L.P., moves the court for reconsideration of its August 5, 2015 order granting in part and denying in part the parties' cross motions for summary judgment. Docket 256. Sprint also moves the court for partial summary judgment on Count 1 of Sprint's complaint. Docket 258. Additionally, Sprint moves the court to compel defendant, Native American Telecom, LLC (NAT), to respond fully to Sprint's discovery requests. Docket 268. NAT resists each of Sprint's motions and moves the court to compel Sprint to respond fully to NAT's discovery requests. Docket 273. Sprint resists NAT's motion. For the following reasons, the court denies Sprint's motion for reconsideration, grants Sprint's motion for summary judgment, grants in part and denies in part Sprint's motion to compel, and grants in part and denies in part NAT's motion to compel.

## BACKGROUND

The facts of this case are more fully set forth in the court's August 7, 2015 order granting in part and denying in part cross motions for summary judgment from both parties. *See* Docket 250. On September 15, 2015, a telephonic status conference was held. Docket 254 (Transcript). This matter is now set for a court trial to begin on April 12, 2016. Docket 267.

## I.   Sprint's Motion for Reconsideration

Sprint inquired during the status conference if the court would reconsider a factual matter in the court's August 5, 2015 order. Docket 254 at 14. Sprint explained that the parties entered into a stipulation during the South Dakota Public Utilities Commission (SDPUC) proceeding that limited "the geographic scope of NAT's certification from the [SD]PUC." *Id.*  Sprint believed that this fact was important and that the court's order should "sync up with what the South Dakota Commission found." *Id.* at 15. The court directed Sprint to file a motion that the court could rule on after NAT had an opportunity to respond.

## DISCUSSION

Sprint argued in its motion for partial summary judgment (Docket 223) that NAT could not enforce any of its interstate tariffs prior to receiving a certificate of authority from the SDPUC. Although in 2008 NAT received a certificate of authority from the Crow Creek Sioux Tribal Utility Authority to provide telecommunication services on the Crow Creek Reservation, NAT did not receive a certificate of authority from the SDPUC until June 12, 2014.

2

Sprint contended that NAT was not operating as a competitive local exchange carrier (CLEC) until it received a certificate of authority from the SDPUC, and NAT's tariffs were unenforceable prior to that time.

This court disagreed. The court addressed several arguments raised by Sprint, for example, whether the SDPUC believed that it had sole regulatory authority over NAT and whether the SDPUC found that NAT was operating illegally in the state prior to receiving the SDPUC's certificate of authority. Docket 250 at 10-11. The court found that Sprint's arguments were not supported by the SDPUC decision. And based on the court's review of case law concerning tribal sovereignty, decisions and statements of policy from the FCC regarding the provision of telecommunication services on tribal land, and the SDPUC proceeding itself, the court concluded:

> The Crow Creek Sioux Tribal Utility Authority expressly granted NAT, a majority tribally-owned entity, permission to provide local telecommunications services on the Crow Creek Reservation. That permission included the authority to act as a CLEC on the Reservation. In light of the observations made by the FCC, the FCC's *Western Wireless* decision, the federal government's long-standing recognition of encouraging tribal self-government, and the SDPUC's response to Sprint's argument that NAT was operating illegally, the court finds that the Tribe possessed its own authority to confer such permission upon NAT. The fact that NAT also sought and obtained permission to provide similar services outside the Reservation from the SDPUC in no way divested the Tribe of the regulatory authority it enjoyed on the Reservation. *Cf. Western Wireless*, 16 FCC Rcd. 18145 at ¶ 23. Consequently, the court finds that NAT had sufficient authority to provide local telecommunications services on the Reservation prior to receiving the state's permission to provide those services off the Reservation.

Docket 250 at 11.

Here, Sprint's argument concerns the court's reference to NAT's authority to provide telecommunications services "off the Reservation." Sprint asserts that although NAT applied for a certificate of authority from the SDPUC to provide services both on and off of the Reservation, the SDPUC only addressed those services offered by NAT on the Reservation. Sprint asks the court to reconsider the court's description of the scope of NAT's authority and to revisit the court's legal conclusion to deny Sprint's summary judgment motion on this issue. Docket 257 at 8 ("The Court should correct that misstatement . . . and grant Sprint's motion for summary judgment as to the time period before June 12, 2014.").

The court denies Sprint's motion for reconsideration. To the extent that Sprint's factual argument is an accurate summary of what the SDPUC considered, the alleged factual error does not change the court's analysis. The court found that the tribal regulatory agency "expressly granted NAT . . . permission to provide local telecommunications services *on the Crow Creek Reservation.*" Docket 250 at 11 (emphasis added). The court also found that "the Tribe possessed its own authority to confer such permission upon NAT." *Id.* In other words, the court found that NAT was operating as a CLEC on the Reservation since 2008 by virtue of the tribal regulatory agency's grant of authority. Thus, the court disagreed with Sprint's argument that NAT was not a CLEC prior to receiving a certificate of authority from the SDPUC in 2012. Although NAT also sought and eventually received permission from the SDPUC, that does not mean that the Tribe was without sufficient authority to grant NAT

4

permission to operate on the Reservation. Thus, Sprint's motion for reconsideration is denied.

## II.    Sprint's Motion for Partial Summary Judgment

Sprint moves for partial summary judgment on Count 1 of its complaint. Count 1 asserts that NAT violated the Communications Act by improperly billing Sprint for access charges. Docket 1 at 15-17.

### LEGAL STANDARD

Summary judgment on all or part of a claim is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Craig*, 144 F.3d 593, 595 (8th Cir. 1998). The moving party can meet its burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party has met this burden, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). "Further, 'the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, the dispute must be outcome determinative under prevailing law.' " *Id.* (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992)). The facts,

and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion" for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## DISCUSSION

Section 201(b) of the Communications Act provides that any "charge, practice, classification, or regulation that is unjust or unreasonable is deemed to be unlawful[.]" 47 U.S.C. § 201(b). And under § 207 of the Act, any person may seek compensation in federal court for damages arising under a violation of § 201(b). 47 U.S.C. § 207; *Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms. Inc.*, 550 U.S. 45, 47 (2007) ("Communications Act language links § 201(b) to § 207, which authorizes any person 'damaged' by a violation of § 201(b) to bring a lawsuit to recover damages in federal court."). One method of demonstrating that a party has engaged in an unjust or unreasonable practice is to show that the practice violates an FCC rule or regulation that implements § 201(b). *Glob. Crossing Telecomms., Inc.*, 550 U.S. at 54 (explaining that "the FCC has long implemented § 201(b) through the issuance of rules and regulations.").

The FCC has declared as unjust and unreasonable the practice of billing for access services that are not provided to an "end user" or "customer" under the terms of a LEC's interstate tariff. *See In the Matter of Qwest Commc'ns Corp. v. Farmers & Merchs. Mut. Tel. Co.*, 24 FCC Rcd. 14801, ¶ 26 (FCC 2009) (*Farmers II*) (concluding that the free conference calling companies were not

6

"end users" under Farmers' tariff and "that Farmers' practice of charging Qwest tariffed switched access rates for its termination of traffic from the conference calling companies is unjust and unreasonable in violation of section 201(b) of the Act.").[1] The FCC has also declared as unjust and unreasonable the practice of tariffing access charges for calls to entities to whom the LEC offers free service. *In the Matter of Qwest Commc'ns Co., LLC, v. Northern Valley Commc'ns, LLC*, 26 FCC Rcd. 8332, ¶ 9 (FCC 2011) (*Northern Valley I*) (explaining that Northern Valley's tariff violated § 201(b) because it "purports to permit Northern Valley to charge IXCs for calls to or from entities to whom Northern Valley offers its services free of charge[.]").[2]

The court addressed in its August 5, 2015 order whether NAT's various interstate tariffs were lawful or otherwise enforceable. Of relevance to Sprint's pending summary judgment motion is NAT's original and revised tariff number 1. This court found:

> NAT's interstate tariff number 1 was filed with the FCC and became effective on September 15, 2009. It was then revised and

---

[1] The Commission reiterated its conclusion in an order denying Farmers' petition for reconsideration. *In the Matter of Qwest Commc'ns Corp. v. Farmers & Merchs. Mut. Tel. Co.*, 25 FCC Rcd. 3422, ¶14 (FCC 2010) (*Farmers III*) (explaining that in *Farmers II* the FCC "found that the service provided to the conference calling companies was not tariffed, and the assessment of switched access charges to Qwest therefore violated sections 201(b) and 203(c) of the Act."). The District of Columbia Circuit Court of Appeals affirmed the FCC's conclusion. *Farmers & Merchs. Mut. Tel. Co. of Wayland, Iowa v. F.C.C.*, 668 F.3d 714, 721 (D.C. Cir. 2011).

[2] The Commission reached the same conclusion in another dispute concerning the same tariff. *In the Matter of Sprint Commc'ns Co. L.P. v. Northern Valley Commc'ns, LLC*, 26 FCC Rcd. 10780, ¶ 7 (FCC 2011). The District of Columbia Circuit Court of Appeals affirmed the FCC's conclusions. *Northern Valley Commc'ns, LLC v. F.C.C.*, 717 F.3d 1017, 1019 (D.C. Cir. 2013).

amended on October 21, 2009, to be effective on October 22, 2009. Docket 250 at 16 (internal citations omitted).[3] The court concluded that NAT attempted to bill Sprint for access services involving calls delivered to Free Conferencing, but based on the particulars of the NAT-Free Conferencing relationship, Free Conferencing was not an "end user" or "customer" under the terms of NAT's original and revised tariff number 1. Docket 250 at 22-23. Thus, under the FCC's *Farmers* line of cases, NAT was not entitled to bill Sprint for those calls. The court concluded that NAT's original and revised tariff number 1 purported to allow NAT to bill Sprint for access charges for calls delivered to entities (namely Free Conferencing) to whom NAT offered free service. *Id.* at 17-18. Thus, under the FCC's *Northern Valley* line of cases, the court concluded that NAT could not enforce its original and revised interstate tariff number 1.

Sprint's motion for summary judgment asks the court to declare explicitly what Sprint argues was stated implicitly: NAT violated § 201(b)'s prohibition on unjust and unreasonable practices by improperly billing Sprint for access charges under NAT's original and revised tariff number 1. Although NAT disagrees with the court's conclusions in the August 5, 2015 order, NAT acknowledges that "applying the Court's ruling leads to the summary judgment determination that Sprint seeks in its Motion." Docket 263 at 2. The court agrees. The court has already determined that NAT improperly billed Sprint in contravention of *Farmers* and *Northern Valley*. Because the FCC has

---

[3] NAT later filed its original tariff number 2 on November 15, 2010, with an effective date of November 30, 2010. Docket 250 at 25.

determined that the practices NAT engaged in are unjust and unreasonable (and therefore unlawful) under § 201(b), Sprint is entitled to summary judgment in its favor on this claim. Thus, under § 207, Sprint is entitled to damages.

Sprint paid $29,170.27 to NAT during the time that NAT's original and revised tariff number 1 was in effect. Docket 260 at 2. NAT acknowledges that it has received that amount. Docket 263 at 1-2. The parties dispute, however, when the issue of damages should be decided. According to NAT, the court should await the outcome of the parties' trial and assign damages as part of a final order as opposed to doing so in a piecemeal fashion. Sprint argues that judgment should be entered now, along with prejudgment interest. The court agrees and directs Sprint to calculate the prejudgment interest as of March 17, 2016, and to file its calculation by March 4, 2016. NAT shall file any objections by March 14, 2016.

Sprint also seeks an award of attorneys' fees. Section 206 of the Communications Act provides that

> In case any common carrier shall do . . .  any act, matter, or thing in this chapter prohibited or declared to be unlawful, . . . such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

47 U.S.C. § 206. This statute provides for the award of reasonable attorneys' fees to the injured party in cases where the court has determined that the

injured party is entitled to recover damages. *Am. Tel. & Tel. Co. v. United Artists Payphone Corp.*, 852 F. Supp. 221, 225 (S.D.N.Y. 1994) ("Thus, the Court concludes that under 47 U.S.C. § 206, attorney's fees may only be awarded to a party that has recovered damages."), *aff'd* 39 F.3d 411 (2d Cir. 1994). Because the court has concluded that Sprint is entitled to recover damages on Count 1 of its complaint, Sprint is also entitled to an award of its reasonable attorneys' fees. The amount of reasonable attorneys' fees will be determined after trial.

III.   **The Parties' Cross Motions to Compel**

**LEGAL STANDARD**

Several amendments to the Federal Rules of Civil Procedure took effect on December 1, 2015. Those amendments "shall govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending."[4] Although the commencement of this case predates those amendments by more than five years, both of the parties' motions to compel were filed after December 1, 2015. Thus, "as just and practicable," the amended Federal Rules of Civil Procedure will apply.

The scope of discovery in a civil case is governed by Federal Rule of Civil Procedure 26. As amended, the rule provides that unless otherwise limited by a court order, the parties may discover any non-privileged matter that is "relevant to any party's claim or defense and proportional to the needs of the

---

[4] Supreme Court of the United States, Amendments to the Federal Rules of Civil Procedure, *available at* http://www.supremecourt.gov/orders/courtorders/frcv15(update)_1823.pdf (last accessed Feb. 19, 2016), at 3.

10

case." Fed. R. Civ. P. 26(b)(1). Chief Justice John Roberts wrote in his Year-End Report on the Federal Judiciary that amended Rule 26(b)(1) "crystalizes the concept of reasonable limits on discovery through increased reliance on the common-sense concept of proportionality."[5] Whether a discovery request is proportional is determined by considering "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Evidence that falls within this scope is discoverable even if it would not be admissible at trial. *Id.*

Both parties' motions to compel concern Rule 33 interrogatories and Rule 34 requests for production. Amended Rule 33 now refers to Rule 26(b)(1) as well as Rule 26(b)(2). Fed. R. Civ. P. 33(a)(1). This addition is meant "to reflect the recognition of proportionality in Rule 26(b)(1)." Advisory Committee Notes (2015 Amendment). Amended Rule 34(b) now prohibits boilerplate objections and requires a party objecting to a request for production to "state with specificity the grounds for objecting, including the reasons" and "whether any responsive materials are being withheld." Fed. R. Civ. P. 34(b)(2)(B), (C). Thus, "[a]n objection may state that a request is overbroad, but . . . should state the scope that is not overbroad." Advisory Committee Notes (2015 Amendment).

---

[5] John Roberts, 2015 Year-End Report on the Federal Judiciary (Dec. 31, 2015), *available at* http://www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf (last accessed Feb. 19, 2016), at 6.

And "[t]he producing party . . .  need[s] to alert other parties to the fact that documents have been withheld and thereby facilitate an informed discussion of the objection." *Id.* Amended Rule 34 also contains a new provision that "[t]he production must then be completed no later than the time for inspection specified in the request or another reasonable time specified in the response." Fed. R. Civ. P. 34(b)(2)(B).

If a party resists discovery, the requesting party may move for an order compelling disclosures or discovery. Fed. R. Civ. P. 37(a)(1). The Supreme Court has long recognized that "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947).

The requesting party must make a threshold showing that the requested information falls within the scope of discovery under Rule 26(b)(1). *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992). "Mere speculation that information might be useful will not suffice; litigants seeking to compel discovery must describe with a reasonable degree of specificity, the information they hope to obtain and its importance to their case." *E.E.O.C. v. Woodmen of the World Life Ins. Soc.*, No. 8:03-CV-165, 2007 WL 1217919 at *1 (D. Neb. Mar. 15, 2007) (citing *Cervantes v. Time, Inc.*, 464 F.2d 986, 994 (8th Cir. 1972)). Once the requesting party has satisfied its threshold showing, the burden then shifts to the party resisting discovery to show specific facts demonstrating that the discovery is irrelevant or disproportional. *See Penford*

*Corp. v. Nat'l Union Fire Ins. Co.*, 265 F.R.D. 430, 433 (N.D. Iowa 2009); *St. Paul Reinsurance Co. v. Commercial Fin. Corp.*, 198 F.R.D. 508, 511 (N.D. Iowa 2000). But the articulation of mere conclusory objections that something is "overly broad, burdensome, or oppressive," is insufficient to carry the resisting party's burden—that party must make a specific showing of reasons *why* the particular discovery should not be had. *Cincinnati Ins. Co. v. Fine Home Managers, Inc.*, Civ. No. 4:09-CV-234-DJS, 2010 WL 2990118, at *1 (E.D. Mo. July 27, 2010); *see also Burns v. Imagine Films Entm't, Inc.*, 164 F.R.D. 589, 593 (W.D.N.Y. 1996).

## DISCUSSION

In its August 5, 2015 order, the court denied Sprint's motion for summary judgment as it pertained to NAT's tariff number 3. That tariff was filed on August 8, 2011, to become effective August 23, 2011. Docket 250 at 30. The court found that NAT's tariff number 3 was analytically indistinguishable from the tariff at issue in the FCC's *Farmers* line of cases. *Id.* Thus, whether NAT properly billed Sprint for access charges under that tariff depends on whether Free Conference is an "end user" or "customer" under the terms of the tariff. *Id.* Under this analysis, the court must apply a multi-factor test, articulated by the FCC, that assesses the actual business relationship between NAT and Free Conferencing. *Id.*[6] Those factors include: (1) Whether the

---

[6] The FCC used the same analysis in its *Sancom* line of cases. *See in the Matter of Qwest Commn'cs Co., LLC v. Sancom, Inc.*, 28 FCC Rcd. 1982, ¶ 13 (F.C.C. 2013). The FCC noted that *Sancom* "is materially similar to and controlled by" the *Farmers* line of cases. *Id.* at ¶ 11. "Indeed, the Tariff's

conference calling companies would pay for the LEC's services; (2) Whether the LEC treated the conferencing company like other customers; (3) Whether the LEC and conference companies operated under an exclusivity agreement; (4) Whether the LEC handled the conferencing company's traffic differently; (5) Whether the LEC's agreements with the conference companies contained terms that did not resemble traditional agreements for tariffed services; and (6) Whether the LEC timely reported revenues from its services or submitted Universal Service contributions. *See Farmers II*, 24 FCC Rcd. 14801 at ¶¶ 12-20. The court concluded that material facts concerning the NAT-Free Conferencing relationship were genuinely disputed, and therefore, the *Farmers* analysis could not be applied summarily. Docket 250 at 30-31.

The court and parties discussed the issues in this case that remained for trial at the status conference. According to counsel for NAT, NAT's primary concern was a determination of its rights with respect to its right to receive payment under its tariff number 3 from the effective date of the *CAF Order* going forward. Docket 254 at 7, 8-9. The *CAF Order* became effective on December 29, 2011. The parties agreed that discovery should be allowed from that point through 2015. Sprint estimated that it had received some discovery up through 2013 but that Sprint would require additional and updated information for 2014 and 2015. *Id.* at 8. Sprint explained that the bulk of the discovery it required would be circumscribed to exploring the NAT-Free

descriptions of 'end user' and 'customer' are identical to the definitions at issue in *Qwest v. Farmers*." *Id.* For clarity, the court will refer only to the *Farmers* line of cases.

Conferencing relationship within the framework of the FCC's *Farmers* analysis. *Id.* at 10.

The court allowed the parties to conduct discovery concerning NAT's request for payment under its interstate tariff number 3. *Id.* at 13 (reiterating that "NAT is limiting its request for damages to any charges after the CAF Order forward."). The court stated: "The documents need to be updated. Any depositions will be limited to just new facts during the periods of 2014 and 2015." *Id.* at 254. A scheduling order to that effect was entered the same day. Docket 253. [7]

### A.    Meet and Confer Requirement

Rule 37(a)(1) requires the parties to meet and confer in good faith to attempt to resolve discovery disputes prior to filing a motion to compel. Fed R. Civ. P. 37(a)(1). In addition, this court's local rules impose a similar requirement. *See* D.S.D. Civ. L.R. 37.1. Based on the affidavits and exhibits submitted by both parties, the court is satisfied that the meet and confer requirement has been fulfilled regarding both motions to compel.

### B.    Sprint's Motion to Compel

Before addressing the specifics of Sprint's motion, the court must address a reoccurring contention regarding many of Sprint's discovery requests and NAT's responses to them. Almost all of NAT's responses contain an objection that Sprint is improperly attempting to discover information from

---

[7] The original discovery deadline was set for December 14, 2015. The court granted the parties' joint motion for an extension to complete discovery by March 21, 2016. Docket 267.

prior to 2014. Following the September 15, 2015 status conference, the court entered a scheduling order that stated: "Discovery should be limited to new facts that have developed during 2014 and 2015." Docket 253 at 1; Docket 267 at 1 (amended scheduling order). NAT reads the court's order to preclude discovery of any information prior to 2014. *See, e.g.*, Docket 272 at 8 ("The Court's pretrial order of September 15, 2015 limited discovery to 'new facts that have developed [during] 2014 and 2015.' ").

NAT stated that it will argue at trial that it is entitled to collect the access charges it has billed to Sprint from December 29, 2011 through 2015. One of the primary issues at trial will be the application of the *Farmers* analysis to the NAT-Free Conference relationship during that timeframe. The *Farmers* analysis is fact-driven and whether an entity is treated as an "end user" or "customer" can change over time. As the court explained in its August 5, 2015 order: "It is apparent from the [2012] amended agreement that NAT and Free Conferencing set out to alter their relationship, but it is unclear whether they in fact did so or actually reached a mutual agreement to do so." Docket 250 at 31. In other words, the court could not adjudicate summarily when or if Free Conferencing became an "end user" or "customer" under the terms of NAT's tariff number 3. Under NAT's view, however, Sprint would be precluded from discovering any relevant information from late 2011 until 2014 that bears on the answer to that question.

The court disagrees; neither the court's discovery order nor principles of basic fairness support NAT's position. Sprint acknowledged that it obtained

some discovery concerning the NAT-Free Conferencing relationship through 2013, but Sprint was unsure whether it possessed complete records for that time and also requested discovery through 2015. As the court directed, the discovery Sprint previously received would need to be updated. The court's use of the word "should" and its reference to "new facts that have developed during 2014 and 2015" in the scheduling order is meant to avoid duplicative discovery. But the court's order does not, as NAT suggests, mean that Sprint must rely solely on the information prior to 2014 that Sprint already has in its possession. As a matter of basic fairness, it would be unjust to insulate the NAT-Free Conferencing relationship from inquiry prior to 2014 because that period of time may be critical to the *Farmers* analysis. Similarly, it would be unjust to allow NAT to support its arguments with relevant evidence prior to 2014 while simultaneously prohibiting Sprint from discovering relevant evidence prior to 2014. Thus, if Sprint has properly requested otherwise discoverable information, NAT's objection to the request because it is not limited to information from 2014 and 2015 is overruled.

### 1.    Interrogatories

**Interrogatory No. 15:** For periods between January 2012 – present, and for calls from Sprint to NAT numbers assigned to Free Conferencing or another Call Connection Company, identify (by type, manufacturer, model number, quantity, and ownership) the equipment on the Reservation that NAT used to deliver calls to the Call Connection Company, and identify (by type, manufacturer, model number, quantity, and ownership) the equipment used by the Call Connection Company to terminate the calls.

**NAT Response:** NAT objects to this request to the extent it is not limited to "new facts during the periods of 2014 and 2015," as

17

>    ordered by the Court during the status conference on September
>    15, 2015. Subject to that objection, NAT states that there are no
>    new facts responsive to this interrogatory.

Docket 270-3 at 4.

Sprint attests that it has not received the type of information sought by this interrogatory. Docket 270 at ¶ 12. Sprint also asserts that it has learned recently that additional conference calling companies other than Free Conferencing are receiving calls through NAT. According to Sprint, the information sought by its interrogatory would be relevant to the *Farmers* analysis because it could show that NAT handled the conference calling companies' traffic differently than it did for other customers. NAT responds that the interrogatory is overbroad because it seeks information about conference calling companies other than Free Conferencing. NAT states it will not attempt to recover access fees for calls delivered to any other conference calling company. And NAT asserts that because no new facts have developed between 2014 and 2015, NAT is not obligated to provide a further response.

The court grants Sprint's motion to compel in part and denies it in part. In *Farmers II*, the FCC noted that "Farmers provided connections to the conference calling companies in a manner that differed from those made available to customers of its tariffed services." *Farmers II*, 24 FCC Rcd. 14801 at ¶ 13. The Commission explained that

>    Farmers provided the conference calling companies with high-
>    capacity DS3 trunks that fed into trunk-side connections, to a
>    brand new "soft switch" that Farmers purchased specifically to
>    handle traffic bound for the conference calling companies rather

than the Nortel DMS-10 circuit switch used to serve all of Farmers'
other customers.

*Id.* Thus, the type of equipment that is used to deliver and terminate calls to

Free Conferencing is relevant to the issue of whether NAT treated Free

Conferencing differently than its other customers. NAT must provide that

information to Sprint–including the information from 2012. But because NAT

will not seek compensation for calls delivered to any entities other than Free

Conferencing, NAT does not need to furnish information about the type(s) of

equipment and connections used by those other conference calling companies.

> **Interrogatory No. 16:** For periods between January 2012 –
> present, identify and describe what connected NAT equipment on
> the Reservation with Free Conferencing equipment on the
> Reservation, who owns it, and identify the capacity of such
> connection(s).

> **NAT Response:** NAT objects to this request to the extent it is not
> limited to "new facts during the periods of 2014 and 2015," as
> ordered by the Court during the status conference on September
> 15, 2015. Subject to that objection, NAT states that there are no
> new facts responsive to this interrogatory.

Docket 270-3 at 4.

Like the information sought by Sprint's interrogatory number 15, Sprint

argues that the information sought in this interrogatory is relevant to the issue

of how NAT treated Free Conferencing compared to its other customers. Sprint

also argues that whether Free Conferencing paid for the connection(s) would be

relevant to the issue of whether Free Conferencing paid for any of the services

provided to it by NAT. NAT responds that Sprint is attempting to argue that

19

NAT is a sham entity and that the court has already disposed of that argument in an earlier order.

NAT is correct that the court determined Sprint is precluded from arguing that NAT is a sham entity that exists only to generate access traffic. *See* Docket 250 at 40 (giving preclusive effect to the findings of the SDPUC). Nonetheless, Sprint is entitled to discover the information sought by its interrogatory because that information is relevant to the *Farmers* analysis. In *Farmers II*, the FCC observed that the connection equipment and soft-switch that Farmers purchased to handle the traffic delivered to the conference calling companies "was connected directly to the conference calling companies' conference bridges, which were located in Farmers' end office." *Farmers II*, 24 FCC Rcd. 14801 at ¶ 13. And the Commission noted the "host of services" Farmers provided to the conferencing companies without cost supported its finding that the conference calling companies were not "end users" or "customers." *Id.* at ¶¶ 12-13 n.50 ("Prior to this litigation, Farmers did not bill the conference calling companies for any of this equipment, facilities, power, or services that it provided."). Thus, NAT must respond fully to Sprint's interrogatory.

> **Interrogatory No. 17:** Describe any changes/modifications/updates to the diagram labeled as "Scenario 3" (and discussed at page 44 of the February 13, 2015 Roesel Deposition). Include a description of the change to the tandem provider reflected at page 43 of the Roesel Deposition, and the V&H coordinates for the location at which NAT receives Sprint calls from the new tandem provider.

> **NAT Response:** NAT objects to this request to the extent it is not limited to "new facts during the periods of 2014 and 2015," as ordered by the Court during the status conference on September 15, 2015. Subject to that objection, NAT states that the answer to the above interrogatory may be found within the documents NAT agrees to produce in response to Sprint's requests for documents set forth below. NAT will produce these documents after the parties execute a mutually agreeable confidentiality stipulation.

Docket 270-3 at 4-5.

The diagram referenced in Sprint's interrogatory is one of several so-called "call flow diagrams" that Sprint obtained during the SDPUC proceeding. Sprint cited the diagrams in support of one of its motions for summary judgment, and the court described the diagrams in the court's order denying Sprint's motion for summary judgment. *See* Docket 243 at 11-21. The diagrams contain a number of illustrations and are accompanied by a "Scenario" that describes in technical terms what the illustrations depict. The diagrams explain how calls are routed and ultimately delivered to NAT.

According to Sprint, NAT has provided updated diagrams, but NAT did not provide an updated description (the accompanying "Scenario"). Sprint also contends that NAT did not identify the V&H coordinates as sought by the interrogatory. NAT asserts that it has produced everything sought by the interrogatory and that Sprint did not ask for a description of the diagrams in its interrogatory. Docket 272 at 10 ("Sprint now claims it is entitled to a description of that diagram, but that is not what the interrogatory requests."). The court disagrees. The interrogatory not only asked NAT to "[d]escribe" any changes to the diagram but also asked NAT to "[i]nclude a description" of

21

certain specific parts of the diagram. Thus, NAT must provide an appropriate

description and identify the V&H coordinates as sought by the interrogatory.

> **Interrogatory No. 18:** For periods between January 2012 and the
> present, identify and describe all services, goods, or products that
> you have provided to Free Conferencing, including the quantity of
> each service; the rate of each service; all features and practices
> associated with the provision of each service; and the specific tariff
> or contract provision(s) pursuant to which each service, good, or
> product has been provided.

> **NAT Response:** NAT objects to this request to the extent it is not
> limited to "new facts during the periods of 2014 and 2015," as
> ordered by the Court during the status conference on September
> 15, 2015. NAT also objects on the ground that the request is
> overbroad to the extent it seeks information about agreements with
> carriers besides Sprint. Such agreements are not reasonably
> calculated to lead to the discovery of admissible evidence. NAT also
> objects on the ground that the interrogatory is vague, ambiguous,
> and does not sufficiently describe the information sought.

> Subject to those objections, NAT states that Free Conferencing is a
> customer of NAT and receives access service. The quantity, rate,
> features, practices and tariff or contract provisions of that service
> are contained within the 2012 Amended Service Agreement
> between NAT and Free Conferencing already in the possession of
> Sprint, as well as the amended agreement and other documents to
> be produced in response to Sprint's request for documents set
> forth below after the parties execute a mutually agreeable
> confidentiality stipulation.

Docket 270-3 at 5.

Sprint argues that the information sought by this interrogatory is

relevant to the issue of how NAT treated Free Conferencing in comparison to

NAT's other customers. Also, Sprint asserts that it is relevant to the issue of

whether Free Conferencing paid for any of the services it received from NAT.

Sprint attests that NAT sent only limited billing information and that the bills

NAT produced do not identify the tariff or contract provision by which certain

services were provided. Docket 270 at ¶ 20. NAT responds that Sprint has already received an amended service agreement that regulates the NAT-Free Conferencing relationship. NAT also argues that it has provided all the 2014 and 2015 invoices that it sent to Free Conferencing.

The court agrees that the information sought by Sprint is relevant under the *Farmers* analysis. More specifically, it is relevant to how NAT treated Free Conferencing in relation to its other customers and to whether Free Conferencing paid for any of the services it received from NAT. NAT must identify the services, goods, and/or products that it provided to Free Conferencing from December 29, 2011 through 2015. NAT must also identify or describe the quantity of what was provided and the tariff or contract provision under which the services, goods, or products were provided. As to the amended service agreement referenced by NAT, the court previously described the document as follows:

> Additionally, the document that purports to replace the 2009 service agreement is not a new document but rather a redlined version of the original. Docket 240-8. A number of clauses are incomplete, and it is not clear if the document was ever completed or carried any legal effect.

Docket 250 at 21-22. The 2009 agreement allowed Free Conferencing to receive a number of services for free, and the court found that "whatever compensation NAT was to receive [under the 2012 agreement] for the services it provided to Free Conferencing (such as Internet access, electrical power, and labor) was not filled in." *Id.* at 22. In other words, even if the amended agreement is a valid contract, it does not describe the rate(s) applicable to the services or the

quantity of service provided as sought by the interrogatory. Thus, NAT must

identify and describe that information.[8]

> **Interrogatory No. 20:** Identify the total number of minutes delivered to NAT for termination on a monthly basis from November 2013-present, and the total number of minutes delivered each month to NAT for termination that were destined to Free Conferencing.

> **NAT Response:** NAT objects to this request to the extent it is not limited to "new facts during the periods of 2014 and 2015," as ordered by the Court during the status conference on September 15, 2015. NAT also objects to the extent the request seeks minutes delivered to NAT [by] carriers other than Sprint. Subject to those objections, NAT states that the answer to the above interrogatory may be found within the documents NAT agrees to produce in response to Sprint's requests for documents set forth below. NAT will produce these documents after the parties execute a mutually agreeable confidentiality stipulation.

Docket 270-3 at 6.

Sprint attests that NAT produced only the number of minutes that NAT

billed to Sprint "broken down by calling company." Docket 270 at ¶ 22. Sprint

argues that the total number of minutes delivered to NAT for termination with

Free Conferencing from *all* carriers is relevant to the *Farmers* analysis.

Specifically, because a single telephone line can deliver only a finite number of

minutes of traffic per day, Sprint argues that it may be able to demonstrate

that NAT has provided Free Conferencing with more lines and thus more

services than what NAT has previously reported. And if NAT is

---

[8] Sprint sought to compel a response to its interrogatory number 19, which asked for the same information as interrogatory number 18 except that it concerned other conference calling companies besides Free Conferencing. *See* Docket 270-3 at 5-6. Because NAT is limiting its damages to those calls that were provided to Free Conferencing, Sprint has withdrawn its motion concerning interrogatory number 19. Docket 275 at 8.

underrepresenting the number of lines it provides to Free Conferencing, then Sprint could show that NAT is not treating Free Conferencing like any other customer. NAT argues that the data concerning other carriers is irrelevant because the only calls for which NAT is seeking compensation are the calls delivered to NAT by Sprint.

In *Farmers II*, the FCC found it significant that the conference calling companies did not pay for any of the services provided by the LEC, including connections to the interexchange network. *Farmers II*, 24 FCC Rcd. 14801 at ¶ 12 (explaining that the parties' agreements showed the conference calling companies would not "pay Farmers for their connections to the interexchange network, as would ordinary end-user customers under the tariff."). The information sought by Sprint is relevant because it could show how many connections were provided to Free Conferencing. NAT has not made any showing that Sprint's request is not proportional or otherwise unduly burdensome. Thus, Sprint's motion to compel a full response to this interrogatory is granted.

> **Interrogatory No. 21:** For 2014-2015, identify (by name, telephone number(s) assigned, service address, and dates of service) those individuals or entities you provided service to.
>
> **NAT Response:** NAT objects to this request to the extent it is not limited to "new facts during the periods of 2014 and 2015," as ordered by the Court during the status conference on September 15, 2015.
>
> Subject to those objections, NAT states that the answer to the above interrogatory may be found within the documents NAT agrees to produce in response to Sprint's requests for documents set forth below, namely the list of customers to whom NAT has

provided service in 2014 and 2015. NAT will produce these documents after the parties execute a mutually agreeable confidentiality stipulation.

Docket 270-3 at 6-7.

Sprint argues that this information is relevant because it cannot determine how NAT treated its other customers if Sprint does not know the identity of the other customers. Sprint attests that it received a list containing some customer data from NAT, but the list does not contain the names, numbers, or other information related to any conference calling companies (including Free Conferencing). Docket 270 at ¶ 23. Thus, Sprint argues NAT's response is incomplete. NAT responds that the interrogatory is overly broad and that it seeks irrelevant information because NAT will not attempt to recover for calls placed to any entities other than Free Conferencing.

The court finds that Sprint is entitled to receive the information sought by this interrogatory. Although NAT will not seek compensation for calls delivered to entities other than Free Conferencing, Sprint should be provided the identifying data concerning those individuals or entities that receive NAT's services. This is especially true of Free Conferencing, and NAT does not refute Sprint's assertion that NAT failed to provide Sprint with the identifying data ascribed to Free Conferencing. Thus, NAT must fully respond to Sprint's interrogatory.

### 2. Requests for Production

**Request for Production No. 19:** Provide profit and loss, general ledger, and balance sheet information for 2014 and any portion of 2015 where it is available. If there have been any restatements to

prior years that change what had been previously provided in discovery for 2012-2013, please provide any restated documents.

**NAT Response:** NAT objects to this request to the extent it is not limited to "new facts during the periods of 2014 and 2015," as ordered by the court during the status conference on September 15, 2015. NAT also objects to this request on the ground that it is not reasonably calculated to lead to the discovery of admissible evidence. Sprint's claim that NAT is a "sham" is precluded by the Court's order that it is collaterally estopped from pursuing that contention. NAT also objects to producing any responsive documents without a Confidentiality Stipulation in place. NAT agrees to meet and confer with Sprint to execute a Confidentiality Stipulation.

Subject to those objections, NAT will produce its profit and loss statements, and balance sheets covering 2014 and 2015. As for the "general ledger," NAT objects on the basis that the request is overbroad in this modern age where the term "general ledger" can refer to many things. NAT objects to producing all data in its electronic accounting database, as it includes such things as bank account numbers and employee information. NAT agrees to meet and confer with Sprint in an effort to define the scope of the information that is relevant to the remaining issues before the court and not addressed by other documents being provided.

Docket 270-3 at 9.

Sprint argues that NAT's response is incomplete because NAT has not produced the general ledger information sought by Sprint's request. Sprint also contends that it represented to NAT that sensitive data such as personal financial information or account numbers could be redacted from NAT's general ledger. NAT acknowledges that it possesses the general ledger information sought by Sprint but argues that NAT should not have to produce its general ledger because it is no longer relevant in this case. According to NAT, its general ledger could be sought by Sprint only for the purpose of arguing that NAT is a sham entity, an issue this court has resolved against

27

Sprint. NAT also argues the request is overbroad because NAT will not seek compensation for calls delivered to any conference calling company except Free Conferencing.

The court grants Sprint's motion to compel in part and denies it in part. In *Farmers II*, the FCC highlighted the importance of analyzing the flow of money between an LEC and the conference calling companies. *Farmers II*, 24 FCC Rcd. 14801 at ¶ 12 n. 49 ("To the contrary, the flow of money between these parties is essential to analyzing their relationship because the tariff expressly contemplates and requires payments to Farmers, not payments that flow in the reverse direction."). The court's August 5, 2015 order considered NAT's general ledger and accounting documentation in its analysis. Docket 250 at 18 ("Similarly, several income statements and ledgers produced during the SDPUC proceeding show that Free Conferencing did not pay NAT until September 12, 2011."). Thus, NAT's general ledger is relevant. At the same time, however, the court finds that Sprint's request that NAT produce the entirety of its general ledger for 2014 and 2015 is disproportionate to the needs of the case. The animating substance of Sprint's request is Sprint's need to determine whether NAT billed Free Conferencing for the various services that NAT provided, whether Free Conferencing paid those bills, and whether NAT and Free Conferencing maintained a revenue sharing arrangement. Although the flow of money between NAT and Free Conferencing is relevant, Sprint has not shown that it should be entitled to the entirety of NAT's general ledger.

Thus, NAT must produce its general ledger from 2014 and 2015 (as well as any restatements to it from earlier periods, if any) as it concerns Free Conferencing.

> **Request for Production No. 40:** Produce communications from 2012 to the present between NAT (including NAT's attorneys) and Carey Roesel (and/or Mr. Roesel's company, Technologies Management Inc.) regarding NAT's regulatory compliance obligations, NAT's collection and/or remittance of taxes and fees, and any filings made with the South Dakota Commission, the Federal Communications Commission, the Crow Cree Tribal Utility Authority, and/or the Universal Service Administrative Company. Sprint does not seek production of draft expert reports or draft expert disclosures.

> **NAT Response:** NAT objects to this request to the extent it is not limited to "new facts during the periods of 2014 and 2015," as ordered by the court during the status conference on September 15, 2015. NAT also objects to this request to the extent it calls for the production of documents covered by the attorney-client privilege, the work product doctrine, or the protection according to Fed. R. Civ. P. 26(b)(4). Subject to those objections, NAT will produce any non-privileged responsive documents in its possession, custody and control after a mutually agreeable confidentiality stipulation is executed.

Docket 270-3 at 17.[9]

Sprint attests that it has neither received any documents that appear to be responsive to its request nor has NAT produced a privilege log. Docket 270 at ¶¶ 9, 26. NAT responds that it intends to supplement its response by producing non-privileged documents and to "serve a privilege log if required under the applicable rules." Docket 272 at 13.

The focus of Sprint's request concerns documents that bear on NAT's compliance with applicable telecommunications regulations as well as NAT's

---

[9] Sprint also moved to compel complete responses to its requests for production number 22 and 31. Sprint has withdrawn its motion to compel as it pertains to those two requests. Docket 275 at 11.

29

collection and remittance of various taxes and fees. Although neither party addressed the relevance of Sprint's inquiry, the court presumes Sprint's request is premised on the sixth *Farmers* factor. That is, whether the LEC has timely reported revenues from its services or submitted Universal Service contributions. *Farmers II*, 24 FCC Rcd. 14801 at ¶ 25 n.97 ("If Farmers had been providing interstate end-user telecommunications services to Qwest or the conference calling companies, then Farmers should have timely reported revenues from those end-user services and paid universal service contributions based on them"). Thus, the court finds that the information Sprint seeks is relevant.

"When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material . . . the party must expressly make the claim; and describe the nature of the documents . . . ." Fed. R. Civ. P. 26(b)(5). The resisting party must "provide sufficient information to enable other parties to evaluate the applicability of the claimed privilege or protection." Advisory Committee Notes (1993 amendment). Thus, if NAT believes any of the documents requested by Sprint are privileged or otherwise protected, NAT must disclose a log describing the basis for the claimed privilege or protection. Otherwise, NAT must produce the documents sought by Sprint.

**C.  NAT's Motion to Compel**

**1.  NAT's contention interrogatories**

30

**Interrogatory No. 6:** State all facts that support every dispute and notice of dispute sent by or on behalf of Sprint to NAT during 2014 and 2015.

**Sprint Response:** Sprint objects to this interrogatory as overbroad. Subject to that objection, with respect to 2014-2015, Sprint has not been provided information showing that calls to NAT's calling company partner(s) generate compensable access charges under NAT's FCC Tariff No. 3. Instead, Sprint's assessment that NAT lacked tariff authority to bill Sprint, and that Free Conferencing was not a legitimate end-user subscriber under the FCC's *Farmers II* test is based on the following:

- The 2009 Agreement
- The 2012 Agreement
- NAT's tariffs and facts regarding the manner in which services were provided to Free Conferencing
- The invoices issued from NAT to Free Conferencing
- Discovery responses identifying the services provided to Free Conferencing
- Discovery responses identifying NAT's failure to collect and/or remit the proper fees and surcharges
- Testimony from Holoubek, Erickson, and Roesel regarding NAT's operations, NAT's billing practices, NAT's provision of numerous services to Free Conferencing without proper compensation, and NAT's sharing of access revenue with Free Conferencing
- *See also* Sprint's post hearing briefs in South Dakota PUC Docket No. TC11-087.

Discovery is continuing as to February of 2014 forward. To date, Sprint has been provided with no facts that convince Sprint that NAT had legitimate end-users. Moreover, documents related to an investigation done by Ms. Clouser and provided in response to NAT's document requests demonstrate that NAT is serving new entities that provide international pass-through capabilities and or access to radio feeds, so that calls to those numbers do not terminate with NAT.

Docket 273-3 at 5-6.

Sprint has sent NAT letters disputing Sprint's obligation to pay the

charges that NAT has billed to Sprint. NAT's interrogatory asks Sprint to

31

provide the facts that support Sprint's position(s) in its letters. NAT argues that Sprint's response is improper. According to NAT, its interrogatory asked for "all facts" supporting Sprint's position(s), but Sprint merely provided a generalized summary and a bulleted list that non-specifically referred to various documents. Sprint argues that its response was sufficient and, to the extent that it is insufficient, that counsel from Sprint has supplemented Sprint's original answer in a subsequent letter. That letter is six pages long. Approximately four-and-one-half of those pages contain the factual points behind Sprint's argument that NAT is not entitled to collect the access charges that NAT billed Sprint under NAT's tariff number 3. *See* Docket 273-9. NAT argues that Sprint's letter is improper.

The court must first address the interrogatory itself. NAT's interrogatory number 6 is a contention interrogatory. A contention interrogatory asks "another party to indicate what it contends, to state all the facts on which it bases its contentions, to state all the evidence on which it bases its contentions, or to explain how the law applies to the facts." *Dziadek v. Charter Oak Fire Ins. Co.*, No. Civ. 11-4134-RAL, 2014 WL 820049 at *16 (D.S.D. Mar. 3, 2014) (quoting *Black Hills Molding, Inc. v. Brandom Holdings, LLC*, 295 F.R.D. 403 (D.S.D. 2013) (Duffy, Magistrate Judge)). When properly used, contention interrogatories can be helpful "in that they may narrow and define the issues for trial and enable the propounding party to determine the proof required to rebut the responding party's claim or defense." *Moses v. Halstead*, 236 F.R.D. 667, 674 (D. Kan. 2006). But broadly phrased contention

interrogatories that require a lengthy narrative explaining a party's claims or defenses can be oppressive or unduly burdensome, and " '[a] litigant may not compel his adversary to go to work for him.' " *Poulos v. Summit Hotel Props., LLC*, No. Civ 09-4062-RAL, 2010 WL 2640394 at *2 (D.S.D. July 1, 2010) (quoting *Breeland v. Yale & Towne Mfg. Co.*, 26 F.R.D. 119, 120 (E.D.N.Y. 1960)). Although NAT's interrogatory asks for "all facts" supporting Sprint's position, the major issue of contention is the application of the *Farmers* analysis to the NAT-Free Conferencing relationship. Because that analysis is fact-driven, NAT should be allowed to discover the facts that Sprint believes supports its argument. Thus, the court is satisfied that the interrogatory is not unduly burdensome.

As for Sprint's initial response, the court finds that the response is insufficient. Sprint merely told NAT what it already knew, *i.e.*, that Sprint believed that NAT could not collect its access charges based on the *Farmers* analysis. But that is a conclusion. What NAT sought were the facts supporting Sprint's conclusion. And Sprint cannot satisfy its obligation to respond to NAT's interrogatory by referring NAT to a mass of documents. *Cf. Black Hills Molding*, 295 F.R.D. at 414 ("More is required of Black Hills Molding than merely referring . . . to the entirety of its document production."). Rather, Sprint needs to provide the facts supporting its argument that NAT is not entitled to collect its access charges.

Regarding Sprint's supplemental letter, the court finds that the letter is procedurally deficient and therefore improper. Under the Federal Rules of Civil

Procedure, interrogatories must be signed, under oath, by the party itself, not by the party's attorney. Fed. R. Civ. P. 33(b) (the party must answer each interrogatory separately and fully in writing under oath, and the attorney signs only as to objections that are raised). Sprint's initial interrogatory responses were signed and verified by Amy Clouser, "an Access Verification Analyst III within Sprint's Access Verification Department." Docket 273-3 at 13. Sprint's letter is signed by one of Sprint's attorneys in this matter. While an attorney may answer interrogatories on behalf of a corporation when the attorney acts as the corporation's officer or agent, Fed. R. Civ. P. 33(b)(1)(B), the letter from Sprint's counsel is not signed under oath, and it is not clear that Sprint designated its counsel to act as its agent. Thus, Sprint's letter is an improper answer to NAT's interrogatory.

Sprint argues that its letter is, nonetheless, a proper supplement under Rule 26(e). Rule 26(e) imposes a continuing duty on

> a party . . . who has responded to an interrogatory . . . [to] supplement or correct its disclosure or response in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]

Fed. R. Civ. P. 26(e)(1)(A). Sprint focuses on the last clause's reference to supplemental information that has "otherwise been made known." According to Sprint, its letter was "in writing," and therefore Sprint was not required to supplement its interrogatory answer in accordance with Rule 33, *i.e.*, with an answer signed under oath by the party. The court disagrees. Under Sprint's

view, a party could shirk the attestation requirement of Rule 33 by providing an evasive or incomplete answer to an interrogatory and then advancing a host of facts in an unsworn letter disguised as a supplement. But interrogatories are intended to be a relatively inexpensive discovery method used to obtain sworn answers from an opposing party. *See* 8B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 2163 (3d. ed) (hereinafter Wright & Miller). Sprint's view would render nugatory the utility of the interrogatory and the value of an interrogatory response. Therefore, Sprint must provide a signed supplement to NAT's interrogatory number 6. *See, e.g.*, *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 254 F.R.D. 463, 467 (M.D. Fla. 2008) ("Thus, if a party amends or supplements its response, the party must attest to the truthfulness of the new response."); *Vazquez-Fernandez v. Cambridge Coll., Inc.*, 269 F.R.D. 150, 155 (D.P.R. 2010) (observing that "[i]f this answer were in the original response, it would have required a signature under oath by the party" and compelling a signed supplemental response).

The burden on Sprint to correct its response is not an onerous one. The court has reviewed the substance of the supplemental letter. If Sprint provides the substance of the letter to NAT in a format that accommodates Rule 33, the contents provide a sufficient response to NAT's interrogatory number 6.[10]

---

[10] NAT argues that if the court were to deem Sprint's letter a procedurally proper response, that the response would still be substantively deficient. NAT contends that Sprint's use of the phrase "include" in the letter suggests that Sprint's letter is evasive or incomplete. *See* Docket 273-9 at 1 ("The facts that Sprint will offer relative to the *Farmers II* and *Sancom* test include the following . . . ."). The court disagrees.

Regardless, Sprint must supply NAT with a full and complete response to NAT's interrogatory.

> **Interrogatory No. 7:** State all facts that support Sprint's contention that it is not legally required to pay NAT for the claims asserted in this matter.

> **Sprint Response:** Sprint incorporates its objections and response to Interrogatory No. 6.

Docket 273-3 at 6.

This interrogatory is similar to NAT's interrogatory number 6. It is ostensibly broader to the extent that the interrogatory asks Sprint to provide "all facts" in support of arguments Sprint has not explicitly made in its dispute letters. Sprint's objection is coextensive with its argument regarding interrogatory number 6. The court found Sprint's response to NAT's interrogatory number 6 insufficient. For the same reasons, the court finds Sprint's response to this interrogatory is insufficient. Thus, Sprint must supply NAT with a full and complete answer to interrogatory number 7.

> **Interrogatory No. 8:** State the basis of your denial, in Paragraph 43 of your Answer To NAT's Amended Counterclaim, that NAT was providing a service to Sprint and/or its customers.

> **Sprint Response:** Sprint objects to this interrogatory as calling for a legal conclusion. Subject to that objection, Sprint incorporates its objections and response to Interrogatory No. 6. NAT is providing neither Sprint nor Sprint's customers with a service described in its Tariff No. 3 in full compliance with NAT's tariff and applicable law.

Docket 273-3 at 6.

Paragraph 43 of Sprint's answer to NAT's amended counterclaim states:

> With respect to the allegations in paragraph 49, Sprint admits that it continued to deliver calls to NAT (as it was obligated to do) and to dispute NAT's bills (as it was entitled to do). Sprint denies that NAT was providing a service to Sprint and/or its customers.

Docket 238 at 8. The allegations in paragraph 49 of NAT's amended complaint are that "[e]ven after NAT filed its [tariff number 3] in August 2011, Sprint continued to terminate calls at NAT without paying for the service that NAT was providing to Sprint and its customers." Docket 172 at 13.

The court disagrees with Sprint's objection that the interrogatory calls for an improper legal conclusion. The last sentence of Rule 33(a)(2) states that "[a]n interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact[.]" Fed. R. Civ. P. 33(a)(2). The advisory committee notes explain that

> As to requests for opinions or contentions that call for the application of law to fact, they can be most useful in narrowing and sharpening the issues, which is a major purpose of discovery . . . . On the other hand, under the new language interrogatories may not extend to issues of "pure law," *i.e.,* legal issues unrelated to the facts of the case.

Advisory Committee Notes (1970 Amendment); *see also* Wright & Miller § 2167 ("Thus the only kind of interrogatory that is objectionable without more as requesting a legal conclusion is one that extends to 'legal issues unrelated to the facts of the case.' "). NAT's interrogatory asks Sprint to provide the basis for Sprint's argument that NAT was not providing Sprint with a compensable service. That argument is a focal point of this case. Thus, NAT's interrogatory does not ask Sprint about a legal issue unrelated to the facts of the case.

The court, nonetheless, finds that Sprint's response to NAT's interrogatory is sufficient. Sprint's answer explained that NAT did not provide Sprint or Sprint's customers with compensable services because those services were not delivered in accordance with NAT's tariff. Unlike NAT's interrogatory number 6, this interrogatory did not ask Sprint to provide anything more than the basis for Sprint's position, and Sprint duly provided it. Thus, no further response is needed. NAT's motion to compel a more complete response is denied.

> **Interrogatory No. 9:** State the basis of your contention, in Paragraph 64 of your Answer To NAT's Amended Counterclaim, that NAT's charges were or are "unlawful."

> **Sprint Response:** Sprint objects to this interrogatory as calling for a legal conclusion. Subject to that objection, Sprint incorporates its objections and response to Interrogatory No. 6. Sprint further states that, under the FCC precedent that Sprint identified in support of its motion for summary judgment on its Count I, billing of access charges that are not due under tariff is unjust and unreasonable in violation of 47 U.S.C. §§ 201(b) and 203. Discovery is continuing as to February of 2014 forward.

Docket 273-3 at 6.

> Paragraph 64 of Sprint's answer to NAT's amended counterclaim states:

> With respect to the allegations in paragraphs 78-80, Sprint admits that it continues to dispute NAT's unlawful charges, and it intends to continue disputing NAT's bills, and denies the remaining allegations.

Docket 238 at 11. The gravamen of paragraphs 78-80 of NAT's amended counterclaim is that Sprint is withholding payment for NAT's services on a continuous, monthly basis. *See* Docket 172 at 19.

Like NAT's interrogatory number 8, this interrogatory asked Sprint to provide the basis for Sprint's argument that NAT's access charges were unlawful. The basis for Sprint's argument is that the FCC has declared unlawful the practice of billing for access charges that are not properly due under a tariff. Because Sprint has provided the information sought by NAT's interrogatory, no further response is needed. Thus, NAT's motion to compel a more complete response is denied.

> **Interrogatory No. 10:** With respect to each and every bill sent by NAT which Sprint has not paid, state the basis of Sprint's contention that it is not legally obligated to pay each such bill.

> **Sprint Response:** Sprint incorporates its objections and responses to Interrogatory Nos. 5 and 6.

Docket 273-3 at 6.

NAT's interrogatory number 5 asked Sprint to "[i]dentify all dispute letters sent by Sprint to NAT from 2014-2015 and state the basis of the dispute." Docket 273-3 at 5. Sprint responded that it will produce the letters and that "Sprint disputed that NAT's access charges are compensable under the terms of NAT's access tariffs." *Id.* NAT did not move to compel an additional response to its interrogatory number 5. The court has already discussed NAT's interrogatory number 6 and Sprint's response to the interrogatory.

NAT's interrogatories 5, 6, and 10 all concern Sprint's justification(s) for refusing to pay NAT's bills. Sprint responded to those interrogatories by asserting that Sprint believes the *Farmers* analysis prevents NAT from collecting the access charges NAT has billed to Sprint. In other words, the basis

for Sprint's contention is that NAT cannot lawfully bill Sprint for calls delivered to Free Conferencing under NAT's tariff number 3 because Free Conferencing is not an "end user" or "customer" as defined by that tariff. While NAT's interrogatory number 6 sought "all facts," NAT's interrogatory number 10 only sought the basis for Sprint's position. Because Sprint's response provides the information sought under NAT's interrogatory number 10, NAT's motion to compel a more complete response is denied.

> **Interrogatory No. 17:** If Sprint contends that NAT cannot lawfully charge Sprint for a terminating access service under its filed tariffs, state the basis for that contention.
>
> **Sprint Response:** Sprint incorporates its objections and responses to Interrogatory Nos. 5-6.

Docket 273-3 at 10.

This interrogatory again asks Sprint to state the basis for its positon that NAT cannot collect on the access charges it billed to Sprint. Because Sprint has already provided the information sought by this interrogatory, NAT's motion to compel a more complete response is denied.

> **Interrogatory No. 18:** If Sprint contends that NAT's FCC tariff violates statutory authority and FCC regulations, state the basis of those contentions.
>
> **Sprint Response:** Sprint objects to this interrogatory as calling for a legal conclusion. Sprint further objects because discovery and analysis are continuing. Subject to those objections and without waiver thereof, Sprint states that Section 2.10.3(H) (Original Page 45) of NAT's Tariff No. 3 states:
>
>> In the event Company, in its sole discretion, chooses to forego billing the Customer for access services in any particular month(s), Company reserves the right to back bill Customer for any unbilled recurring or nonrecurring charges

40

for a period of twenty-four (24) months.

A "customer" is one who subscribes to the services offered under the Tariff, including end users. This language purports to allow NAT to impose tariffed switched access charges on IXCs for calls placed or received by individuals or entities to whom NAT offers free services. Because this language gives NAT the discretion not to bill its end users, the tariff is unlawful and in violation of the FCC's *Northern Valley v. Qwest* decision. Sprint reserves the right to supplement this response in the event that it discovers other unlawful terms.

Docket 273-3 at 10.

The court disagrees with Sprint's argument that this interrogatory calls for an improper legal conclusion. Sprint has argued, and the court has found, that several of NAT's earlier tariffs were unlawful and unenforceable. Thus, NAT's interrogatory does not ask Sprint about a legal issue unrelated to the facts of the case.

As to the substance of Sprint's response, the court finds it is sufficient. NAT's interrogatory asked Sprint to state the basis for Sprint's argument that NAT's tariff violates FCC regulations or statutory authority. Sprint explained its argument that certain provisions of NAT's tariff may violate the FCC's *Northern Valley* line of cases. No further response is needed. Thus, NAT's motion to compel a more complete response is denied.

### 2.    Other issues

NAT's interrogatories 15 and 16 ask Sprint for information about the revenue Sprint has derived from the calls Sprint delivered to NAT. For example, NAT asked Sprint to "[d]escribe fully all long distance plans offered to Sprint's customers for traffic delivered to NAT and the corresponding profit per minute

obtained on these plans by Sprint." Docket 273-3 at 9 (NAT interrogatory number 15). NAT's requests for production 11-13 asked Sprint to produce documentation concerning the revenues it has received from calls it delivered to NAT. For example, NAT asked Sprint to produce "[a]ll documents that identify Sprint's revenue for calls transmitted to NAT for termination." Docket 273-2 at 7 (NAT request for production number 13). Sprint raised a number of objections to these inquiries, including their lack of relevance.

As the propounding party, NAT must make a threshold showing that the requested information falls within the scope of discovery under Rule 26(b)(1). *Hofer*, 981 F.2d at 380. NAT argues that it is entitled to collect the access charges it billed to Sprint under its tariff number 3. Sprint has identified potential arguments against NAT's efforts to enforce its tariff, for example, under the FCC's *Farmers* and *Northern Valley* line of cases. NAT has not explained how the revenue Sprint received is relevant to NAT's ability to enforce its tariff or the *Farmers* and *Northern Valley* cases.

NAT posits that "Sprint has alluded to unspecified claims and defenses that NAT's charges are 'un[just] and unreasonable' and otherwise violate sections 201 and 202 of the Federal Communications Act." Docket 274 at 14. According to NAT, information concerning the revenue Sprint has received would be relevant to Sprint's allegedly unspecified claims. In response, Sprint stated that it has no intention of making any "claim that the rate elements listed in NAT's FCC Tariff No. 3 exceed the rates allowed by the FCC's CAF Order and the step down." Docket 273-9 at 6. NAT replies that there are still "a

42

myriad of ways" that Sprint's revenues could be relevant to this case. Docket 280 at 9. NAT has not, however, explained what any of those "myriad of ways" might be.[11] Consequently, the court can only speculate. But "[m]ere speculation that information might be useful will not suffice; litigants seeking to compel discovery must describe with a reasonable degree of specificity, the information they hope to obtain and its importance to their case." *Woodmen*, 2007 WL 1217919 at *1 (citing *Cervantes*, 464 F.2d at 994). NAT has not met its threshold burden of demonstrating that the information it seeks falls within Rule 26(b)(1). Thus, NAT's motion to compel more complete responses to interrogatories 15 and 16 and requests for production of documents 11-13 are denied.

### D.    Expenses

The court has discretion under Rule 37(a)(5)(C) to impose an award of reasonable expenses if a party's motion to compel is granted in part and denied in part. Fed. R. Civ. P. 37(a)(5)(C). Because both parties' motions to compel are granted in part and denied in part, the court does not impose monetary sanctions on either party.

---

[11] NAT cites an objection Sprint made to a set of interrogatories in a different case, in a different federal district, and involving a different LEC. Docket 280-10. According to NAT, the specific wording of Sprint's objection demonstrates that Sprint considers its revenues as relevant information in cases involving claimed violations of the Communication Act. Even if that was a plausible inference to extract from Sprint's objection, it is this court–not a party–that decides issues of relevance.

## CONCLUSION

The court will not reconsider its August 5, 2015 order. Sprint is entitled to summary judgment on Count 1 of its complaint, but the court will not assign costs prior to trial. The parties' cross motions to compel are granted in part and denied in part in accordance with this court's opinion. Thus, it is

ORDERED that Sprint's motion for reconsideration (Docket 256) is denied.

IT IS FURTHER ORDERED that Sprint's motion for summary judgment (Docket 258) is granted.

IT IS FURTHER ORDERED that Sprint's motion to compel (Docket 268) is granted in part and denied in part.

IT IS FURTHER ORDERED that NAT's motion to compel (Docket 273) is granted in part and denied in part.

Dated February 26, 2016.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE