UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SPRINT COMMUNICATIONS COMPANY L.P., <br><br>             Plaintiff, <br><br>    vs. <br><br> CROW CREEK SIOUX TRIBAL COURT, NATIVE AMERICAN TELECOM, LLC., and B. J. JONES, in his official capacity as special judge of Tribal Court; <br><br>          Defendants. | 4:10-CV-04110-KES <br><br><br> MEMORANDUM OPINON AND ORDER |

The issue before the court is whether defendant, Native American Telecom, LLC. (NAT), is entitled to collect access service charges that it billed to plaintiff, Sprint Communications Company, L.P.. A court trial was held on April 12-13, 2016. The court has considered the testimony, exhibits, and briefs in determining the outcome of this dispute.

## PROCEDURAL HISTORY AND BACKGROUND

Sprint provides nationwide long-distance telephone services and is known under the telecommunications regulatory framework as an interexchange carrier (IXC). Sprint delivers long-distance calls to a local exchange carrier (LEC) for termination to end-users. Under the FCC's current regulatory framework, Sprint pays the LEC a terminating access charge based on the LEC's interstate access tariff, which is filed with the FCC.

In October 2008, the Crow Creek Sioux Tribal authority authorized NAT to provide telecommunications services on the Crow Creek Reservation subject to the tribe's laws. Pursuant to the 2008 approval order, NAT began to operate as a LEC. NAT filed interstate tariff number one with the FCC, which became effective on September 15, 2009. NAT's interstate tariff number two became effective on November 30, 2010, and canceled and replaced NAT's tariff number one. NAT revised its tariff number two, which revision became effective on June 26, 2011. NAT's interstate tariff number three was filed with the FCC in August 2011, and became effective on August 23, 2011.

NAT also operates a free conference calling system (used for conference calling, chat-lines, and similar services) in connection with Free Conferencing Corporation. A party using NAT's services does not pay NAT for the conference call, but rather is assessed charges by the party's telecommunications provider. NAT then bills the telecommunications provider an access fee as defined in its interstate tariff. NAT's access charges that were billed to Sprint for conference calls are at issue here.

After paying two of NAT's bills for charges connected to conference calls, Sprint ceased paying NAT's terminating access tariffs because Sprint believed that NAT was involved in a traffic-pumping scheme, otherwise known as access stimulation, to generate traffic from free conference calls and chat services. On August 16, 2010, Sprint filed suit against NAT alleging a breach of the Federal Communications Act (FCA) and a state-law unjust enrichment claim. Docket 1.

On March 8, 2011, NAT amended its answer and asserted counterclaims against Sprint alleging a breach of contract and a collection action pursuant to its tariffs, a breach of implied contract resulting from a violation of its tariffs, and a quantum meruit/unjust enrichment claim. NAT also sought declaratory relief. Docket 99.

On November 29, 2011, the FCC released its *Connect America Fund* final rule that addresses access stimulation and traffic pumping. *See Connect America Fund; A National Broadband Plan for Our Future; Establishing Just and Reasonable Rates for Local Exchange Carriers; High-Cost Universal Service Support*, 76 Fed. Reg. 73,830 (Nov. 29, 2011). On December 27, 2011, this court issued an order directing the parties to discuss what effect, if any, the FCC's *Connect America Fund* final rule had on the issues presented in this case. Docket 128. On February 22, 2012, this court found that the FCC's final rule did not apply retroactively. Docket 141 at 9-11 ("Thus, the final rule is inapplicable to the time period before the final rule became effective."). As part of the same order, this court granted Sprint's then-pending motion to stay this proceeding and referred three issues to the FCC for resolution. *Id.* at 25. The parties were directed to provide periodic updates to this court describing the status of the FCC proceeding. The updates were filed over the next two years. The status of the FCC referral remained unchanged from November 2012 to July of 2014. *Compare* Docket 154 *with* Docket 163. Because of the limited progress on the FCC referral, a telephonic status conference was held on July 23, 2014. *See* Docket 164.

3

The parties stated that they had been engaged in litigation before the South Dakota Public Utilities Commission (SDPUC). Docket 169 at 5. In that litigation, NAT was granted a certificate of authority by the SDPUC to provide certain telecommunications services in South Dakota. Based on the results of the SDPUC litigation and the lack of action by the FCC during the period of the stay, the parties discussed whether some of the disputes in this case remained viable. *Id.* at 8-10. The court proposed entering an order that would lift the stay, withdraw the issues that had been referred to the FCC, and establish deadlines for the parties to amend the complaint, to file counterclaims, and to file any motions to dismiss. *Id.* at 12. The court also stated that it would rule on any motions to dismiss based on a statute of limitations defense and that a new referral of issues to the FCC could then be discussed. *Id.* With the parties in agreement, a formal order was issued that same day. *See* Docket 168. Sprint did not amend its complaint. NAT amended its counterclaim on September 9, 2014, and added a number of allegations that arose during the period of the stay and FCC referral. Docket 172. Additional motions were filed by the parties.

Relevant to the issue now pending is the court's August 7, 2015 memorandum order that resolved motions for summary judgment filed by both parties. *See* Docket 250. There, and among other things, the court addressed whether NAT's various interstate tariffs were lawful or otherwise enforceable. The court concluded that NAT's interstate tariffs numbers 1 and 2 were unenforceable, and granted summary judgment in Sprint's favor. *See id.* at 40.

The court could not, however, determine summarily whether NAT's tariff number 3 was enforceable. *See id.* at 40-41.

A status conference was held on September 15, 2015, to determine the issues in this case that remained for trial and whether another referral to the FCC was necessary. *See* Docket 254 (Transcript). The parties agreed that the court could resolve without a referral to the FCC whether NAT's tariff number 3 is enforceable. *Id.* at 6-7. A court trial was held on April 12-13, 2016. The parties submitted post-trial briefs, and the dispute is now ripe for adjudication.

## FINDINGS OF FACT

The following constitutes the court's findings of fact pursuant to Federal Rule of Civil Procedure 52(a)(1), which were found by a preponderance of the evidence:

NAT was founded in approximately 2007 or 2008 to provide telephone and broadband service on the Crow Creek Sioux Reservation. Tr. 18:18-24. Gene DeJordy and Tom Reiman were NAT's original owners. Tr. 19:2-3. NAT provides Tribal members on the Reservation with telephone and broadband service through a high-speed wireless network. Tr. 46:10-15. According to DeJordy, most Tribal customers receive subsidized or discounted service. Tr. 44:15-25; Tr. 45:1-3.

NAT's focus is to encourage private entities to locate on the Reservation and to spur economic development. Tr. 19:13-25. NAT reached out to several companies about investing in and developing on the Reservation. Only Free Conferencing expressed an early interest going forward. Tr. 20:13-19. As time

went on, NAT turned away several other commercial entities that sought to do business with NAT. Tr. 37:12-25; Tr. 38:1-3; Tr. 53:3-24 (DeJordy cited NAT's ongoing legal disputes as the reason why companies were discouraged from doing business with NAT at this time). ZenoRadio and YakFree did, however, eventually do business with NAT. Tr. 54:5-9; Tr. 242:1-11.

The Crow Creek Sioux Tribal Utility Authority entered an order in 2008 that granted approval for NAT to provide telecommunications services on the Reservation. Tr. 24:18-24; Ex. 9. NAT's facilities were also housed on the Reservation. The location was "a fairly small shelter" approximately "8-by-10 [feet], [and] kind of a small room." Tr. 28:16-24. Free Conferencing was permitted by NAT to co-locate its equipment in NAT's facilities. Tr. 29:8-11.

NAT's ownership was restructured after Free Conferencing agreed to operate on the Reservation. Tr. 20:20-25; Tr. 21:1-14. The Crow Creek Sioux Tribe became the majority owner of NAT with a 51% ownership interest in the company.[1] A private investor known as Wide Voice Communications holds a 25% ownership interest in NAT, and another company established by DeJordy, Native American Telecom Enterprise (NATE), holds the other 24%. The Tribe, Wide Voice, and NATE signed a Joint Venture Agreement in 2009, and the parties govern NAT jointly as members. Tr. 21:15-18; Tr. 22:10-16.

NAT and Free Conferencing executed a service agreement in 2009. Tr. 25:12-14; Ex. 5 (2009 Service Agreement). The 2009 Service Agreement required Free Conferencing to generate a monthly minimum number of

---

[1] The Tribe's interest was later transferred to Crow Creek Holdings, LLC, a holding company that is owned by the Tribe. Tr. 23:5-10.

6

minutes of conferencing traffic. Ex. 5, ¶ 7. NAT was obligated to pay Free
Conferencing in return a so-called "marketing fee" based on the number of
minutes of traffic terminated on Free Conferencing's equipment. Ex. 5, ¶ 7.
NAT also agreed to provide Free Conferencing with a number of services
"without charge." Ex. 5, ¶ 22 (NAT agreed to provide co-location space, rack
space, dedicated Internet access, analog telephone circuits, electrical power,
fire protection, generator and battery backup, switch technician labor, and
switch programming service, among others). The 2009 Service Agreement
contained an exclusivity clause and a confidentiality agreement. Ex 5, ¶¶ 2, 7.
The 2009 Service Agreement also contained a choice of law clause providing
that the laws of California would govern any claims arising out of the
agreement. Ex. 5, ¶ 21.

Although NAT received a certificate from the Tribal Utility Authority to
provide telecommunications services in 2008, the 2009 Service Agreement was
executed before NAT filed an intrastate or interstate tariff, and before NAT
began its telecommunications operations. Tr. 26:8-16. The 2009 Agreement,
however, purported to incorporate all of NAT's tariffs by reference "[t]o the
extent applicable." Ex. 5, ¶ 8.

The 2009 Service Agreement was amended on approximately
December 6, 2012. Tr. 39:6-15; Ex. 6 (2012 Service Agreement). The 2012
Service Agreement is not a new document. Rather, it is a redlined version of the
2009 Service Agreement. DeJordy acknowledged that drafting of the 2012
Service Agreement "wasn't really the normal course of doing business[.]" Tr.

7

40:19-21. Portions of the 2009 Service Agreement were deleted, but no provisions were added to it. Tr. 94:9-13. For example, the exclusivity clause was deleted, and so was the language stating that NAT's provision of numerous services to Free Conferencing was "without charge." *See* Ex. 6, ¶¶ 7, 22. The 2012 Service Agreement still contained a provision that NAT would pay Free Conferencing a marketing fee, but the language explaining how the fee is calculated was deleted. *See* Ex. 6, ¶ 9. Several other clauses are similarly incomplete. For example, the provisions stating where Free Conferencing could locate its equipment and the duration of the agreement are not completed. *See* Ex. 6, ¶¶ 1, 3. The clause incorporating NAT's tariffs "to the extent applicable," however, was not altered. Ex. 6, ¶ 8.

The 2012 Service Agreement was amended on October 29, 2015. Tr. 42:8-17; Ex. 7 (2015 Service Agreement). The 2015 Service Agreement is a two-page document that purports to modify several specific sections of the 2012 Service Agreement. For example, the choice of law provision was modified to state that "the laws of the Crow Creek Sioux Tribe and/or the laws of the State of South Dakota" shall apply. Ex. 7. The section detailing the services NAT would provide to Free Conferencing was also amended to state only that "[NAT] shall charge [Free Conferencing] for service in accordance with the provisions of its effective tariff for tariff services." Ex. 7. And the section pertaining to the marketing fee was amended so that Free Conferencing received a flat 85% share of gross access revenue based on the traffic it generated. Ex. 7. Finally,

the 2015 Service Agreement provides that "[a]ll other provisions" of the previous agreement remain in effect. Ex. 7.

NAT filed its first interstate tariff with the FCC in August 2009 that became effective on September 15, 2009. Tr. 32:18-20. Relevant here is NAT's third interstate tariff that NAT filed with the FCC in August 2011. Ex. 1. Carey Roesel, a telecommunications consultant and NAT's expert witness, drafted and filed NAT's third interstate tariff. Tr. 121:1-6. Roesel testified that he drafted NAT's third intererstate tariff to include "time-tested, standardized language" used by other LECs. Tr. 128:25; 129:1-3.

NAT's interstate tariff has a specific provision for "End User Access Service." Ex. 1, § 4.1. That service applies to certain "end users who obtain local exchange service" under NAT's "general and/or local exchange tariffs." Ex. 1, § 4.1. A monthly billable rate of $6.45 for End User Access Service applies on a "per line or Trunk" basis. Ex. 1, § 4.1.2. Dr. Brian Staihr is a professor of economics at the University of Kansas. Tr. 359:16-18. Staihr worked previously in the telecommunications industry, and he testified as Sprint's expert witness. Tr. 361:3-7. Staihr testified that receiving local access service is a necessary condition to receiving End User Access Service under § 4.1 of NAT's interstate tariff. Tr. 372:153:8-10.

NAT's interstate tariff also states that NAT "will pay a percentage of its retail revenues to support the Universal Service Fund (USF)." Ex. 1, § 4.2. The tariff further provides that NAT will "pass-through the USF assessment to its customers" by billing a surcharge to those customers. Ex. 1, § 4.2. NAT's third

9

interstate tariff was necessary to address then-recent FCC decisions, such as *Farmers II* and *Northern Valley*. Tr. 34:14-18; Tr. 125:17-25; Tr. 127:16-18.[2]

Revisions to NAT's third interstate tariff were made and subsequently filed with the FCC on July 16, 2014. Tr. 121:16-17; Ex 2. NAT's tariff was again revised in part on August 13, 2014. Tr. 123:9-10; Ex. 3. The section pertaining to End User Access Service was not altered, however, until NAT's tariff was revised on July 16, 2015. Tr. 124:18-22; Ex. 43 (adding the words "or via contract" to the end of the End User Access Service definition).

Roesel also drafted NAT's first intrastate tariff, and it was filed with the Crow Creek Sioux Tribal Utility Authority on November 4, 2011 (Tribal tariff). Tr. 123:20-25; Ex 4. Roesel explained that the Tribal tariff was filed voluntarily because the Tribal Utility Authority did not require it. Tr.142:14-17. He explained that section 5.2 of the Tribal tariff was drafted specifically to apply to high-volume entities like Free Conferencing. Tr. 143:17-24; Ex 4. § 5.2 ("Inbound Calling Service"). By contrast, section 5.1 of the Tribal tariff described a "basic local exchange offering." Tr. 146:3-4; Ex. 4 § 5.1 ("Nationwide Calling Plan"). Although Roesel testified that § 5.2 applied to the services NAT billed Free Conferencing, he acknowledged that NAT originally represented to Sprint in a discovery response during the SDPUC proceeding that NAT provided Free Conferencing with local service under § 5.1. Tr. 184:2-12; Ex. 106. Staihr in his report used the service definition and applicable

---

[2] This court ruled previously that NAT's first and second interstate tariffs were unenforceable pursuant to the FCC's *Farmers II* and *Northern Valley* lines of cases. *See* Docket 250.

rates set forth in § 5.1 based on NAT's representation. Tr. 373:3-6; Tr. 375:13-21 (explaining that he did not know § 5.2 was important until reading Roesel's expert report on March 9, 2016). Staihr opined that no services under § 5.1 were provided to Free Conferencing. Tr. 373:7-9.[3] Roesel testified that no charges were billed to Free Conferencing based on the service or rates described in § 5.1 of the Tribal tariff. Tr. 192:22-25.

NAT's Tribal tariff contains a provision for an "Individual Case Basis" or "ICB" agreement. *See* Ex. 4, § 8.1. The agreement must be offered "in writing and on a nondiscriminatory basis." Ex. 4, § 8.1. Roesel explained that ICB provisions are common and that ICB agreements provide carriers with flexibility for how services are provided. Tr. 146:21-25; Tr. 147:1-2. Roesel was not consulted on any of the NAT-Free Conferencing service agreements. Tr. 158:13-15; Tr. 175:2-7. He opined that, nonetheless, the various NAT-Free Conferencing contracts were ICB agreements. Tr. 157:22-25; 158:1-4.[4]

Section 5.2 of the Tribal tariff details a calculation to assess a fee for the local exchange service. The calculation establishes a "DS0-equivalent basis" that NAT also refers to as a number of "ports" or "lines." Tr. 153:11-14.[5] But

---

[3] Staihr testified that if NAT charged Free Conferencing pursuant to § 5.1, then NAT would have billed Free Conferencing approximately $1.3 – 1.4 million more over the relevant period of time here. Tr. 156:1-6.

[4] This is Roesel's testimony. Whether the service agreements are ICB agreements within the meaning of NAT's tariff is a question of law for the court.

[5] The calculation described in § 5.2 works as follows: First, the customer's total number of minutes of use for a given month is aggregated. Second, that number of minutes is divided by 7,000,000. Finally, the resulting quotient is multiplied by 672. According to Roesel, this calculation establishes "sort of an

instead of using that calculation, NAT billed Free Conferencing based on a so-called "high water mark" methodology. Tr. 153:2-3. The "high water mark" was determined by looking at Free Conferencing's highest level of line usage at any one point in time during a given month. Tr. 154:6-9. The "high water mark" is a different method of calculation from what is described in § 5.2. Tr. 202:13-21.

Section 5.2 also describes separate "Transport Charges" and "Port Charges" that are assessed based on the DS0-equivalence calculation. Ex. 4, § 5.2. A "Usage Charge" is also assessed based on a customer's total number of minutes of use during the month. Ex. 4, § 5.2. None of the rates described in § 5.2 of the Tribal tariff were billed to Free Conferencing. Tr. 185:3-7. Instead, NAT used the "high water mark" to establish the number of ports/lines that it charged Free Conferencing under the $6.45 "per line or Trunk" rate in § 4.1 of NAT's interstate tariff. Tr. 153:7-10. According to Roesel, the arrangement used by NAT allowed NAT to generate Universal Service Fund contributions. Tr. 154:19-20. Roesel also opined that the $ 6.45 charge in § 4.1 of NAT's interstate tariff was "apparently" also an "all-inclusive" rate. Tr. 159:21-23. Thus, according to Roesel, each of the various services that NAT provided to Free Conferencing under the NAT-Free Conferencing service agreements, such as power, Internet access, and rack space, was included within the $6.45 per line/port charge. Tr. 159:14-23. The service agreements, however, did not explicitly provide for such an arrangement. Tr. 187:8-14; Tr. 188:18-23.

---

average" amount of usage for the month and is used to determine the DS0-equivalence or "ports" that Free Conferencing should be billed for under the Tribal tariff. Tr. 152:25; 153:1.

NAT began billing Free Conferencing for services in 2011, shortly after NAT's third interstate tariff was filed with the FCC. Tr. 41:14-16. Shane Murphy provides accounting and billing services for NAT. Tr. 95:8-11; 96:14-22. Murphy testified that he prepared a spreadsheet each month that calculated the fees that Free Conferencing owed NAT. Tr. 97:12-14; Ex. 13. He testified that NAT established Free Conferencing's fees by taking the "high water mark" and multiplying that number by $6.45. Tr. 98:4-9. The charge is described on the monthly invoices that were issued to Free Conferencing as "End User Fees." *See* Ex. 12. The spreadsheet also contained a calculation for the USF contributions that NAT paid every month. Tr. 97:9-11; Ex. 13. The USF contribution was calculated based on the revenue that NAT received for "End User Fees" from Free Conferencing and multiplying that number by a percentage established quarterly by the FCC. Tr. 98:22-25; Tr. 99:1-5. Murphy explained that NAT used his spreadsheets to issue monthly invoices to Free Conferencing. Tr. 99:16-17. NAT has issued invoices to Free Conferencing and has billed Free Conferencing for "End User Fees" each month. *See* Ex. 12 (invoices beginning with January 2012). Although NAT paid USF contributions each month, NAT did not pass-through the USF charge to Free Conferencing until January 2016. Tr. 168:20-25; Tr. 169:1-6; Tr. 238:1-6; *see* Ex. 13 (last page).

Under the NAT-Free Conferencing revenue sharing (or "market fee") arrangement, NAT paid Free Conferencing roughly $1.6 million from the period of January 2012 to September 2015. Ex. 108. During the same period of time,

NAT received from Free Conferencing approximately $340,000 in fees. *See* Ex. 12.

NAT seeks as damages $463,210.50. Ex. 11. That figure is calculated by aggregating the invoices NAT sent to Sprint for switched access service from January 2012 until March 2016 and subtracting a credit of $56,048.68. The credit was issued in January 2016 for traffic that was delivered to YakFree and improperly billed to Sprint. Tr. 105:25; Tr. 106:1-5; Tr. 290:1-2.

## LEGAL CONCLUSIONS

II. **Post-trial Motions**

    A. **NAT's Motion for Judicial Notice**

NAT moves the court to take judicial notice of a court opinion and judgment from the case titled *CenturyTel of Chatham LLC v. Sprint Commc'ns Co., L.P.*, No. 09-1951 (W.D. La. May 4, 2016). Docket 311. There, a number of LECs sued Sprint over Sprint's refusal to pay for originating switched access charges involving Voice over Internet Protocol (VoIP) calls. The LECs alleged that Sprint was liable under § 201(b) of the Communications Act for engaging in unlawful self-help. *See* Docket 311-1 at 23 (court opinion) (citing 47 U.S.C. § 201(b)). The district court concluded that the LECs properly billed Sprint for access charges involving the VoIP calls and that Sprint's refusal to pay for those charges was an unjust and unreasonable practice under § 201(b). *Id.* at 24. NAT argues that the court should take judicial notice of the *CenturyTel* decision and that the court should conclude that Sprint is liable in this case for violating § 201(b).

NAT acknowledges, however, that it does not have a claim against Sprint under § 201(b) for engaging in unlawful self-help. Docket 310 at 45 n.5. Also, the issue presented during the court trial was whether NAT properly billed Sprint for access charges, not whether Sprint was liable for a cause of action that NAT never raised. Consequently, the *CentruyTel* decision is not relevant to this dispute. *Am. Prairie Constr. Co. v. Hoich*, 560 F.3d 780, 797 (8th Cir. 2009) (cautioning that judicial notice should not be used to admit irrelevant evidence). Thus, the court declines to take judicial notice of the *CenturyTel* decision.

**B.    NAT's Motion to Supplement the Record**

NAT's motion concerns its request for damages and the $56,048.68 credit issued to Sprint for traffic delivered to YakFree. Sprint argues in its post-trial brief that NAT did not meet its burden of proof regarding damages because Sprint cannot determine the actual number of minutes of traffic delivered to YakFree and, thus, the accuracy of the credit. NAT moves to supplement the record with several emails that were exchanged between counsel for NAT and Sprint. Docket 315. The emails purport to show that Sprint received notice on January 28, 2016, of how the credit was broken down by month between December 2014 and November 2015. Because the court does not reach the issue of damages, however, NAT's motion to supplement the record is denied as moot.

## II.     Whether NAT Properly Billed Sprint for Switched Access Services

### A.     The FCC's *Farmers* legal framework

Previously, the court identified the legal standards articulated by the FCC to determine if an LEC properly provided switched access services under the terms of the LEC's interstate tariff. *See* Docket 250 at 13-16. Relevant here is the so-called "*Farmers*" test that originated in the FCC's decision in *In the Matter of Qwest Commc'ns Corp. v. Farmers & Merchs. Mut. Tel. Co.*, 24 FCC Rcd. 14801 (F.C.C. 2009) (*Farmers II*). The FCC's *Farmers II* opinion was affirmed by the D.C. Circuit Court of Appeals. *See Farmers & Merch. Mut. Tel. Co. v. F.C.C.*, 668 F.3d 714 (D.C. Cir. 2011) (*Farmers III*). The FCC has also used the *Farmers* test in subsequent cases. *See In the Matter of Qwest Commc'ns Corp. v. Sancom, Inc.*, 28 FCC Rcd. 1982 (F.C.C. 2013); *In the Matter of AT&T Corp. v. All Am. Tel. Co.*, 28 FCC Rcd. 3477 (F.C.C. 2013) (*All American II*); *AT&T Corp. v. YMax Commc'ns Corp.*, 26 FCC Rcd. 5742 (F.C.C. 2011).

Under the *Farmers* test, the FCC analyzes whether a conference calling company is an "end user" or "customer" of the LEC's tariffed services. *Farmers II*, 24 FCC Rcd. 14801, 14805 at ¶ 10 (noting that "[t]he tariff requires that to be a customer, the person or entity must subscribe to the services under the tariff"); *Sancom*, 28 FCC Rcd. 1982, 1989 at ¶ 16 (explaining that "in order for Sancom to provide Switched Access under the Tariff, calls must originate or terminate with an 'end user' (i.e., a 'customer' that 'subscribes to the services offered' under the Tariff")). To answer that question, the Commission engages in a multi-factor analysis that looks to the actual business relationship

16

between the conference calling company and the LEC. *Farmers II*, 24 FCC Rcd. 14801, 14806-13 at ¶¶ 12-20, 25 (explaining it looked to "the totality of the circumstances and facts of this case"); *Sancom*, 28 FCC Rcd. 1982, 1989-92 at ¶¶ 17-23 (same). The non-exhaustive factors identified by the FCC are: (1) Whether the conference calling companies paid for the LEC's services; (2) Whether the LEC treated the conference calling company like typical customers; (3) Whether the LEC and conference calling companies operated under an exclusivity agreement; (4) Whether the LEC handled the conference calling company's traffic differently; (5) Whether the LEC's agreements with the conference calling companies contained terms that did not resemble traditional agreements for tariffed services; and (6) Whether the LEC timely reported revenues from its services or submitted Universal Service contributions. *See Farmers II*, 24 FCC Rcd. 14801, 14806-10 at ¶¶ 12-20; *Sancom*, 28 FCC Rcd. 1982, 1989-92 at ¶¶ 13, 18-23. If the conference calling companies were not "customers" or "end users" that subscribed to the LEC's services under the tariffs, then the LEC was not entitled to bill the IXC for switched access services under the tariffs. *Farmers II*, 24 FCC Rcd. 14801, 14805 at ¶ 10; *Sancom*, FCC Rcd. 1982, 1989 at ¶ 17.

## B.    Analysis

NAT's interstate tariff number 3 states generally that "Switched Access Service, which is available to customers for their use in furnishing their services to end users, provides a two-point electrical communications path between a customer's premises and an end user's premises." Ex. 1, § 3.1.1. An

17

"end user" is defined as "any customer of an interstate or foreign telecommunications service that is not a carrier[.]" Ex. 1 at 12. A "customer" is defined as any entity "which subscribes to the services offered under this Tariff, including Interexchange Carriers (ICs), end users and interconnectors." Ex. 1 at 10. The end user and customer definitions were not altered materially by any of the revisions to NAT's interstate tariff,[6] and they are indistinguishable from the end user and customer definitions at issue in *Farmers II* and *Sancom*. *Farmers II*, 24 FCC Rcd. 14801, 14805 at ¶ 10; *Sancom*, 28 FCC Rcd. 1982, 1985-87 at ¶¶ 6, 11. Thus, for Free Conferencing to be an "end user" under NAT's tariff requires Free Conferencing to be a "customer," and to be a "customer" requires Free Conferencing to "subscribe to" or "utilize" the services under the terms of the tariff. *Farmers II*, 24 FCC Rcd. 14801, 14805 at ¶ 10; *Sancom*, 28 FCC Rcd. 1982, 1985-87 at ¶¶ 6, 11.

### 1. Whether Free Conferencing Properly Paid for NAT's Services

According to NAT, the service offered under its interstate tariff that Free Conferencing "subscribes to" (or "utilizes") is End User Access Service. That service is defined in § 4.1 of NAT's interstate tariff as follows:

> End User Access Service provides for the use of Company common lines by end users who obtain local exchange service from the Company under its general and/or local exchange tariffs.

---

[6] The July 16, 2015 revision replaced the word "subscribes" with the word "utilizes" in the tariff's definition of a customer. Ex. 43 at 10. This change still requires the customer to "utilize" the services as defined by the tariff. *AT&T Corp. v. YMax Commc'ns Corp.*, 26 FCC Rcd. 5742, 5753 ¶ 28 (F.C.C. 2011).

Ex. 1, § 4.1. A $6.45 rate "per line or Trunk" is assessed for this service. Ex. 1, § 4.1.2.

The July 16, 2015 tariff revision added the words "or via contract" to the end of the End User Access Service definition. *See* Ex. 43, § 4.1 (". . . who obtain local exchange service from the Company under its general and/or local exchange tariffs or via contract"). The tariff's $6.45 rate and the rest of its definition otherwise remained the same.  The court agrees with Staihr's analysis that Free Conferencing must obtain "local exchange service" as a necessary condition in order to subscribe to End User Access Service. *See Farmers II*, 24 FCC Rcd. 14801, 14805 at ¶ 10 ("The tariff requires that to be a customer, the person or entity must subscribe to the services offered under the tariff").

There are two types of local exchange service offered in NAT's Tribal tariff: a "Nationwide Calling Plan" is defined in § 5.1, and an "Inbound Calling Service" is described in § 5.2. NAT argues that § 5.2 was drafted specifically to apply to Free Conferencing, and that NAT, in fact, provides Free Conferencing with local service under § 5.2.

Section 5.2 defines an "Inbound Calling Service" and includes a calculation method to determine a DS0-equivalence (also referred to by NAT as a number of "ports" or "lines"). Ex. 4, § 5.1. Two separate fees are assessed under the Tribal tariff based on the DS0-equivalance calculation, and another fee is assessed based on the customer's number of minutes of use for the month. NAT acknowledges that it did not determine the number of ports/lines

that it billed to Free Conferencing based on the method described in § 5.2. Rather, NAT used what it called the "high water mark," *i.e.*, the highest number of lines Free Conferencing used at any given point during a month, to make that determination. Likewise, and regardless of how NAT calculated the number of ports/lines billable to Free Conferencing, NAT did not bill Free Conferencing under to any of the rate elements set out in § 5.2 of the Tribal tariff.

The Communications Act "requires a carrier to provide communications services in strict accordance with the terms and conditions of its tariff." *Sancom*, 28 FCC Rcd. 1982, 1989 at ¶ 16 (citing 47 U.S.C. § 203(c)). *See Farmers II*, 24 FCC Rcd. 14801, 14805 at ¶ 10. Thus, NAT's admissions compel a conclusion that Free Conferencing did not subscribe to End User Access Service under § 4.1 of NAT's interstate tariff because Free Conferencing did not obtain local exchange service under § 5.2 of NAT's Tribal tariff.

Even if the NAT-Free Conferencing service agreements could serve as ICB agreements that permit NAT to deviate from the explicit terms of its tariffs, as NAT contends, for a service agreement to be an ICB agreement under NAT's Tribal tariff, its terms must be "in writing." Ex. 4, § 8.1.[7] Here, NAT's billings were based on using the "high water mark." But none of the service agreements provide that NAT will use the "high water mark." To the contrary, the NAT-Free Conferencing service agreements purport to incorporate NAT's Tribal and

---

[7] NAT's interstate tariff also contains an ICB provision. Ex. 1, § 5.1. The ICB provision in the interstate tariff differs from the provision in the Tribal tariff. Roesel's testimony concerned the Tribal tariff. Tr. 146:15-23; Tr. 157:7-10.

interstate tariffs by reference. Thus, without a provision in the contract specifying that NAT will deviate from § 4.1 or § 5.2 of those tariffs, then NAT must bill Free Conferencing in accordance with those tariffs. In other words, the contract still requires NAT to determine the number of lines/ports that it bills Free Conferencing for purposes of § 4.1 of NAT's interstate tariff by using the calculation method described in § 5.2 of NAT's Tribal tariff. NAT's method of determining the number of ports/lines that it bills to Free Conferencing is in derogation of NAT's tariffs and the service agreements. The fact that NAT billed Free Conferencing *something* and gave that *something* an "End User Fees" facade for billing purposes does not demonstrate that Free Conferencing actually subscribed to the End User Access Service in NAT's tariff. *Sancom*, 28 FCC Rcd. 1982, 1989 at ¶ 16 (citing 47 U.S.C. § 203(c)); *Farmers III*, 668 F.3d at 722 ("The Commission has long instructed that a service that does not 'fall within the plain meaning' of the tariff is not governed by the tariff whether or not it is 'functionally similar' to a tariffed service") (citing cases).

A second problem with the service agreements is related to Universal Service Fund contributions. Section 4.2 of NAT's interstate tariff states that

> [NAT] will pay a percentage of its retail revenues to support the Universal Service Fund (USF). [NAT] will pass-through the USF assessment to its customers by assessing a charge applicable against all retail interstate and international charges, including usage and non-usage charges. . . . [NAT's] Universal Service Fee factor will match the relevant quarterly Universal Service Contribution Factor approved by the FCC rounded up to the nearest tenth of a percent.

Ex. 1, § 4.2. The fact that NAT paid some amount in USF contributions is only one part of the tariff's requirements. NAT is also required to pass-through that

21

USF assessment to Free Conferencing if Free Conferencing is, in fact, a "customer." But NAT acknowledges that it did not begin to pass-through the USF assessment to Free Conferencing until January 2016. Because NAT did not bill Free Conferencing in accordance with its tariffs in the first instance, NAT did not determine accurately the USF contribution that should have been passed-through. *See Farmers II*, 24 FCC Rcd. 14801, 14813 ¶ 26, n.98; *Sancom*, 28 FCC Rcd. 1982, 1989-90 ¶ 18-19 (noting, among other requirements, that Sancom's tariff required it to "apply a federal Universal Service charge each month to the tariffed interstate access services provided to end users" but that Sancom failed to do so). None of the service agreements purport to deviate from the USF contribution requirements in § 4.2 of NAT's interstate tariff.

A third problem with the service agreements is that none of those documents state that NAT will provide Free Conferencing with a variety of ancillary, non-tariffed services such as power, Internet access, and rack space under an "all-inclusive" rate of $6.45 per port/line as Roesel theorized. The service agreements contain neither the "$6.45" rate element nor any other reference to § 4.1 of NAT's interstate tariff. To the extent that NAT's tariffs are incorporated by reference into the agreements, it is not clear from reading the service agreements what tariff provisions are supposed to apply to NAT's provision of non-tariffed services.[8]

---

[8] There are many rate elements for different services in NAT's interstate tariff.

Regardless, paragraph 22 of the 2009 Service Agreement stated that NAT would provide Free Conferencing "all telecommunications services utilized by [Free Conferencing] *without charge*." Ex 5, ¶ 22 (emphasis added). Those services included co-location space, rack space, dedicated Internet access, analog telephone circuits, electrical power, fire protection, generator and battery backup, switch technician labor, and switch programming service, among others. NAT acknowledges that it did, in fact, provide those services without charge until at least September 2011. And the court found previously that NAT's provision of those services for free was problematic under *Farmers*. *See* Docket 250 at 18-19.

The 2009 Service Agreement was not altered when NAT began to bill Free Conferencing in 2011, and still states that NAT would provide Free Conferencing telecommunications services without charge. And NAT's invoices from 2011 and 2012 to Free Conferencing list only a single, nondescript "End User Fees" designation without any reference to the non-tariffed services that purportedly are covered by the fee. *See* Ex. 12 (invoices).

The 2012 Service Agreement removed the problematic "without charge" language, but the amendment also rendered paragraph 22 incomplete. As amended, the clause provided in its entirety that

> [sic] This shall include monthly recurring charges (MRC), [sic] but are not limited to, PRI's, co-location space, rack space, POTS lines (analog telephone circuits), DSL or other dedicated Internet access, referral message fees, electrical power, fire protection, generator and/or battery backup, DID's, labor of switch technicians as needed, switch programming as needed.

23

Ex. 6 at ¶ 22. Although the clause's opening reference to "This shall include" is ambiguous because of the alterations, the clause could be read to mean that "monthly reoccurring charges" apply to the various services listed. Even so, a natural reading of this clause does not suggest that the $6.45 rate element from § 4.1 of NAT's interstate tariff should apply to any one of these services, let alone all of them. Although the $6.45 charge appears on the invoices that were sent to Free Conferencing from 2012 to 2015, those invoices still only refer to "End User Fees" and not any other service. *See* Ex. 12 (invoices).

The 2015 Service Agreement deleted the entirety of paragraph 22 and replaced it with a single sentence: "[NAT] shall charge [Free Conferencing] for service in accordance with the provisions of its effective tariff for tariff services." Ex. 7. Therefore, the 2015 Service Agreement removed all reference to the provision of non-tariffed services. Those services, however, were still being provided to Free Conferencing in the absence of any agreement concerning non-tariffed services ostensibly under the $6.45 "all-inclusive" rate. Tr. 159:21-23; *see also* Ex. 12 (invoices). Thus, NAT has not met its burden of proof to show that the NAT-Free Conferencing service agreements contemplate that Free Conferencing will pay an "all-inclusive" rate of $6.45 per line/port for various non-tariffed services.

A fourth problem with the service agreements pertains to the NAT-Free Conferencing revenue sharing arrangement. Under the 2009 Service Agreement, Free Conferencing was required to generate a monthly minimum number of minutes of conferencing traffic. Ex. 5, ¶ 7 ("[Free Conferencing shall

24

provide a minimum of 15,000,000 minutes per month of conferencing traffic[.]"). NAT was obliged to pay Free Conferencing a so-called "marketing fee" for each minute of traffic terminated on Free Conferencing's equipment. Ex. 4, ¶ 9. A three-tiered "Marketing Fee Schedule" was attached to the agreement as "Exhibit B" that established the percentage of revenue NAT paid to Free Conferencing. *See* Ex., 4 (ranging from 75% to 95% of NAT's gross access fee revenues). The court found previously that this arrangement was problematic under *Farmers*. Docket 250 at 19. In *Farmers II*, the FCC found it "significant" that the LEC was required "to pay the conference calling companies a per-minute fee for the traffic generated through their mutual relationship." *Farmers II*, 24 FCC Rcd. 14801, 14806 at ¶ 12. More specifically, the arrangement was improper because the LEC's provision of tariffed services contemplated that money would flow from the customer to the LEC, as opposed to "payments that flow in the reverse direction." *Id.* n.49.

Under the 2012 Service Agreement, Free Conferencing was still required to generate the same monthly minimum number of minutes of conferencing traffic. Ex. 6, ¶ 7. Likewise, NAT was still required to pay a "marketing fee," although the provision describing the marketing fee was rendered unintelligible. As amended, the clause states in its entirety that

> NAT-CC shall pay FCC a marketing fee [sic] traffic terminating on FCC's equipment in accordance with the schedule set forth on Exhibit B. This marketing fee is due and payable within ( ) days of NAT-CC receiving payment from [sic]

Ex. 6, ¶ 9.[9] In addition to the clause's internal inconsistency, its lack of a conclusion, and the absence of a number of days filled-in describing when NAT was required to pay Free Conferencing, its reference to "Exhibit B" is meaningless because Exhibit B was also deleted. *See* Ex. 6 (notation that the fee schedule was "Deleted" by "Jeff" on "9/17/12 [at] 3:48 PM").

The 2015 Service Agreement does not add clarity. A recital states that "Whereas, [Free Conferencing] and NAT desire to delete 'Section 7. Conference Traffic' from the Agreement[.]" Ex. 6. "Section 7" is the clause in the 2009 and 2012 Service Agreements that requires Free Conferencing to generate a monthly minimum number of minutes of conferencing traffic. But there is no operational language that carries the parties' "desire" in the recital to delete Section 7 into effect. *Contra* Ex. 7 ("Whereas [Free Conferencing] and NAT desire to modify 'Section 18. Waiver' of the Agreement; Now, Therefore, the Parties agree to replace 'Section 18. Waiver' with the following . . ."). NAT and Free Conferencing did, however, restore Exhibit B and replace its three-tiered fee schedule with a flat, 85% share of NAT's gross access revenue payable to Free Conferencing. Ex. 7 ("'[Free Conferencing] Shall Receive 85% of Collected Gross Revenues for all [Free Conferencing] traffic'"). Assuming that the recital is sufficient to delete Section 7, then NAT still paid Free Conferencing for Free

---

[9] In the agreement, "NAT-CC" refers to NAT and "FCC" refers to Free Conferencing. The court leaves the clause as written in the agreement to more accurately reproduce its appearance.

Conferencing's service of generating access traffic. Free Conferencing would not, however, be required to generate a minimum amount of that traffic.[10]

From the period of January 2012 to September 2015, NAT paid Free Conferencing roughly $1.6 million in "marketing fees." Ex. 108. By comparison, during the same period of time, NAT received from Free Conferencing approximately $340,000 in "End User Fees." *See* Ex. 12. Although the flow of money between the parties is not entirely one directional, the comparative amounts are relevant under the *Farmers* analysis. *Farmers II*, 24 FCC Rcd. 14801, 14806 at ¶ 12; *Sancom*, 28 FCC Rcd. 1982, 1989-90 at ¶ 19.

The court also rejects as incredible NAT's assertion that its theory is not a "post hoc rationalization[.]" Docket 310 at 17. First, Sprint argued in support of an earlier summary judgment motion that certain provisions within the 2009 Service Agreement–specifically those provisions discussing the marketing fee, the minimum amount of traffic Free Conferencing was required to produce, and the host of services NAT provided to Free Conferencing free of charge– demonstrated that Free Conferencing was not an "end user" or "customer" under any of NAT's interstate tariffs (including NAT's interstate tariff number three). *See, e.g.,* Docket 219 at 14-15; Docket 220 at 2; Docket 224 at 4. In response, NAT did not argue that its service agreements with Free Conferencing

---

[10] Also, the 2015 Service Agreement did not address any of the incomplete language in paragraph 9 of the 2012 Service agreement. Rather, the 2015 Service Agreement only addressed Exhibit B. Thus, the incomplete language of paragraph 9 remains unchanged. *See* Ex. 7 ("All other provisions of the [Service Agreement] dated July 1, 2009, *as amended November 30, 2012*, remain unchanged") (emphasis added).

incorporated the terms of NAT's local and interstate tariffs and that those tariffs circumscribed the NAT-Free Conferencing relationship. Rather, NAT asserted previously that it and Free Conferencing agreed not to enforce the exclusivity clause and that the "marketing fee" would need to be adjusted. *See, e.g.*, Docket 242 at 22-24 (discussing the 2009 and 2012 Service Agreements).

Second, NAT originally represented to Sprint in an interrogatory response during the SDPUC proceeding that NAT provided local exchange service to Free Conferencing under § 5.1 of the Tribal tariff. Docket 106. Sprint propounded the same substance of that interrogatory as part of this dispute in October 2015, and NAT did not identify § 5.2 as the applicable Tribal tariff provision until March 21, 2016. Docket 291-5. Sprint's expert testified credibly during the court trial that he was unaware that § 5.2 was even relevant to this dispute until he read Roesel's March 2016 report. Tr. 383:21-24.

Finally, NAT denied entirely the relevance of its Tribal tariff to this dispute as late as April 2015. Sprint's aforementioned summary judgment motion argued as an undisputed statement of material fact that NAT did not provide Free Conferencing with local service under NAT's Tribal tariff. Docket 220 at 18 (Statement of Fact #32). That statement of fact asserted in relevant part that

> NAT did not comply with its tariff in the provision of services to Free Conferencing. In NAT's discovery responses provided in the SDPUC matter, NAT specified that "[t]he services provided to Free Conferencing Corporation are described in NAT's South Dakota Tariff No. 1 [*i.e.*, the "Tribal Tariff["]] (Section 5.1, Page 1)...." That section of NAT's Tribal Tariff has a $35 per Primary Rate Interface ("PRI") charge for local service. However, NAT has never invoiced Free Conferencing for that charge, in violation of its own Tribal

> Tariff. NAT's consultant could not explain why that charge had
> never been assessed to NAT.

*Id.* (alterations added and in original) (internal citations omitted). NAT

responded that "[t]his statement is disputed and, even more important, it is a

complete red herring that is wholly irrelevant to the claims in this case."

Docket 240 at 42. NAT emphasized the irrelevance of its Tribal tariff by

explaining that

> At issue in this case are NAT's tariffs filed with the FCC that cover
> *interstate* service. Sprint's Complaint in this matter concerns solely
> *interstate* service under NAT's three FCC interstate tariffs (Tariffs
> Nos. 1, 2, and 3). NAT's contract/tariffs claims against Sprint for
> switched access service also are solely for *interstate* switched
> access service under its federal Tariff Nos. 1, 2, and 3. NAT does
> not seek to recover anything from Sprint for *intrastate* traffic.
>
> In an attempt at misdirection, Sprint here refers to a "Tribal Tariff"
> attached to the Schenkenberg Affidavit as Exhibit 6. That "Tribal
> Tariff" is for "service offerings, rates, terms and conditions
> applicable to the furnishing of *intrastate* end-user local exchange
> communications services by Native American Telecom, LLC to
> Customers within the state of South Dakota." Docket 221-6 (page
> 7 of 62).

Docket 240 at 43 (emphasis in original). NAT went so far in the same response

to state that "[i]f that 'Tribal Tariff' were declared to be completely void, it would

be irrelevant to the case." *Id.* But now NAT contends that the same Tribal tariff

is the key to its entire theory. The court, therefore, rejects NAT's argument that

it and Free Conferencing intended all along to operate in the manner first

advanced by NAT in this proceeding. And, in accordance with *Farmers*, the

court finds that NAT did not properly bill Free Conferencing for any tariffed (or

non-tariffed) service, that Free Conferencing did not properly pay for those

services, that NAT failed to pass-through USF contributions as required by its tariff, and that NAT paid Free Conferencing much more for Free Conferencing's services than Free Conferencing paid to NAT. These considerations demonstrate that Free Conferencing did not properly pay for the services it received from NAT. *See Farmers II*, 24 FCC Rcd. 14801, 14806-13 at ¶¶ 12, 25 (finding that "the evidence . . . demonstrates that there was no purchase of tariffed services"); *Sancom*, 28 FCC Rcd. 1982, 1989-90 at ¶¶ 18-20. Thus, this factor weighs heavily against NAT.

### 2. Whether NAT treated Free Conferencing like other customers

NAT provides Tribal members on the Reservation with telephone and broadband service through a high-speed wireless network. Tr. 46:10-15. According to DeJordy, most Tribal customers receive subsidized or discounted service. Tr. 44:15-25; Tr. 45:1-3.

The court observed previously that NAT's provision under the 2009 Service Agreement of various non-tariffed services to Free Conferencing "without charge" demonstrated that NAT did not treat Free Conferencing like any other customer. *See* Docket 250 at 19-20 (citing *Farmers II*, 24 FCC Rcd. 14801, 14806 at ¶ 12). As discussed in section II.B.1, *supra*, the 2012 Service Agreement removed the "without cost" language, and the 2015 Service Agreement removed all reference to non-tariffed services. Although none of the service agreements provided that those services would be offered under an "all-inclusive" rate (or any rate at all), NAT ostensibly began bundling those services into the $6.45 per line/port "End User Fee" on the monthly invoices to Free

Conferencing. There was no testimony or evidence that established the actual value of those services.

The fact that NAT entered Free Conferencing into its billing system and began to bill Free Conferencing, albeit belatedly, for a charge nominally titled "End User Fees" suggests that NAT attempted to treat Free Conferencing like a typical customer. *See Farmers II*, 24 FCC Rcd. 14801, 14806 at ¶ 16 (observing the LEC "did not enter [the conference calling company's] account information into its customer billing systems"). But as explained in section II.B.1, *supra*, the method NAT chose to bill Free Conferencing does not comport with any of NAT's tariffs or service agreements.

Other considerations tend to show that NAT did not treat Free Conferencing like a typical customer. For example, in *Sancom*, the FCC observed that "despite the requirement that a common carrier '[hold itself] out to serve indifferently all potential users,' Sancom eschewed similar arrangements with other companies." *Sancom*, 28 FCC Rcd. 1982, 1991-92 ¶ 23; *see also Farmers II*, 24 FCC Rcd. 14801, 14807 at ¶ 14 (noting that Farmers eventually entered into agreements with three new conference calling companies but also turned away others). Here, NAT turned away several other commercial entities that reached out to do business with NAT. Tr. 37:12-25; Tr. 53:3-24. The FCC in *Sancom* also found that Sancom did not treat the conference calling companies like typical customers because Sancom allowed only the conference calling companies to co-locate in Sancom's central office. *Sancom*, 28 FCC Rcd. 1982, 1991 at ¶ 22 n.79. Here, too, NAT allowed only

Free Conferencing to co-locate at NAT's facilities, although Free Conferencing was required to install its equipment at its own expense. *See* Ex. 5, at ¶ 1.[11] The FCC also observed in *Sancom* that the presence of a confidentiality clause in Sancom's service agreements with its free conference calling partners demonstrated that Sancom did not treat them as typical customers. *Sancom*, 28 FCC Rcd. 1982, 1991-92 at ¶ 23. The NAT-Free Conferencing service agreements likewise contained a confidentiality clause that was not removed, if at all,[12] until the 2015 Service Agreement was finally executed in October 2015. *See* Ex. 5, at ¶ 2; Ex. 6, at ¶ 2. A revenue sharing agreement also exists between Free Conferencing and NAT that NAT does not offer to typical customers. Thus, the court finds that this factor weighs against NAT.

### 3. Whether NAT and Free Conferencing operated under an exclusivity agreement

The court observed previously that the 2009 Service Agreement contained an exclusivity agreement that, according to the FCC, was "antithetical to the notion of tariffed service." Docket 250 at 20 (quoting *Farmers II*, 24 FCC Rcd. 14801, 14807 at ¶ 14); *see also Sancom*, 28 FCC Rcd. 1982, 1991-92 at ¶ 23 (finding "Sancom's relationships with the Free Calling Companies were exclusive and demonstrate an intention for Sancom not to provide service as a common carrier."). The exclusivity clause was excised in

---

[11] This provision was not altered by the subsequent service agreements.
[12] Like the recital concerning paragraph 7 discussed in section II.B.1, *supra*, there is only a recital in the 2015 Service Agreement without any operative language that the parties "desire to delete 'Section 2. Confidentiality' from the Agreement." Ex 7.

the 2012 Service Agreement, and the 2015 Service Agreement did not revive it. Although NAT turned away several offers from other commercial entities, NAT eventually began doing business with ZenoRadio and YakFree. The court finds that this factor weighs in favor of NAT.

### 4. Whether the NAT-Free Conferencing contracts contained terms that did not resemble traditional agreements for tariffed services

The problems with the NAT-Free Conferencing service agreements are legion. The court found previously that the 2009 Service Agreement contained several provisions identified by the FCC that do not resemble traditional arrangements for tariffed services. *See* Docket 250 at 20-21. Those non-traditional terms include: the requirement that Free Conferencing generate a minimum amount of monthly traffic, the "marketing fee" payable to Free Conferencing for that traffic, the confidentiality clause, the exclusivity agreement, the California choice of law clause, and the host of non-tariffed services provided to Free Conferencing without charge. *Id.* (citing *Sancom*, FCC Rcd. 1982, 1991-93 at ¶¶ 23, 25).

The 2012 Service Agreement removed the exclusivity agreement, but the alterations to the document left a number of provisions incomplete, unintelligible, or both. As explained in section II.B.1, *supra*, the language in paragraph 9 detailing the marketing fee that NAT paid to Free Conferencing was incomplete, as was the language in paragraph 22 containing the various non-tariffed services that NAT provided to Free Conferencing. Other provisions are likewise incomplete. *See, e.g.,* Ex. 6, ¶¶ 1, 3, 4, and 5. One of those

incomplete provisions purports to govern the duration of the agreement. Ex. 6, at ¶ 3 ("The initial term of this Agreement shall be for ( ) Years from July 1st, 2009 through June 30, [___]"). Ex. 6. A recital at the beginning of the agreement simply states, "Whereas, NAT-CC desires to FCC." And the 2012 Service Agreement still contained the confidentiality clause, the California choice of law clause, and the clause requiring Free Conferencing to generate a minimum number of minutes of traffic.

The 2015 Service Agreement made a few improvements if the court assumes that the parties' recitals, without more, are sufficient to delete the confidentiality clause and the clause requiring Free Conferencing to generate a monthly minimum amount of traffic. The 2015 Service Agreement also deleted the California choice of law clause and replaced it with one stating that "the laws of the Crow Creek Sioux Tribe and/or the laws of the State of South Dakota" apply depending on "whichever is applicable." Ex. 7.[13] But the 2015 Service Agreement still required NAT to pay Free Conferencing a fee based on the traffic generated by Free Conferencing. And because "[a]ll other provisions of the [Service Agreement] dated July 1, 2009, *as amended November 20, 2012,*

---

[13] The first signature on the 2015 Service Agreement is dated August 13, 2015. The contracting parties' attempt to set an effective date of this agreement as "August 1, 2015" notwithstanding, these amended provisions are the same provisions identified as problematic by the court on August 7, 2015. *See* Docket 250.

remain unchanged," the 2015 Service Agreement did not cure many of the incomplete clauses in the 2012 Service Agreement.[14]

The court finds that the NAT-Free Conferencing service agreements either do not resemble traditional agreements for tariffed services or, due to incomplete and/or unintelligible provisions, do not resemble traditional agreements of any kind at all. Thus, the court finds that this factor weighs against NAT.

### 5.    Whether NAT properly reported revenues from its services or submitted USF contributions

NAT contributed to the Universal Service Fund during the relevant period of this dispute. Roesel testified that NAT attempted to bill Free Conferencing for End User Access Service under § 4.1 of NAT's interstate tariff, and NAT contributed to the USF in the process. But as described in section I.B.1, *supra*, NAT did not properly assess End User Access Service for purposes of determining accurately what the USF contribution should be, and until January 2016 NAT did not pass-through the USF contribution as a surcharge to Free Conferencing under § 4. The court will give NAT the benefit of the doubt that it made a colorable attempt to properly make USF contributions.

---

[14] There is also a provision that, if read broadly, would mean that the entire written service agreement could be rendered meaningless if NAT and Free Conferencing decided at any given time to ignore it. *See* Ex. 7 ("All Terms or provisions herein may be waived by mutual agreement, either in writing *or by consent which can be verified by the conduct of the Parties*") (emphasis added). The FCC in *All American II* was unconvinced by the LEC's representations that it operated legitimately with its partners under terms and conditions that were not reduced to writing. *All American II*, 28 FCC Rcd. 3477, 3495 at ¶ 40-41 n.179. No testimony was elicited about this provision, however, and NAT has not cited the provision or argued its relevance in this case.

### C.    Weighing the factors

Here, the balance of the *Farmers* factors shows that Free Conferencing was not an "end user" or "customer" under NAT's interstate tariff number 3. The primary factor in this case is the factor that focuses on whether Free Conferencing properly paid for NAT's services. The evidence adduced at trial demonstrates that Free Conferencing did not obtain End User Access Service under § 4.1 of NAT's interstate tariff because NAT did not calculate or bill Free Conferencing for the local exchange service described in § 5.2 of NAT's Tribal tariff. NAT's theory ignores the explicit requirements of its tariffs and contracts and relies, instead, on unwritten and unverifiable amendments to those documents. Similarly, NAT did not pass-through USF contributions to Free Conferencing as required by its interstate tariff, and NAT has not shown that it offered Free Conferencing a variety of non-tariffed services under an "all-inclusive" rate. Also, the flow of money between NAT and Free Conferencing favors Free Conferencing. As described in section II.B.1, *supra,* the fact that NAT billed Free Conferencing for something that NAT labeled "End User Fees" does not immunize the NAT-Free Conferencing relationship from scrutiny.

Regarding the other factors, there is considerable evidence that NAT did not treat Free Conferencing like a typical customer and that NAT's agreements with Free Conferencing do not resemble traditional agreements for the provision of tariffed service. Although NAT removed the exclusivity clause from its agreements with Free Conferencing and NAT attempted to make USF contributions, those two factors do not outweigh the others.

**CONCLUSION**

The NAT-Free Conferencing relationship does not resemble a normal carrier-customer relationship. Rather, it resembles a relationship between business partners attempting to operate in a manner only superficially consistent with the FCC's rules and regulations. Consequently, because Free Conferencing was not an "end user" or "customer" as defined in NAT's interstate tariff number 3, NAT did not properly bill Sprint for switched access services regarding calls delivered to Free Conferencing. Thus, it is

ORDERED that judgment will be entered in favor of Sprint and against NAT in accordance with this memorandum opinion and order.

IT IS FURTHER ORDERED that NAT's motion for judicial notice (Docket 311) is denied.

IT IS FURTHER ORDERED that NAT's motion to supplement the record (Docket 315) is denied.

Dated August 4, 2016.

BY THE COURT:

*/s/Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE